



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHAL D. KENNEDY, SR.                    )
2941 Master Street                      )
Philadelphia, PA 19121                  )
                                        )
CLEVIS BURRIS                           )
2056 Morris Street                      )
Philadelphia, PA 19145                  )
                                        )
ANDREW WEBB                             )
Curran-Fromhold Correctional Facility   )
7901 State Road                         )
Philadelphia, PA 19136                  )
                                        )
BRIAN KENNEDY                           )
Curran-Fromhold Correctional Facility   )
7901 State Road                         )
Philadelphia, PA 19136                  )
                                        )
CHARLES CLARK                           )
Curran-Fromhold Correctional Facility   )
7901 State Road                         )
Philadelphia, PA 19136                  )
                                        )
DARNELL CUNNINGHAM                      )
Curran-Fromhold Correctional Facility   )
7901 State Road                         )
Philadelphia, PA 19136                  )
                                        )
DAVID WOODWARD                          )
Curran-Fromhold Correctional Facility   )
7901 State Road                         )
Philadelphia, PA 19136                  )
                                        )
EARL REEDMAN                            )
Curran-Fromhold Correctional Facility   )
7901 State Road                         )
Philadelphia, PA 19136                  )
                                        )
EVAN JORDAN                             )

**13    2678**

FILED

MAY 16 2013

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
JEROME POLISON )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )

JIMMY THOMPSON )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
JOĀN VASQUEZ )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
KENNETH COLLINS )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
KEVIN BENJAMIN )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
LARCELL WAGSTAFF )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
LUIS LOPEZ )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
MARCELLO FOY )
Curran-Fromhold Correctional Facility )
7901 State Road )
Philadelphia, PA 19136 )
)
RAHEEM PLEASANT )
Curran-Fromhold Correctional Facility )

7901 State Road          )
Philadelphia, PA 19136       )
                )
RONALD SMITH         )
Curran-Fromhold Correctional Facility  )
7901 State Road          )
Philadelphia, PA 19136       )
                )
THOMAS DANIELS       )
Curran-Fromhold Correctional Facility  )
7901 State Road          )
Philadelphia, PA 19136       )
                )
WALTER PERSON        )
Curran-Fromhold Correctional Facility  )
7901 State Road          )
Philadelphia, PA 19136       )
                )
WILLIAM ALLEN        )
Curran-Fromhold Correctional Facility  )
7901 State Road          )
Philadelphia, PA 19136       )
                )
WARREN EVANS         )
Curran-Fromhold Correctional Facility  )
7901 State Road          )
Philadelphia, PA 19136       )
     Plaintiffs,       )
                )
v.               ) No. 13-CV-_____
                )
                )
                )
ARAMARK HOLDINGS CORPORATION[1] )
1101 Market Street         )
Philadelphia, PA 19107       )
                )
ARAMARK CORPORATION     )
1101 Market Street         )
Philadelphia, PA 19107       )
                )
ARAMARK CORRECTIONAL SERVICES, INC. )
c/o ARAMARK CORPORATION    )

---

[1]For the sake of clarity, all the ARAMARK Defendants will be referred to as "ARA-MARK."

3

1101 Market Street )
Philadelphia, PA 19107 )
)
ARAMARK CORRECTIONAL SERVICES, LLC )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
ARAMARK CORRECTIONAL FACILITY SERVICES, INC. )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
WALTER FLAHERTY, GENERAL MANAGER, ARAMARK )
In His Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
ROSS[2], SUPERVISOR, ARAMARK )
In His Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
VERONICA LEMON, SUPERVISOR, ARAMARK )
In Her Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"MAKEBBA[3]", SUPERVISOR, ARAMARK )
In Her Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"DAVE[4]", SUPERVISOR, ARAMARK )
In His Individual and Official Capacities )

---

[2]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[3]This is a phonetic identification only. The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[4]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

4

c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"ROB[5]", SUPERVISOR, ARAMARK )
In His Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"DENISE[6]", SUPERVISOR, ARAMARK )
In His Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"TINETTA[7]", SUPERVISOR, ARAMARK )
In His Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"JOHN DOES" – ARAMARK EMPLOYEES )
In Their Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
"JANE DOES" – ARAMARK EMPLOYEES )
In Their Individual and Official Capacities )
c/o ARAMARK CORPORATION )
1101 Market Street )
Philadelphia, PA 19107 )
)
CORIZON HEALTH, INC. )
f/k/a PHS CORRECTIONAL HEALTHCARE, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)

---

[5]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[6]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[7]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

MARY SILVA, VICE PRESIDENT OF OPERATIONS )
CORIZON HEALTH, INC. )
In Her Individual and Official Capacities )
c/o CORIZON HEALTH, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)
DR. EKE KALU, REGIONAL MEDICAL DIRECTOR )
CORIZON HEALTH, INC. )
In His Individual and Official Capacities )
c/o CORIZON HEALTH, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)
BARBARA MCKENNEDY-ADAMS, NURSE )
CORIZON HEALTH, INC. )
In Her Individual and Official Capacities )
c/o CORIZON HEALTH, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)
HELEN[8], PA )
CORIZON HEALTH, INC. )
In Her Individual and Official Capacities )
c/o CORIZON HEALTH, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)
"JOHN DOES" – CORIZON HEALTH, INC., EMPLOYEES )
In Their Individual and Official Capacities )
c/o CORIZON HEALTH, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)
"JANE DOES" – CORIZON HEALTH, INC., EMPLOYEES )
In Their Individual and Official Capacities )
e/o CORIZON HEALTH, INC. )
105 Westpark Drive, Suite 200 )
Brentwood, TN 37027-5010 )
)
CITY AND COUNTY OF PHILADELPHIA )
c/o City Law Department )
1515 Arch Street, 14th Floor )

---

[8]Upon reasonable belief Plaintiffs aver that this Defendant is a Caucasian female of Russian descent.

6

Philadelphia, PA 19102-1595                               )
                                                          )
LOUIS GIORLA, COMMISSIONER,                               )
In His Individual and Official Capacities                 )
c/o PHILADELPHIA PRISON SYSTEM                            )
7901 State Road                                           )
Philadelphia, PA 19136                                    )
                                                          )
DR. BRUCE HERDMAN, CHIEF MEDICAL OFFICER                  )
In His Individual and Official Capacities                 )
c/o PHILADELPHIA PRISON SYSTEM                            )
7901 State Road                                           )
Philadelphia, PA 19136                                    )
                                                          )
JOHN P. DELANEY, WARDEN                                   )
In His Individual and Official Capacities                 )
c/o PHILADELPHIA PRISON SYSTEM                            )
7901 State Road                                           )
Philadelphia, PA 19136                                    )
                                                          )
CLYDE D. GAINEY, DEPUTY WARDEN                            )
In His Individual and Official Capacities                 )
c/o PHILADELPHIA PRISON SYSTEM                            )
7901 State Road                                           )
Philadelphia, PA 19136                                    )
                                                          )
DEPUTY WARDEN FOR ADMINISTRATION                          )
In His/Her Individual and Official Capacities             )
c/o PHILADELPHIA PRISON SYSTEM                            )
7901 State Road                                           )
Philadelphia, PA 19136                                    )
                                                          )
GERALD MAY[9], DEPUTY WARDEN                              )
In His Individual and Official Capacities                 )
c/o PHILADELPHIA PRISON SYSTEM                            )
7901 State Road                                           )
Philadelphia, PA 19136                                    )
                                                          )
CORRECTIONAL OFFICER WHITTAKER[10]                        )

---

[9]Upon reasonable belief, Plaintiffs allege that this Defendant is a Major having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[10]Upon reasonable belief, Plaintiffs allege that this Defendant is a Major having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

7

In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER MOORE[11] )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
FREDERICK ABELLOS, DEPUTY WARDEN )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER DEAN[12] )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER GLOVER[13] )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER BARKSDALE[14] )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )

---

[11] Upon reasonable belief, Plaintiffs allege that this Defendant is a Major having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[12] Upon reasonable belief, Plaintiffs allege that this Defendant is a Lieutenant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[13] Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[14] Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

Philadelphia, PA 19136                                      )
                                                            )
CORRECTIONAL OFFICER BENTLY[15]                             )
In His Individual and Official Capacities                   )
c/o PHILADELPHIA PRISON SYSTEM                              )
7901 State Road                                             )
Philadelphia, PA 19136                                      )
                                                            )
CORRECTIONAL OFFICER BROWN[16]                              )
In His Individual and Official Capacities                   )
c/o PHILADELPHIA PRISON SYSTEM                              )
7901 State Road                                             )
Philadelphia, PA 19136                                      )
                                                            )
CORRECTIONAL OFFICER BALMORE[17]                            )
In His Individual and Official Capacities                   )
c/o PHILADELPHIA PRISON SYSTEM                              )
7901 State Road                                             )
Philadelphia, PA 19136                                      )
                                                            )
CORRECTIONAL OFFICER JAY[18]                                )
In His Individual and Official Capacities                   )
c/o PHILADELPHIA PRISON SYSTEM                              )
7901 State Road                                             )
Philadelphia, PA 19136                                      )
                                                            )
CFCF D-1 HOUSING UNIT MANAGEMENT TEAM[19]                   )
In Their Individual and Official Capacities                 )
c/o PHILADELPHIA PRISON SYSTEM                              )
7901 State Road                                             )

---

[15]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[16]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[17]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[18]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[19]Upon reasonable belief, Plaintiffs allege that these Defendants have supervisory authority over other correctional officers and were personally present during the constitutional violations complained about at all times relevant hereto.

9

Philadelphia, PA 19136                                         )
                                                              )
CORRECTIONAL OFFICER BARNETT                                  )
In His Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER CARTER                                   )
In His Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER LEFTWICH                                 )
In Her Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER THOMAS                                   )
In His Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER GRAHAM                                   )
In Her Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER PERRY                                    )
In His Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER MILTON                                   )
In His Individual and Official Capacities                     )
c/o PHILADELPHIA PRISON SYSTEM                                )
7901 State Road                                               )
Philadelphia, PA 19136                                        )
                                                              )
CORRECTIONAL OFFICER GAINEY                                   )
In Her Individual and Official Capacities                     )

c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER ROSS )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER KENNEDY )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER STILES )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER WILLIAMS )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER LEE )
In His Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER BRANCH )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER LESLIE )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)

CORRECTIONAL OFFICER SMITH )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER WILSON )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER BRADLEY )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
CORRECTIONAL OFFICER ANDERSON )
In Her Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
)
"JOHN DOES" – PHILADELPHIA PRISON SYSTEM )
In Their Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136; and )
)
"JANE DOES" – PHILADELPHIA PRISON SYSTEM )
In Their Individual and Official Capacities )
c/o PHILADELPHIA PRISON SYSTEM )
7901 State Road )
Philadelphia, PA 19136 )
                    Defendants. )

## CIVIL ACTION COMPLAINT

This is a civil rights action brought by Plaintiffs seeking injunctive relief, declaratory relief,

medical monitoring, damages and punitive damages against the named Defendants for violations

of their constitutional and other federally guaranteed and protected rights; additional relief is

sought under state law.

## I. JURISDICTION

1. This action is brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986 and 1988, and First, Fifth, Fourteenth Amendments to the United States Constitution, other constitutional provisions, federal statutes and state tort laws.

2. Jurisdiction is also based upon 28 U.S.C. §§ 1331 and 1343 and the aforementioned statutory and Constitutional provisions.

## II. EXHAUSTION

3. To the extent that Plaintiffs were required to exhaust any administrative remedies, they have exhausted those remedies by filing grievances for every issue raised in this Complaint.

## III. PARTIES

4. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 3, as though they are fully set forth herein.

5. Plaintiff, Chal D. Kennedy, Sr. ("Mr. Kennedy, Sr." or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Kennedy, Sr. was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

6. Plaintiff, Clevis Burris ("Mr. Burris" or "Plaintiff"), is an African-American male adult resident of the Commouwcalth of Pennsylvauia. At all times rclevant here, Mr. Burris was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

7. Plaintiff, Andrew Webb ("Mr. Webb" or "Plaintiff"), is an African-American malc adult resident of thc Commonwealth of Pennsylvania. At all times relevant here, Mr. Wcbb

was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

8. Plaintiff, Brian Kennedy ("Mr. B. Kennedy" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. B. Kennedy was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

9. Plaintiff, Charles Clark ("Mr. Clark" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Clark was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

10. Plaintiff, Darnell Cunningham ("Mr. Cunningham" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Cunningham was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

11. Plaintiff, David Woodward ("Mr. Woodward" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Woodward was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

12. Plaintiff, Earl Reedman ("Mr. Reedman" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Reedman was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

14

13. Plaintiff, Evan Jordan ("Mr. Jordan" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Jordan was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

14. Plaintiff, Jerome Polison ("Mr. Polison" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Polison was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

15. Plaintiff, Jimmy Thompson ("Mr. Thompson" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Thompson was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

16. Plaintiff, Joån Vasquez ("Mr. Vasquez" or "Plaintiff") is a Hispanic male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Vasquez was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

17. Plaintiff, Kevin Benjamin ("Mr. Benjamin" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Benjamin was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

18. Plaintiff, Kenneth Collins ("Mr. Collins" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr.

15

Collins was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

19. Plaintiff, Larcell Wagstaff ("Mr. Wagstaff" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Wagstaff was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

20. Plaintiff, Luis Lopez ("Mr. Lopez" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Lopez was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

21. Plaintiff, Marcello Foy ("Mr. Foy" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Foy was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

22. Plaintiff, Raheem Pleasant ("Mr. Pleasant" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Pleasant was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

23. Plaintiff, Ronald Smith ("Mr. Smith" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Smith was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

16

24. Plaintiff, Thomas Daniels ("Mr. Daniels" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Daniels was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

25. Plaintiff, Walter Person ("Mr. Person" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Person was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

26. Plaintiff, William Allen ("Mr. Allen" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Allen was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

27. Plaintiff, Warren Evans ("Mr. Evans" or "Plaintiff"), is an African-American male adult resident of the Commonwealth of Pennsylvania. At all times relevant here, Mr. Evans was imprisoned in the City and County of Philadelphia Prison System's ("PPS") Curran-Fromhold Correctional Facility ("CFCF").

28. Defendant, ARAMARK HOLDINGS CORPORATION ("Defendant ARAMARK HOLDINGS"), a Delaware Corporation, through its subsidiary, provides a range of managed services to business, educational, healthcare, and governmental institutions; and sports, entertainment, and recreational facilities worldwide. Defendant ARAMARK HOLDINGS was incorporated in 2007 and is based in Philadelphia, Pennsylvania. At all times relevant hereto, Defendant ARAMARK HOLDINGS, through one or more of its

17

subsidiaries, by contract, provided food and related facility management services to Defendants, City of Philadelphia and Philadelphia Prison System.

29. Defendant, ARAMARK CORPORATION ("Defendant ARAMARK CORPORATION"), a Delaware Corporation, subsidiary of Defendant ARAMARK HOLDINGS, provides a range of managed services to business, educational, healthcare, and governmental institutions; and sports, entertainment, and recreational facilities worldwide. Defendant ARAMARK CORPORATION was incorporated in 2007 and is based in Philadelphia, Pennsylvania. At all times relevant hereto, Defendant ARAMARK CORPORATION, through one or more of its subsidiaries, by contract, provided food and related facility management services to Defendants, City of Philadelphia and Philadelphia Prison System.

30. Defendant, ARAMARK CORRECTIONAL SERVICES, INC. ("Defendant ARAMARK CORRECTIONAL SERVICES, INC."), a Delaware Corporation, subsidiary of Defendant ARAMARK HOLDINGS, provides a range of managed services to business, educational, healthcare, and governmental institutions; and sports, entertainment, and recreational facilities worldwide. Defendant ARAMARK CORRECTIONAL SERVICES, INC. was incorporated in 1994 and is based in Philadelphia, Pennsylvania. At all times relevant hereto, Defendant ARAMARK CORRECTIONAL SERVICES, INC., by contract, provided food and related facility management services to Defendants, City of Philadelphia and Philadelphia Prison System.

31. Defendant, ARAMARK CORRECTIONAL SERVICES, LLC ("Defendant ARAMARK CORRECTIONAL SERVICES, LLC"), a Delaware Corporation, subsidiary of Defendant ARAMARK HOLDINGS, provides a range of managed services to business, educa-

tional, healthcare, and governmental institutions; and sports, entertainment, and recreational facilities worldwide. Defendant ARAMARK CORRECTIONAL SERVICES, LLC was incorporated in 2007 and is based in Philadelphia, Pennsylvania. At all times relevant hereto, Defendant ARAMARK CORRECTIONAL SERVICES, LLC, by contract, provided food and related facility management services to Defendants, City of Philadelphia and Philadelphia Prison System.

32. Defendant, ARAMARK CORRECTIONAL FACILITIES SERVICES, INC. ("Defendant ARAMARK CORRECTIONAL FACILITIES SERVICES, INC."), a Delaware Corporation, subsidiary of Defendant ARAMARK HOLDINGS, provides a range of managed services to business, educational, healthcare, and governmental institutions; and sports, entertainment, and recreational facilities worldwide. Defendant ARAMARK CORREC-TIONAL FACILITIES SERVICES, INC. was incorporated in 1996 and is based in Philadelphia, Pennsylvania. At all times relevant hereto, Defendant ARAMARK CORREC-TIONAL FACILITIES SERVICES, INC., by contract, provided food and related facility management services to Defendants, City of Philadelphia and Philadelphia Prison System.

33. Defendant, Ross[20] ("Defendant ROSS") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant ROSS acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant ROSS is being sued in his individual and official capacities because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

---

[20]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

19

34. Defendant, Veronica Lemon ("Defendant LEMON") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant LEMON acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant LEMON is being sued in his individual and official capacities because she personally subjected Plaintiffs to the nnlawful actions and conditions described in this Complaint.

35. Defendant, "Makebba[21]" ("Defendant MAKEBBA") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant MAKEBBA acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant MAKEBBA is being sued in her individual and official capacities because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

36. Defendant, "Dave[22]" ("Defendant DAVE") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant DAVE acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant DAVE is being sued in his individual and official capacities because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

37. Defendant, "Roh[23]" ("Defendant ROB") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant ROB acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant ROB is being sued in his individual and official capacities because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

---

[21]This is a phonetic identification only. The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[22]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[23]The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

38. Defendant, "Denise[24]" ("Defendant DENISE") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant DENISE acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant DENISE is being sued in her individual and official capacities because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

39. Defendant, "Tinetta[25]" ("Defendant TINETTA") is an ARAMARK supervisory employee at PPS. At all times relevant hereto, Defendant TINETTA acted as an agent, servant or employee of Defendant ARAMARK at PPS. Defendant TINETTA is being sued in her individual and official capacities because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

40. Defendant CORIZON HEALTH, INC. ("Defendant CORIZON"), is a Delaware corporation which has a principal place of business in Brentwood, Tennessee. At all times relevant to this lawsuit, Defendant CORIZON regularly conducted business in Philadelphia, PA, and was the holder of a contract to provide all medical services to inmates in the PPS and was acting under the color of state law within the scope and course of its employment at the PPS, and was under the direct control and supervision of Defendant CITY OF PHILADELPHIA. Further, at all times relevant hereto, Defendant CORIZON was a recipient of federal funds (Title VI) and state funds to facilitate its county correctional medical activities and programs, including, but not limited to the provision of medical services to pretrial detainees and inmates.

---

[24]This is a phonetic identification only. The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

[25]This is a phonetic identification only. The true identification and spelling of this Defendant's name will determined at a later date and will be substituted accordingly.

41. Defendant, Mary Silva ("Defendant SILVA"), is a Vice President at Defendant, CORI-ZON. At all times relevant hereto, Defendant SILVA was a policy-maker and was personally responsible for the delivery of and quality of the medical services provided to prisoners at PPS such as Plaintiff. Defendant SILVA is being sued in her individual and official capacities because she personally subjected Plaintiff to the unlawful actions and conditions described in this Complaint.

42. Defendant, Dr. Eke Kalu ("Defendant KALU"), is a Regional Medical Director at Defendant, CORIZON. At all times relevant hereto, Defendant KALU was a policy-maker and was personally responsible for the delivery of and quality of the medical services provided to prisoners at PPS such as Plaintiff. Defendant KALU was under the direct supervision of Defendant SILVA. Defendant KALU is being sued in his individual and official capacities because he personally subjected Plaintiff to the unlawful actions and conditions described in this Complaint.

43. Defendant, Barbara McKennedy-Adams ("Defendant ADAMS"), is a Nurse at Defendant, CORIZON. At all times relevant hereto, Defendant ADAMS was personally responsible for the provision of medical services to prisoners at PPS such as Plaintiffs. Defendant ADAMS was under the direct supervision of Defendants SILVA and KALU. Defendant ADAMS is being sued in her individual and official capacities because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

22

44. Defendant, Helen[26] ("Defendant HELEN"), is a Physician Assistant at Defendant. CORIZON. At all times relevant hereto, Defendant HELEN was personally responsible for the provision of medical services to prisoners at PPS such as Plaintiffs. Defendant HELEN was under the direct supervision of Defendants SILVA and KALU. Defendant HELEN is being sued in her individual and official capacities because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

45. Defendants, "John Does" ("Defendant JOHN DOES"), are a health services worker employed by Defendant CORIZON. At all times relevant hereto, Defendants JOHN DOES was personally responsible for the provision of medical services to prisoners PPS such as Plaintiff. Defendants "JOHN DOES" were under the direct supervision of Defendants SILVA and KALU. Defendants JOHN DOES are being sued in their individual and official capacities because they personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

46. Defendants, "Jane Does" ("Defendant JANE DOES"), are a health services worker employed by Defendant CORIZON. At all times relevant hereto, Defendants JANE DOES was personally responsible for the provision of medical services to prisoners PPS such as Plaintiff. Defendants "JANE DOES" were under the direct supervision of Defendants SILVA and KALU. Defendants JANE DOES are being sued in their individual and official capacities because they personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

47. Defendant, City and County of Philadelphia ("Defendant CITY OF PHILADELPHIA"), is a municipality organized by and through the Commonwealth of Pennsylvania that di-

---

[26]Upon reasonable belief Plaintiffs aver that this Defendant is a Caucasian female of Russian descent.

23

rects, manages and controls the Philadelphia Prison System ("PPS"), and employs the in-
dividually named PPS and contacts with the ARAMARK, and CORIZON Defendants.

48. Defendant, Louis Giorla ("Defendant GIORLA"), is the Commissioner of the PPS. At all
times relevant hereto, Defendant GIORLA was employed by the City of Philadelphia in
his capacity as Commissioner at PPS. Defendant GIORLA is being sued in his individual
and official capacities because he was personally involved in developing and implement-
ing the customs, policies and practices and subjected Plaintiffs to the unlawful actions
and conditions described in this Complaint.

49. Defendant, Dr. Bruce Herdman ("Defendant HERDMAN"), is the Chief Medical Officer
of the Philadelphia Prison System ("PPS"). At all times relevant hereto, Defendant
HERDMAN was personally responsible for the delivery of and quality of the medical,
behavioral health and dental services provided to prisoners such as Plaintiffs. Defendant
HERDMAN is being sued in his individual and official capacities because he personally
subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

50. Defendant, John Delaney ("Defendant DELANEY"), was the Warden at CFCF. At all
times relevant hereto, Defendant DELANEY was employed by the City of Philadelphia
in his capacity as Warden at CFCF and under the direct control and supervision of De-
fendants, CITY OF PHILADELPHIA and GIROLA. Defendant DELANEY is being
sued in his individual and official capacities because he was personally involved in de-
veloping and implementing the customs, policies and practices and subjected Plaintiffs to
the unlawful actions and conditions described in this Complaint.

51. Defendant, Clyde D. Gainey ("Defendant GAINEY"), is a PPS Deputy Warden at CFCF.
At all times relevant hereto, Defendant GAINEY was employed by the City of Philadel-

24

phia in PPS and under the direct control and supervision of Defendants CITY OF PHIL-
ADELPHIA, GIROLA and DELANEY. Defendant GAINEY is being sued in his indi-
vidual and official capacities because he was personally involved in developing and im-
plementing the customs, policies and practices and subjected Plaintiffs to the unlawful
actions and conditions described in this Complaint.

52. Defendant, Deputy Warden of Administration ("Defendant DEPUTY WARDEN OF
ADMINISTRATION"), is a PPS Deputy Warden at CFCF. At all times relevant hereto,
Defendant DEPUTY WARDEN OF ADMINISTRATION was employed by the City of
Philadelphia in PPS and under the direct control and supervision of Defendants CITY OF
PHILADELPHIA, GIROLA and DELANEY. Defendant DEPUTY WARDEN OF
ADMINISTRATION is being sued in his/her individual and official capacities because
he/she was personally involved in developing and implementing the customs, policies
and practices and subjected Plaintiffs to the unlawful actions and conditions described in
this Complaint.[27]

53. Defendant, Gerald May ("Defendant MAY"), is a PPS Deputy Warden at CFCF. At all
times relevant hereto, Defendant MAY was employed by the City of Philadelphia in PPS
and under the direct control and supervision of Defendants CITY OF PHILADELPHIA,
GIROLA, GAINEY and DELANEY. Defendant MAY is being sued in his individual
and official capacities because he was personally involved in developing and implement-
ing the customs, policies and practices and subjected Plaintiffs to the unlawful actions
and conditions described in this Complaint.

---

[27]The identity of this Defendant is presently unknown. However, he/she is responsible for
the review and processing of Inmate Medical Grievances.

54. Defendant, Whittaker ("Defendant WHITTAKER"), is a PPS Major at CFCF. At all times relevant hereto, Defendant WHITTAKER was employed by the City of Philadelphia in PPS and under the direct control and supervision of Defendants CITY OF PHILA-DELPHIA, GIROLA and DELANEY. Defendant WHITTAKER is being sued in his individual and official capacities because he was personally involved in developing and implementing the customs, policies and practices and subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

55. Defendant Moore ("Defendant MOORE"), is a PPS Major at CFCF. At all times relevant hereto, Defendant MOORE was employed by the City of Philadelphia in PPS and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIROLA and DELANEY. Defendant MOORE is being sued in her individual and official capacities because she was personally involved in developing and implementing the customs, policies and practices and subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

56. Defendant, Frederie Abellos ("Defendant ABELLOS"), is a PPS Deputy Warden at CFCF. At all times relevant hereto, Defendant ABELLOS was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, DEPUTY WARDEN OF ADMINISTRATION and MAY. Defendant ABELLOS is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

26

57. Defendant, Dean[28] ("Defendant DEAN"), is a PPS Lieutenant at CFCF. At all times relevant hereto, Defendant DEAN was employed by the City of Philadelphia in PPS and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIROLA and DELANEY. Defendant DEAN is being sued in her individual and official capacities because she was personally involved in developing and implementing the customs, policies and practices and subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

58. Defendant, Glover[29] ("Defendant GLOVER"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant GLOVER was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant GLOVER is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

59. Defendant, Barksdale[30] ("Defendant BARKSDALE"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant GLOVER was acting as an agent, servant,

---

[28]Upon reasonable belief, Plaintiffs allege that this Defendant is a Lieutenant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[29]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[30]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant GLOVER is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint

60. Defendant, Bently[31] ("Defendant BENTLY"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant BENTLY was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, MAY and ABELLOS. Defendant BENTLY is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

61. Defendant, Brown[32] ("Defendant BROWN"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant BROWN was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY,

---

[31]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[32]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

MAY and ABELLOS. Defendant BROWN is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

62. Defendant, Balmore[33] ("Defendant BALMORE"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant BALMORE was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, MAY and ABELLOS. Defendant BALMORE is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

63. Defendant, Jay[34] ("Defendant JAY"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant JAY was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, MAY and ABELLOS. Defendant JAY is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

---

[33]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

[34]Upon reasonable belief, Plaintiffs allege that this Defendant is a Sergeant having supervisory authority over other correctional officers and was personally present during the constitutional violations complained about at all times relevant hereto.

29

64. Defendants, CFCF D-1 HOUSING UNIT MANAGEMENT TEAM,[35] at all times relevant hereto, Defendants CFCF D-1 HOUSING UNIT MANAGEMENT TEAM were employed by Defendant CITY OF PHILADELPHIA in their capacities at CFCF and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendants CFCF D-1 HOUSING UNIT MANAGEMENT TEAM are being sued in their individual and official capacities because they was personally involved in developing and implementing the customs, policies and practices subjected Plaintiffs to the unlawful actions and conditions described in this Complaint. Plaintiffs reasonably believe and aver that Defendants CFCF D-1 HOUSING UNIT MANAGEMENT TEAM a lieutenant, who serves as the UNIT manager, and a sergeant, as well as treatment and clerical staff.

65. Defendant, Barnett ("Defendant BARNETT"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant BARNETT was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant BARNETT is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

---

[35]Upon reasonable belief, Plaintiffs allege that these Defendants have supervisory authority over other correctional officers and were personally present during the constitutional violations complained about at all times relevant hereto.

66. Defendant, Carter ("Defendant CARTER"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant CARTER was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant CARTER is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

67. Defendant, Leftwich ("Defendant LEFTWICH"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant LEFTWICH was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant LEFTWICH is being sued in her individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

68. Defendant, Graham ("Defendant GRAHAM"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant GRAHAM was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA,

DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant GRAHAM is being sued in her individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

69. Defendant, Perry ("Defendant PERRY"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant PERRY was acting as au agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the eolor of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant PERRY is being sued in his individual and official eapacity because he personally subjeeted Plaintiffs to the unlawful actions and conditions described in this Complaint.

70. Defendant, Milton ("Defendant MILTON"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant MILTON was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and eourse of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant MILTON is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

71. Defendant, Gainey ("Defendant GAINEY"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant GAINEY was acting as an agent, servant, and/or em-

32

ployee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant GAINEY is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

72. Defendant, Kennedy ("Defendant KENNEDY"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant KENNEDY was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant KENNEDY is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

73. Defendant, Stiles ("Defendant STILES"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant STILES was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. De-

33

fendant STILES is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

74. Defendant, Williams ("Defendant WILLIAMS"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant WILLIAMS was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant WILLIAMS is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

75. Defendant, Lee ("Defendant LEE"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant LEE was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant LEE is being sued in his individual and official capacity because he personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

76. Defendant, Branch ("Defendant BRANCH"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant BRANCH was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of his employment at PPS, and under the direct

34

control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant BRANCH is being sued in her individual and official capacity because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

77. Defendant, Leslie ("Defendant LESLIE"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant LESLIE was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant LESLIE is being sued in her individual and official capacity because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

78. Defendant, Smith ("Defendant SMITH"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant SMITH was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant SMITH is being sued in her individual and official capacity because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

79. Defendant, Wilson ("Defendant WILSON"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant WILSON was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant WILSON is being sued in her individual and official capacity because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

80. Defendant, Bradley ("Defendant BRADLEY"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant BRADLEY was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant BRADLEY is being sued in her individual and official capacity because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

81. Defendant, Anderson ("Defendant ANDERSON"), is a PPS Correctional Officer at CFCF. At all times relevant hereto, Defendant ANDERSON was acting as an agent, servant, and/or employee of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of her employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA,

36

DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendant ANDERSON is being sued in her individual and official capacity because she personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

82. Defendants, "JOHN DOES" Philadelphia Prison System ("PPS"), Correctional Officers ("Defendants JOHN DOES"). At all times relevant hereto, numerous Defendants JOHN DOES were acting as an agents, servants, and/or employees of Defendant CITY OF PHILADELPHIA and was acting under the color of state law within the scope and conrse of their employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendants JOHN DOES are being sued in their individual and official capacities because they personally subjected Plaintiffs to the unlawful actions and conditions described in this Complainr.

83. Defendants, "JANE DOES" Philadelphia Prison System ("PPS"), Correctional Officers ("Defendants JANE DOES"). At all times relevant hereto, numerous Defendants JANE DOES were acting as an agents, servants, and/or employees of Defendants CITY OF PHILADELPHIA and was acting under the color of state law within the scope and course of their employment at PPS, and under the direct control and supervision of Defendants CITY OF PHILADELPHIA, GIORLA, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS. Defendants JANE DOES are being sued in their individual and official capacities because they personally subjected Plaintiffs to the unlawful actions and conditions described in this Complaint.

37

## IV. FACTS

**A Deplorable Culture of Corporate Negligence, Medical Malpractice, Deliberate Indifference, Fraudulent and Deceptive Practices In The Mistreatment of Prisoners By CORIZON HEALTH, INC.**

84. Plaintiff hereby incorporates by reference, Paragraphs 1 through 84, as though they are fully set forth herein.

85. In May 2010, Prison Health Services, Inc.[36] ("PHS") was the provider of healthcare throughout the PPS.

86. In fact, on December 8, 2009, Richard Hallworth, as CEO of CORIZON f/k/a PHS, personally negotiated and signed a "Standard Amendment Agreement," which expired on August 31, 2010.

87. Defendant, CORIZON HEALTH, INC., is a newly formed company as the result of merger between PHS Correctional Healthcare, Inc. (American Service Group, Inc.) and Correctional Medical Services (Valitás Health Services, Inc.).

88. According to the Wall Street Journal, at the time of the merger, the combined company had about 11,000 employees and revenues of more than $1.4 Billion.

89. According to PHS Correctional Healthcare, Inc. and Correctional Medical Services, the new company, CORIZON HEALTH, INC.:

> Brings together today's best-in-class correctional healthcare companies with the vision and commitment to become even better tomorrow… Within the talented people and systems of Corizon are a wealth of expertise, the latest in methodology and technology, and economies of scale – all working on behalf of the clients we serve and the patients in our care.

---

[36]Previously identified as PHS Correctional Healthcare, Inc.

Is firmly centered around service – to our clients, our patients and our employees…
the insight of unparalleled experience assisting our client partners, and caring pro-
fessionals serving the unique healthcare needs of patients.

Provides qnality healtheare services at over 400 correetional facilities across the
country serving approximately 400,000 inmates in 31 states.

90. However, the truth of the matter is that PHS Correctional Healthcare, Inc., American
Service Group, Inc., Correctional Mcdical Serviee, and Valitás Health Services, Inc. now,
CORIZON f/k/a PHS, have a deplorable record of corporate ncgligence. medical mal-
practice and deliberate indifference in tbc provision of hcalth carc serviccs to prisoners
and prctrial detainees throughout the United States and has a history and a repntation of
customarily cutting corners in the provision of prisoner health care to maintain high prof-
its.

91. According to CORIZON HEALTII, INC.'s organizational chart, Richard Hallworth con-
trols the company, and all corporate officers, and other decision and policy-making offi-
cials al CORIZON f/k/a/ PHS must rcport dircctly of Richard Hallworth.

92. Further, every decision to hire, firc and disciplinc every employee, eontractor and sub-
contractor at CORIZON HEALTII, INC., PHS, CORIZON f/k/a/ PHS must be approved
by Richard Hallworth.

93. At times relevant hcreto, according "Corizon News: Corizon Announces New Chief
Nursing Officer," dated January 18, 2012. Defendant CORIZON, Rebecca Pinney, was
the Director of Nursing at PPS and directly involviug with the corporate supervision of
the delivery of and management of medical services at PPS, other Defcndants sueh as
Defendants SILVA and KALU reported dircctly to Ms. Pinney.

94. Defendant CORIZON also posted on its website statcments about Mr. Hallworth and Ms.
Pinney.

95. At times relevant hereto, according Defendant CORIZON, Mr. Hallworth has the final say for recruiting and hiring CORIZON employees at PPS such as Defendants SILVA and KALU.

96. Upon reasonable belief, Plaintiffs aver that Defendant CORIZON knows that some of the statements posted on its website are sheer prevarication intended to mislead and does mislead the public about Defendant CORIZON.

97. At all times relevant hereto, Defendant CORIZON engaged in Interstate Commerce.

98. Since 1991, the companies that make up CORIZON have been sued more than 8,500 times for corporate negligence, medical malpractice and deliberate indifference in the provision of health care services to prisoners and pretrial detainees.

99. In Philadelphia County, Plaintiffs reasonably believe and aver that CORIZON's companies have been sued more than 800 times for corporate negligence, medical malpractice and deliberate indifference in the provision of health care services to prisoners and pretrial detainees.

100. In the few months that Defendant, CORIZON HEALTH, has been in existence, as of May 1, 2013, there were more than 300 lawsuits pending against it for corporate negligence, medical malpractice and deliberate indifference in the provision of health care services to prisoners and pretrial detainees in Philadelphia County.

101. In response to the large number of lawsuits, and taking absolutely no responsibility for the culture of medical malpractice, corporate negligence and deliberate indifference in the provision of health care services to prisoners and pretrial detainees, one of the company's lawyers deadpanned that that number of lawsuits were due to inmates having "access to the law library and a lot of time on their hands."

40

102. Nationwide, CORIZON's corporate negligence, medical malpractice and deliberate indifference in the provision of health care services to prisoners and pretrial detainees has been well documented:[37]

   a. In 1995, a federal court monitor in Pinellas County, Florida found that PHS provided "inadequate medical care despite a federal judge's orders and the sheriff's insistence" – this report was part of an investigation into the death 46-year-old Diane C. Nelson who died of a heart attack when PHS medical staff refused to give her heart medication.

   b. On July 18, 1996, The New York Times reported that EMSA Correctional Care's $10.2 Million contract with Westchester County Jail was cancelled after a 17-year-old female patient committed suicide shortly after an EMSA psychiatrist stopped her antidepressant medications.

   c. On May 31, 1996, after an investigation into the death of an inmate at the Santa Barbara County Mail Jail, a County Grand Jury found:

      1) PHS drastically reduced its offer by $96,000.00 per contract year to acquire a contract to deliver health care services to county inmates;

      2) PHS failed to provide a procedure manual and operation protocol for the county jail.

      3) PHS failed to provide nurse staffing levels in accord with the terms of the contract and actually lowered the staffing levels without the county's knowledge;

      4) PHS failed to deliver certain on-site services at another county jail;

---

[37]In a recent case, Defendant CORIZON denied each of these allegations in its answer to an Amended Complaint; however, when its corporate officers were asked during depositions to provide information to prove CORIZON's denials, they could provide none; not an iota of evidence.

5)    PHS had not attained the necessary medical accreditations from the California Medical Association;

6)    PHS was assessed a $25,000.00 penalty for not being accredited;

7)    PHS failed to provide 14-Day health appraisals of county inmates in accord with the terms of the contract; and

8)    PHS failed to examine pregnant inmates in a timely manner, if at all.

d.    A 1998 in-depth investigative report by the *St. Louis Post-Dispatch*, then CORI-ZON'S hometown newspaper, shed light on the downside of prison care privatization. The *St. Louis Post-Dispatch*'s investigative team spent five months "visiting prisons and jails; gathering hundreds of police, court and medical records and other documents; and interviewing doctors, nurses, inmates, lawyers, scholars, prison and health experts and families of inmates who died behind bars." Published in September 1998, "Death, Neglect and the Bottom Line: Push to Cut Costs Poses Risks." found that while CMS successfully reduced the cost of health care to several states, there were "more than 20 cases in which inmates allegedly died as a result of negligence, indifference, understaffing, inadequate training or overzealous cost-cutting."

e.    In 1998, the Minnesota Department of Corrections contracted with CMS for health care services in its state's prisons. According to the *Twin Cities Independent Media Center*, the local chapter of the NAACP called a press conference in mid-October 2001 to publicize a lawsuit "over the death of Gregory Jennings, who died in Stillwater prison on April 6, 2001 because the medical staff was indifferent to his complaints of symptoms of diabetes."

42

f.   In 1999, after 19-year-old Georgia county prison inmate, Alfonza Robertson, died of either an aneurysm or a blood clot, his grandmother complained that PHS neglected her grandson and "let [him] lay there and die like an animal without just listening to [him];"

g.   In late-January 2001, the ACLU posted on its website a late-January 2001 letter it sent to the Connecticut Department of Correction (CDOC) that claims CMS's health care services -- medical, mental health and dental care -- at the Wallens Ridge State Prison in Big Stone Gap, Virginia is woefully "inadequate."   The ACLU writes: "The health care provided by Correctional Medical Services, the contract provider at [Wallens Ridge], was considered so grossly inadequate that [Virginia Department of Corrections] recently fined CMS nearly one million dollars. The Virginia State Auditor specifically found that CMS did not provide a dentist at [Wallens Ridge] for over three months, and never provided an optometrist. Medical privacy and confidentiality is non-existent at [Wallens Ridge]; as a matter of policy, prisoners are required to discuss their most private medical and mental health issues in the presence of security staff and other prisoners."

h.   In 2003, a Correctional Medical Authority (CMA) survey of mental health medical services at Taylor CI in Florida found 15 deficiencies by PHS in the mental health area of its Taylor CI survey.   Significant findings included "three to four month delays in obtaining psychiatric evaluations for inmates demonstrating symptoms of serious mental illness, lack of timely confinement evaluations of close management inmates, missing documentation of observation of suicidal inmates, and lack of consistently documented responses to psychological emergencies."

43

i.  In 2004, PHS was sued for the death a premature infant that was born at a Florida
    county jail;

j.  In 2004, the Florida Attorney General demanded that PHS and American Service
    Group, Inc. repay more than $3.25 Million Dollars in fraudulent Medicare claims;

k.  In 2004, while under PHS's care, Florida county jail inmate Patrick Bilello died of
    severe emaciation and anemia;

l.  In 2005, CORIZON's negligent hiring a medical director was cited as the chief rea-
    son for the death of 47-year-old Arkansas county prison inmate, Larry Morris, Sr.
    In their complaint, the plaintiffs alleged that the doctor was "incompetent and indif-
    ferent to patients' need." Ironically, the dismissed medical director, Dr. Craig
    Bardell was cited for medical malpractice in 2002 Pennsylvania prison lawsuit that
    was settled for $2.15 Million Dollars;

m.  On February 27, 2005, *The New York Times* published "Harsh Medicine: As Health
    Care Goes Private, 10 Days Can Be Death Sentence," outlining numerous lapses in
    medical treatment by PHS's employees that lead to numerous inmate deaths in sev-
    eral states.

n.  On March 7, 2005, in response to *The New York Times* article, then-PHS Chairman,
    Michael Catalano deadpanned: "[W]e learn from mistakes and take proper correc-
    tive action as part of our continuous quality improvement process."

o.  On August 1, 2005, *The New York Times* published another article reminding the
    public of PHS's "turbulent record in many of the 33 states where it has provided jail
    or prison medicine." There, *The New York Times* focuses the lack of treatment for
    H.I.V. patients in the Alabama prison system by PHS and the fact that PHS had

been fined $580,000.00 by the state of Alabama for failing to meet performance

standards.

p.   On August 15, 2005, a Committee of The Association of the Bar of the City of New

York opined:

> The Committee is, of course, particularly disturbed by the description of su-
> icides of persons with mental health conditions who were allowed to deteri-
> orate and decompensate while held in an environment in which Prison
> Health was the sole provider of healthcare services....

> Reckless and unprincipled in its corporate pursuits, irrespective of patient
> care, and added that [t]he lack of credentials, lack of training, shocking in-
> competence and outright misconduct of the doctors and nurses in that par-
> ticular case were emblematic of P.H.S., Inc.'s conduct as a business corpo-
> ration, holding himself out as a medical care provider while seemingly be-
> reft of any quality control.

> That corporation has consistently followed a practice of providing inade-
> quate services for the purpose of reducing expenses, and ... numerous fatali-
> ties have resulted from this practice. Obviously, the Committee has become
> very concerned that, among other things, inmates with serious mental ill-
> nesses are being overlooked for the sake of cutting costs.

q.   On June 21, 2006, *The Billings Gazette* reported that the State of Wyoming paid

$50,000 to settle a federal lawsuit brought by a former Wyoming prison inmate who

blamed the state Department of Corrections and a private company, Correctional

Medical Services, which provided medical care to inmates for the loss of his lower

right leg.  Former inmate, Salvatore Lucido, a diabetic, filed the lawsuit in April

2004 alleging that he developed sores on his feet when the medical staff at the state

prison in Rawlins refused to give him appropriate shoes.  Lucido claimed that Cor-

rectional Medical Services and prison officials delayed taking him to a hospital

where his foot might have been saved.

r.   On October 18, 2006, the State of Florida Office of Inspector General's Bureau of

Internal Audit issued the findings of its audit of Prison Health Service's contract

45

(Contract Number S6149 – Prison Health Services at Taylor CI) wherein it concluded that PHS owed the state a refund of $579,631.00 in inmate per diem overpayments for inmates that were not housed at the prison, but for whom the state was billed by PHS.

s.   In 2007, 50-year-old Florida county jail inmate, James Johnson was taken off "legally prescribed medicals he had taken for years for his clinical depression, including the anti-depressant Paxil, anti-psychotic Seroquel and the sedative Trazodone" by PHS medical staff. Shortly thereafter, Johnson attempted to commit suicide by running into the concrete walls of his cell – headfirst.

t.   On June 7, 2007, *The St. Louis Post-Dispatch* reported that, according to a blistering report by the fire department, a delay in letting paramedics into the city jail and "substandard" emergency care by Correctional Medical Services' staff there may have doomed an inmate who suffered an asthma attack,. One of the paramedics who treated LaVonda Kimble early April 11, 2007 wrote of commonly encountering delays and apathy on calls to the St. Louis Justice Center.

u.   On June 8, 2007, a County Circuit Court in Virginia found that a *pro se* inmate was a third-party beneficiary to the contract for medical services between PHS and the Commonwealth of Virginia, and permitted his breach of contract and cruel and unusual punishment claims to proceed to trial.

v.   In 2009, 23-year-old Vermont state prison inmate Ashley Ellis died because PHS failed to stock potassium and woefully understaffed the prison's medical unit – all Defendants settled that lawsuit.

46

w.    On September 30, 2009, *The News Journal* of Wilmington, Delaware reported, that despite spending more than $130 million over three years, Delaware's prison system continues to provide health care to inmates that falls short of federal requirements, according to a report issued by an independent monitor.  The State of Delaware entered into the agreement with the federal government following a series of articles in 2005 by *The News Journal* that pointed to problems with prison health care and high inmate death rates, especially from AIDS. Other findings by the newspaper's six-month investigation included an outbreak of flesh-eating bacteria and an inmate's massive brain tumor -- largely ignored by staff -- which led to his death.  Problems listed in a 210-page report include a "lack of stable and effective leadership" by CORIZON, an ongoing problem listed in previous reports.  Other problems cited include shortages of mental health counselors and psychiatrists, incomplete annual staffing plans, poor treatment plans and a continued lack of space that results in inadequate privacy. In response, CORIZON officials said in an e-mail they were reviewing the monitor's findings and recommendations.

x.    On October 14, 2009, *The News Journal* of Wilmington, Delaware reported that after years of criticism and a federal investigation, state officials announced they will let their contract with Correctional Medical Services ("CMS") expire and try to find a new provider.  The Delaware Department of Correction announced it will take bids for a new contract with modifications it hopes will provide better care, including breaking the contract into smaller pieces to allow multiple companies to provide more specialized service. The new contract will also have a "shared risk," with the DOC paying for certain costs in order to prevent medical providers from limiting

47

inmate care in order to maximize their profits. "The Department of Correction has used the last few months to prepare for and make an informed decision about this [Request for Proposals]," Commissioner of Correction Carl Danberg said. "We have reviewed the best practices from other states and interviewed medical experts from around the country in an effort to develop a better contracting model for prison health services. In addition, the department has interviewed correctional healthcare professionals to identify and eliminate the impediments to competition, which existed in previous contracts." The Delaware DOC has come under scrutiny for its care of inmates in Delaware prisons. Delaware entered into the agreement with the federal government following a series of articles in 2005 by *The News Journal* that pointed to problems with prison health care and high inmate death rates, especially from AIDS. Other findings by the newspaper's six-month investigation included an outbreak of flesh-eating bacteria and an inmate's massive brain tumor -- largely ignored by staff   which led to his death. Independent reports as a result of the agreement with the federal government repeatedly pointed out that CMS suffers from a "lack of stable and effective leadership."

y.     On July 18, 2010, *The New York Times* reported that a PHS doctor, Dr. Trevor P. Parks, "in charge of medical care for 12,000 New York City jail inmates abruptly resigned last week after questions arose about his professional certification." During the doctor's tenure, the New York City corrections commission criticized PHS for a "pattern of providing are that repeatedly harmed inmates with acute physical or mental illnesses."

48

z.  On October 12, 2010, the American Civil Liberties Union filed a wrongful death lawsuit over the death of a jail inmate in St. Louis, Courtland Lucas, claiming he did not get proper care for a heart condition. Lucas died at the St. Louis City Justice Center in May 2009, five days after he was jailed on a probation violation. According to the lawsuit, Lucas had chronic heart disease and was wearing a pacemaker when taken into custody. The lawsuit contends Correctional Medical Services failed to provide proper medications or care for Lucas.

aa. November 19, 2010, *The St. Louis Post-Dispatch* reported that, "medical care [by Correctional Medical Services] in city jails, already the subject of wrongful-death lawsuits, was challenged… with an ACLU claim that an HIV-positive inmate was deprived of his medications for 17 days and got only sporadic care thereafter. A lawsuit filed in federal court by the American Civil Liberties Union of Eastern Missouri alleges that the John Doe plaintiff was deprived of his rights at both the Justice Center downtown and the Medium Security Institution on Hall Street."

bb. On March 18, 2011, a federal jury awarded a former county inmate $1.2 Million after PHS was found liable for not treating MRSA abscesses on his spine (see Fields v. Corizon Health, Inc., 09-CV-529 (M.D.Fla., 2009). PHS' medical staff told the inmate he had a staph infection and muscle strain, and simply prescribed Tylenol.

cc. In 2011, 26-year-old Kentucky county jail inmate Anthony Dwayne Davis died after PHS nurses refused to treat him and stated that Davis was "manipulating the system" – the nurses had their licenses suspended by Kentucky Board of Nursing.

dd. On March 18, 2011, after deliberating roughly four hours, a Middle District of Florida federal jury awarded Bret Allen Fields, Jr., North Fort Myers man, $1.2 million

49

after he became paralyzed at the Perry County jail in 2007, finding the jail's medical provider, PHS, solely responsible. The jury found that PHS was deliberately indifferent to Mr. Allen's medical needs by only prescribing Tylenol.

ee. On March 31, 2011, *6NBC South Florida* reported that PHS settled a lawsuit for $500,000.00 that alleged its medical staff at Broward Correctional Institution in Fort Lauderdale, Florida failed to provide proper medical treatment for a "bipolar, clinically depressed with psychotic features" 18-year-old female inmate who committed suicide. On June 8, 2011, *NPR* highlighted the lawsuit on its *ROOT* program (see The Root: Inmate Health Care Another Kind of Prison, www.npr.org/2011/06/08/ 137055836/the-root-inmate-health-care).

ff. On May 25, 2011, *The New York Times* reported that the City of New York paid $2 Million to settle a lawsuit in the death of an inmate where PHS's employees exhibited deliberate indifference and the inmates' death "may have been prevented had he received timely medical diagnosis and treatment."

gg. On June 6, 2011, it was reported by *The Spokesman-Review*, a local newspaper in Idaho, that Correctional Medical Services was fined $382,000 for failing to provide the South Boise Women's Correctional Center without an OB/GYN for two years and failing to provide the Idaho Maximum Security Institution with a staff psychologist for at least eight months – during those periods the state had to pay for off-site health care;

hh. In a November 2011 Government Oversight Committee, Office of Program Evaluation & Government Accountability of Maine State Legislature issued its Final Report: *Health Care Services in State Correctional Facilities – Weaknesses Exist in*

50

*MDOC's Monitoring of Contractor Compliance and Performance: New Administration is Undertaking Systemic Change*, wherein it found that found that Correctional Medical Services did not always comply with contract provisions requiring adherence to MDOC policies – even in the accredited facilities. Adherence to professional standards for medical care was also lacking in some areas. The Final Report noted that some prisoners did not receive standard medical services, such as physicals, dental services or sick call response within the timeframe required by MDOC's contracts. Persistent issues with proper administration of prescribed medications were also noted.

ii.     On February 2, 2012, in the most scathing indictment of CORIZON to date, Dr. Mark Stern, a health care expert appointed by a federal court judge in Idaho in the long-running case of Balla, *et al.* v. Idaho State Board of Correction, 81-CV-01165 (BLW (D.Idaho, Feb. 2, 2012) concluded in a 94-page report that the medical care provided by CORIZON at an Idaho state prison amounts to cruel and unusual punishment, amongst the deplorable findings were:

1)     inmates who were terminal or required long-term care and were unable to move on their own were sometimes left in soiled linens, given inadequate pain medication and went periods without food and water;

2)     medical staffers routinely failed to bring basic parts of resuscitation device – a ventilator mask for recue breathing – to inmates experiencing medical emergencies;

3)     medical staffers not telling an inmate that he had cancer for seven months;

4)    routinely denying inmates access to emergency medical services by denying
      medical care by telling guards to have the inmates make the care request the
      following day;

5)    the death of an inmate because a CORIZON nurse failed to check vital signs
      and give him oxygen;

6)    the report cited numerous other cases of deliberate indifference by CORIZON
      and PHS;

7)    the report also found that CORIZON failed 23 of 33 audit categories in 2010 –
      and despite feedback and follow-up – failed 26 of 33 categories in 2011.

jj.   On February 17, 2012, a jury awarded a former SCI-Albion inmate $312,000 after
      concluding that PHS provided negligent medical care.

kk.   There are at least two other lawsuits alleging medical malpractice or negligence by
      PHS at SCI-Albion in death and mistreatment of inmates.

ll.   Recently, a class of inmates at two New Mexico prisons filed suit against a doctor
      employed by CORIZON alleging that the doctor engaged in overly long, unprotect-
      ed "digital anal penetration and probing and stimulation of the genitals."

mm. On November 28, 2012, *The Guardian* newspaper in Oakland, California, reported
      that Kayvan Sabeghi, 33, a war veteran who claims he was falsely arrested, beaten,
      and almost died due to neglect in an Oakland prison has launched legal action
      against the jail, claiming his pleas for help were ignored. Sabeghi was arrested dur-
      ing an Occupy rally in Oakland, California, in November last year. Video footage
      shows him being beaten with batons and he suffered a lacerated spleen that almost
      killed him after he was left without treatment for 18 hours in prison. On arrival at

52

the prison Sabeghi told medical officers that he had been beaten by police and he offered to show them his injuries. CORIZON's staff is accused of refusing to look at Sabeghi's injuries. The suit claims that his condition deteriorated and that despite showing severe distress and vomiting, Sabeghi did not receive treatment for 18 hours and was mocked by prison guards who dismissed his suffering as heroin withdrawal symptoms. It further claims that one officer filmed Sabeghi as he lay on the floor in agony and vomiting. By the time his friends posted his bail, at 2pm the following day, he was so ill he could not lift himself from the concrete floor of his cell. Four hours later his friends came to the prison to get him out and an ambulance was called. The suit further claims that a medical staffer did take Sabeghi's blood pressure but reported, wrongly, that he was a diabetic and alcoholic and sought no further treatment for him. But the authorities in Oakland have rejected the claims.

103. Since 1995, CORIZON f/k/a PHS has held a contract to provide physical healthcare services, including dental, hospital, laboratory, optometry, pharmacy, and specialist services, to inmates at correctional facilities throughout the City of Philadelphia in the Philadelphia Prisons Systems (PPS).

104. The contract was originally valued at $35.9 million per year and has since been increased through yearly amendments, reaching a total current value of $196 million per year.

105. Defendant, CORIZON f/k/a PHS, has repeatedly shown deliberate indifference through its failure to properly examine, diagnose and treat inmates in the PPS for years:

   a.   In 1997, Dr. Robert L. Cohen, a medical expert, examined the prison health care system for an attorney representing the inmates. He found that half the prisoners

53

who request medical care do not get it. The nursing staff had falsified medical records. He found that some patients died following inadequate psychiatric treatment.

b.   The family of Luis Manuel Soto brought suit after his December 28, 1998 death. According to the complaint, Soto was admitted to CFCF on November 7, 1998. About six weeks later, on December 21, 1998, he complained to a nurse about shortness of breath and chest pains. A PHS doctor ordered Ben Gay and Tylenol. Another PHS doctor took X-rays of Soto's chest, but "no abnormal findings were noted." Over the next several days, PHS nurses told Soto to reapply Ben Gay when he complained of pain. On December 28, 1998, Soto requested to see a doctor because of severe pain in his chest and lungs and dizziness. He was never examined. The next day, Soto was found lying on the floor, not breathing. An autopsy revealed that a tear in his aorta allowed blood to seep into his heart.

c.   In late spring and early summer 2000, Truemanna Collins Howland, a PPS Corrections Officer, essentially watched her son, Derrick F. Collins, die in the very prison she worked. The younger Collins was arrested and housed at Detention Center on April 10, 2000 until he died on June 14, 2000. During that period of time, he was repeatedly denied medications for his HIV-related meningitis   despite submitting several sick-call slips wherein Collins repeatedly mentioned that his back and neck ached so badly that he could hardly walk and that his head ached. A PHS doctor concluded Collins was "faking and was full of shit" according to a correctional officer who overheard these comments. Even after Collins' outside doctor's office phoned the prison to confirm his illness, PHS doctors continued to ignore Collins' condition. Collins' health continued to deteriorate. Numerous sick-call requests

54

failed to result in treatment. On June 7, 2000, his mother found him "slumped" over and in a "catatonic state." Finally, he was carried out of the prison on a stretcher to Temple University Hospital. He never recovered and died on June 14, 2000. In a statement to Philadelphia City Council, Ms. Howland, lamented: "I know the death of my son Derrick F. Collins, which occurred on June 14, 2000, was a direct result of total medical negligence in every conceivable form."

d.   In June 2000, the family of Stewart Jones filed a lawsuit against the city and PHS. According to the complaint, Jones had at least eight seizures while he was waiting to be processed by police. He was then taken to CFCF, where a PHS doctor examined him. While Stewart was in the infirmary, he drank an entire bottle of rubbing alcohol. Even though he was completely unconscious, according to the complaint, doctors allowed guards to carry him back to a holding cell, where he died.

e.   According to wrongful death lawsuit filed against PHS, Santiago Perez was arrested September 13, 2000, and taken to the Roundhouse for processing. He told PHS nurses that be was a type I diabetic. While waiting to be arraigned, Perez complained to nurses of vomiting, nausea, chills and other signs of severe insulin deficiency. He was given a dosage of insulin on September 14, 2000, and transferred to the general population at CFCF the next day. Santiago Perez "repeatedly informed prison personnel that he was sick and in need of immediate medical attention," the complaint says. They did nothing. On September 16, 2000, around 5:45 a.m., Perez was found semi-conscious in his cell. His glucose level was 497, his heart rate was 96 and his blood pressure was undetectable. He was pronounced dead less than an hour later.

55

f.   In 2001, two independent medical consultants, Drs. Robert Greifinger and Raymond Patterson, issued reports concluding gross medical neglect in Philadelphia jails. They found inmates waiting as long as eight weeks to be seen in the chronic care clinic, despite a contractual requirement that inmates be seen within 14 days. The reports also found that PHS failed to screen and treat all inmates for sexually transmitted diseases, as required; that inmates are routinely released from jail without a three- to five-day supply of medication, as the contract specifies; and that inmates with mental-health referrals are being neglected. The doctors also concluded that a PHS "understaffing crisis" contributed to lax suicide watches, delays in treatment and messy record-keeping. *They also found that CORIZON f/k/a PHS medical staff did not process inmate sick call slips in a timely manner.* According to local newspapers, the city opted not to impose sanctions on PHS for violating the terms of its contract, and it even continued to pay the company for vacant staff positions.

g.   In 2002, an inmate, Shawn Ruppert, with a history of seizures was assigned to a top bunk by medical staff at CFCF and fell off the top bunk sustaining serious injuries.

h.   In 2004, Osvaldo Bermudez, "an insulin-dependent diabetic with a medically diagnosed condition that weakens his leg bones" was denied bottom bunk status at CFCF by CORIZON f/k/a PHS medical staff; subsequently, "[w]hile [using a chair to climb down from the top bunk]], 'the chair slipped from under his legs and he fell' Bermudez 'landed on the cemented floor in an awkward position causing him to suffer severe, permanent and debilitating injuries.'"

56

i.  On February 27, 2005, *The New York Times* published "Harsh Medicine: As Health Care Goes Private, 10 Days Can Be Death Sentence," outlining numerous lapses in medical treatment by PHS's employees that lead to numerous inmate deaths in several states and observed: "[i]n Philadelphia jails, state and federal court monitors in the late 1990's told of potentially dangerous delays and gaps in treatment and medication for inmates under Prison Health…"

j.  In 2009, a class of female inmates brought suit against CORIZON f/k/a PHS alleging that the corporation failed to provide basic medical testing to properly detect MRSA, which caused the women long-term injury. Defendants, City of Philadelphia and CORIZON f/k/a PHS settled the lawsuit for an unknown sum of money.

k.  In 2010, PPS inmate George Heard almost died due to the negligent and deliberate indifference of CORIZON's f/k/a PHS nurses at PPS who simply ignored his serious medical symptoms for more three weeks and told him he just needed Pepto Bismol while he bleed internally into his lungs and nearly drowned on his own blood. Fortunately, Mr. Heard was transported to a private hospital just in time to have life-saving surgery. Defendants, City of Philadelphia and CORIZON f/k/a PHS settled Mr. Heard's lawsuit.

l.  Recently, another PPS inmate, Thomas Warren, brought suit making some claims strikingly similar to Mr. Spearman. In particular, it is alleged that Defendant, Dr. Mandel refused to examine him after PPS failed to transport him to the appointment in a timely manner.

m.  Currently, there is a lawsuit pending in this federal district court alleging that CORIZON f/k/a/ PHS's medical staff negligently and deliberately indifferently

57

failed to discover that an inmate was a male after numerous medical examinations –
that inmate was housed in the women's county prison for more than 16 months
where he sexually abused, and maybe impregnated one female prisoner.

n.   At least two female prisoners at RCF were severely beaten by the male prisoner
from January 1, 2011 through May 10, 2011. Each the beating occurred either a
day after or with five days of strip searches of all inmates at RCF.

o.   In past two years, several PPS inmates with broken bones have come forward to de-
scribe rancid acts of corporate negligence and deliberate indifference. Several of
these inmates are represented by Plaintiffs' counsel who has put Defendants on no-
tice of the inmates' injuries and their intent to sue under the Ku Klux Klan Act of
1871.

p.   Other inmates and former inmates have come forward to share their horrifying ex-
periences at the hands of Defendant CORIZON. Last year, a former Riverside Cor-
rectional Facility female inmate told the *Philadelphia Daily Newspaper* that she
was "treated like a dog" by CORIZON's medical staff during a 16-day imprison-
ment because they did not provide her with proper medical care for ongoing com-
plications from a May 2000 car accident (the Social Security Administration deter-
mined that she was permanently disabled in August 2001) and allowed to her suffer
excoriating pain, great humiliation and morphine withdrawal, that resulted in her
hospitalization. Her further complaints were met with a retaliatory placement on
the prison Psych Ward by Defendants CITY OF PHILADELPHIA and CORI-
ZON's employees.

58

q.    Defendants CITY OF PHILADELPHIA and CORIZON's employees have a cus-
      tom, policy and practice of placing inmates who complaint about the lack proper
      and timely medical treatment on the prison Psych Wards.

r.    Defendants CITY OF PHILADELPHIA and CORIZON's employees' custom, poli-
      cy and practice of placing inmates who complaint about the lack proper and timely
      medical treatment at PPS on the prison Psych Wards violates due process, equal
      protection, the First, Fifth and Fourteenth Amendments to the United States because
      it deters reasonable inmates from complaining about the lack proper and timely
      medical treatment at PPS.

106. As part of it PPS contract, CORIZON was supposed to provide medical and pharmaceuti-
     cal supplies through an approved certified minority-, women- or disabled-owned vendors
     ("M/W/DSBE") subcontractor.

107. According to an investigation by the City of Philadelphia Office of Inspector General
     ("OIG"), "PHS used a pass-through woman owned business entity (WBE) to circumvent
     the City's minority, women, and disabled business entities (M/W/DSBE) requirements
     outlined in Mayoral Executive Order 02-05."

108. The OIG "investigation found that PHS contravened the City's anti-discrimination poli-
     cies by subcontracting with an Iudiana based first-aid supplier, JHK Inc., d.b.a. American
     Safety & First Aid (JHK), a pass-through WBE that was not approved by the City to pro-
     vide the services that it was engaged to perform, and in fact provided no commercially
     acceptable function. PHS also submitted paperwork that inflated JHK's role to represent
     compliance with the City's anti-discrimination policies."

59

109. "If PHS could not meet the M/W/DSBE participation ranges after making a showing to the City of a good faith effort, the City could grant a reduction in participation ranges. From May 2006 through March 2012, PHS never made a good faith showing or applied for a participation reduction. Instead, PHS attempted to meet the M/W/DSBE participation ranges by using a pass-through. In May 2006, PHS finalized a subcontract with JHK to provide pharmaceutical services as part of the PPS contract."

110. PHS repeatedly stated that it paid JHK, Inc. 40 percent of the value of its $196 million-a-year health-care contract.

111. "In exchange for the use of its name, PHS paid JHK 1% of the value of pharmaceutical services under the contract.  PHS passed this 1% cost of the use of JHK's name to the City through monthly invoices that PHS submitted to the City, resulting in a loss to the City of over $400,000."

112. "JHK performed no commercially acceptable function as required by the City's anti-discrimination policies."

113. "The OIG investigation found that Secure Pharmacy Plus, LLC. (Secure Pharmacy Plus), a Tennessee based entity sharing the same parent corporation as PHS, subcontracted with JHK and provided pharmaceutical services to the PPS until April 30, 2007."

114. On April 30, 2007, Maxor National Pharmacy Services Corp. ("Maxor") and America Service Group, Inc. announced that they have executed an asset purchase agreement for the sale of certain assets of Secure Pharmacy Plus an indirect subsidiary of America Service Group, Inc., to Maxor.  As a part of the transaction, Maxor and PHS, America Service Group's primary operating subsidiary, entered into a long-term pharmacy services

agreement pursuant to which Maxor will become the provider of pharmaceuticals and medical supplies to PHS.

115. "The OIG investigation further found that, from 2007 to 2011, PHS submitted provider agreements, monthly MBE listings, Solicitation for Participation and Commitment Forms, and correspondence to the City with incorrect information as to JHK's role. The documents represented that PHS contracted with JHK and paid JHK approximately 40% of the total contract amount for its services. However, from September 2008 through August 2011, PHS's required monthly invoices revealed that PHS never paid JHK 40% of the total contract amount. PHS's general ledgers reflecting money allocated by PHS each month demonstrate that from October 2007 to December 2011, JHK did not receive the 40% that PHS represented on the documentation provided to the City. Instead, JHK received a check each month from PHS for less than 1% of the contract price for services separately provided by Maxor simply for the use of its name on City contracting documents. Moreover, the $206,896 PHS paid JHK between September 2008 and August 2011 is far less than the $23,739,525.13, which PHS certified to the City on its monthly MBE reports submitted with its monthly invoices as money directly allocated to PHS's M/W/DSBEs for that period."

116. Prior to PHS using a pass-through woman owned business entity (WBE) to circumvent the City's minority, women, and disabled business entities (M/W/DSBE) requirements outlined in Mayoral Executive Order 02-05, decision-making officials at PHS, CORI-ZON f/k/a/ PHS, Secure Pharmacy Plus and JHK, Inc. entered into unlawful agreements with each other and their respective corporate entities to submit fraudulent and deceptive provider agreements, monthly MBE listings, MBE reports, Solicitation for Participation

61

and Commitment Forms, monthly invoices and correspondence to co-Defendant, City of Philadelphia, with incorrect information as to JHK's role.

117. Each month from October 2007 to December 2011, decision-making officials at PHS, CORIZON f/k/a/ PHS, Secure Pharmacy Plus and JHK, Inc. entered into unlawful agreements with each other and their respective corporate entities to submit fraudulent and deceptive provider agreements, monthly MBE listings, MBE reports, Solicitation for Participation and Commitment Forms, monthly invoices and correspondence to the City with incorrect information as to JHK's role.

118. Each month from October 2007 to December 2011, decision-making officials at PHS, CORIZON f/k/a/ PHS, Secure Pharmacy Plus and JHK, Inc. used interstate private and public communications facilities to knowingly or intentionally facilitate the commission of their fraud to submit fraudulent and deceptive provider agreements, monthly MBE listings, MBE reports, Solicitation for Participation and Commitment Forms, monthly invoices and correspondence to the City with incorrect information as to JHK's role.

119. Each month from October 2007 to December 2011, decision-making officials at PHS, CORIZON f/k/a/ PHS, Secure Pharmacy Plus and JHK, Inc. unlawfully entered into agreements with each other to falsely state to their co-Defendant, City of Philadelphia that the companies were providing medical and pharmaceutical supplies that were not provided.

120. Prior to setting the fraudulent scheme in motion, and each month from October 2007 to December 2011, decision-making officials at CORIZON f/k/a/ PHS, Secure Pharmacy Plus and JHK, Inc. reached a knowing and deliberate agreement amongst themselves to unlawfully enter into agreements with each other to falsely state to their co-Defendant,

62

City of Philadelphia, that the companies were providing medical and pharmaceutical supplies that were not provided.

121. As a result of the fraud, PHS, CORIZON f/k/a/ PHS and Secure Pharmacy Plus and its parent corporation fraudulently earned nearly $78,000,000.00.

122. After PHS was caught lying, cheating and stealing, its co-Defendant, City of Philadelphia, slapped them on the wrist with a headline grabbing, but meaningless $1.85 million fine.

123. That $1.85 million fine is only 0.0237 percent of the ill-gotten profits, and 0.0094 percent of the total value of the $196 million-a-year health-care contract.

124. After PHS's fraud made national headlines, CORIZON f/k/a/ PHS and Secure Pharmacy Plus, LLC, put their *spin machines* to work and stated that they fully cooperated in the investigation.

125. There was no mention of PHS, CORIZON f/k/a/ PHS and Secure Pharmacy Plus' nearly $78,000,000.00 in illegal profits.

126. Also not mentioned was the harm to PPS inmates due to the lack of adequate medical and pharmaceutical supplies that resulted from PHS, CORIZON f/k/a/ PHS and Secure Pharmacy Plus' lying, cheating and stealing.

127. As outlined herein, over the course of their dealings with the City of Philadelphia, Plaintiffs reasonably believe and aver that Defendants CORIZON has developed a reputation for engaging in numerous fraudulent schemes that have been the subject of multi-million dollar stockholder lawsuits[38], and attorney generals, legislative, federal monitor inquiries,

---

[38] See Plumbers and Pipefitters Local 51 Pension Fund, et al. v. American Service Group, Inc., et al., 06 CV-00323 (M.D.Tenn. 2012)(settling stockholder fraud case for $15 million

newspaper and scholarly articles and Defendants CORIZON has been fined millions of dollars for its misdeeds.

## A Deplorable Culture of Deliberate Indifference, Commercial Exploitation and Mistreatment of Prisoners By Defendant, City of Philadelphia

128. Plaintiff hereby incorporates by reference, Paragraphs 1 through 127, as though they are fully set forth herein.

129. Notwithstanding the deplorable culture of corporate negligence and deliberate indifference in the mistreatment of prisoners by Defendant CORIZON, Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS and city other policy and decision-makers, motivated mostly by their desire to hire the lowest cost prison healthcare provider, in deliberate indifference to the welfare and constitutional rights of Mr. Spearman and thousands of prisoners similarly situated, repeatedly contracted with Defendant CORI-ZON.

130. By the time Defendant CITY OF PHILADELPHIA, entered the contract with Defendants, PHS Correctional Healthcare, Inc. and CORIZON f/k/a PHS that resulted in the injuries to Plaintiffs, Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS and other city policy and decision-makers knew of Defendant CORIZON's deplorable culture of deliberate indifference, but simply ignored it and chose the lowest bidder for inmate healthcare services without regard to Defendant CORIZON's, deplorable culture of deliberate indifference and corporate negligence.

---

where the plaintiffs alleged that the company falsely overstated its profits to induce them to invest). American Service Group, Inc. is no longer a publicly traded company.

131. According to information posted on PPS's Website, PPS has a "Policy and Audit Division (PAD), under the supervision of Commissioner of Prisons, and Chief Counsel, has been given the responsibility of providing the Philadelphia Prison System (PPS) staff guidance by developing comprehensive policies and procedures and assisting in training programs. The PAD assists correctional administrators by identifying organizational lapses and deficiencies. In addition, the PAD assists managers in planning, developing, implementing and constantly improving operational strategies and protects the public by conducting security audits and unannounced system checks...."

132. Plaintiffs reasonably believe and aver that, to date, Defendants, CORIZON, CITY OF PHILADELPHIA, HERDMAN, GIORLA and other city policy and decision-makers within the government of the City of Philadelphia have recklessly and in deliberate indifference his rights, not investigated and/or audited Defendant CORIZON for the quality of the healthcare services that it delivers at PPS.

133. Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS and city other policy and decision-makers failures to investigate and/or audit Defendant CORIZON for the quality of the healthcare services that they deliver at PPS have existed in spite of hundreds of lawsuits against them and Defendant CORIZON alleging corporate negligence, deliberate indifference and medical malpractice.

134. Instead, Defendant GIORLA[39] attempts to defend the lack of constitutionally required medical care by, in part, claiming in a recent *Philadelphia Daily Newspaper* interview

_____

[39] His uninformed by reference was to a recent female inmate's complaint the lack of treatment for severe pain that required morphine. According the U.S. National Library of Medicine and the National Institutes of Health, "Morphine is used to relieve moderate to severe pain.

that "prisons deal with a large number of substance-addicted people who experience withdrawal."

135. Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS and other city employees, agents and servants have a well-known and well-documented history of entering into agreements with private corporations and individuals that allow those private corporations and individuals to exploit Plaintiffs and other inmates for private profit.

136. Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS and other city employees, agents and servants knew or should have known that the ARAMARK Defendants would exploit Plaintiffs and other inmates for private profit, but in deliberate indifference to the rights of Plaintiffs and other inmates entered into agreements with the ARAMARK Defendants anyway.

137. The ARAMARK Defendants did exploit Plaintiffs and other inmates for private profit by compelling them to work for pennies while being exposed to toxic chemicals for years.

138. During the time the ARAMARK Defendants exploited Plaintiffs and other inmates for private profit by compelling them to work for pennies while being exposed to toxic chemicals for years, the ARAMARK Defendants made millions of dollars in profits.

139. Plaintiffs reasonably believe and aver that, to date, Defendants CITY OF PHILADELPH-IA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-

---

Morphine long-acting tablets and capsules are only used by patients who are expected to need medication to relieve moderate to severe pain around-the-clock for longer than a few days. Morphine is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the body senses pain." http://www.nlm.nih.gov/medlineplus /druginfo/meds/a682133. htnml#why.

ISTRATION, MAY and ABELLOS and other city policy and decision-makers within the government of the City of Philadelphia have recklessly and in deliberate indifference their rights, not investigated and/or audited Defendant ARAMARK's compliance with workplace safety rules and regulations at PPS.

140. Plaintiffs reasonably believe and aver that, to date, Defendants CITY OF PHILADELPH-IA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY and ABELLOS and other city policy and decision-makers within the government of the City of Philadelphia have recklessly and in deliberate indifference their rights, failed to properly hire, train and discipline their employees at PPS; instead, when it has become to known to them that their employees have acted with deliberate in-difference to the rights of inmates, Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS and other city policy and decision-makers within the government of the City of Philadelphia simply transfer those employees with well-known histories of abusive behavior to other locations, as if they are the Catholic Church transferring dan-gerous priests with well-known histories of abusive behavior.

**A Deplorable Culture of Deliberate Indifference, Private Corporation Exploitation and the Mistreatment of Prisoners By Defendant ARAMARK**

141. Plaintiff hereby incorporates by reference, Paragraphs 1 through 140, as though they are fully set forth herein.

142. Plaintiffs reasonably believe and aver that since 1991 the ARAMARK Defendants have contracted with the CITY OF PHILADELPHIA Defendants to provide food services and

67

related management services throughout the PPS, and that contract was in existence at all times relevant hereto.

143. Plaintiffs reasonably believe and aver that even if the ARAMARK Defendants are not state actors, based upon their pleadings the ARAMARK Defendants have conspired with the other Defendants who are, without question, state actors; and, therefore, for the purposes of this lawsuit the ARAMARK Defendants have acted under the color of state law.

144. Even though the ARAMARK Defendants' contract with the City of Philadelphia pays them millions of dollars, it is allowed to make excessive profits by the exploiting imprisoned laborers who are compelled to work for TWENTY-ONE CENTS ($.21) PER HOUR for the same work that unionized laborers are paid approximately TWELVE DOLLARS ($12.00) PER HOUR to do.[40]

145. Additionally, the ARAMARK Defendants would be compelled to comply with all the state and federal work place safety rules regarding the use of toxic chemicals, including, but not limited to proving training and proper clothing to its employees, and decontamination to its employees if they were exposed to toxic chemicals, if they could not exploit imprisoned laborers.

146. In its food service operation, related operations and maintenance activities at PPS, the ARAMARK DEFENDANTS use toxic chemicals to clean its ovens, kitchen and food preparation areas.

147. One of the more commonly used toxic chemicals is Greasecutter Plus – a heavy duty degreaser and cleaner - manufactured and distributed by ECOLAB, Inc., located in St. Paul, MN 55102.

---

[40]This does not include the numerous benefits that ARAMARK must provide its unionized workers.

148. According to the Greaseeutter Plus Material Safety Data Sheet, "3. Composition/information on ingredients" Greasecutter Plus is 4"% by weight" "SODIUM HYDROXIDE."

149. Sodium hydroxide is a caustic soda.

150. According to the Argonne National Laboratory Education Program Office, "Caustie Soda (sodium hydroxide, lye) dissolving in water is an extremely exothermic reaction - a great deal of heat is generatcd as the Caustic Soda is separated into its component ions. On a small scale this means that the water will get warmer. On a larger scale enough heat can bc generated to cause the water to boil - and this can be extremely dangerous."

151. The United States Agency for Toxic Substances & Disease Registry (ATSDR) ToxFAQs for Sodium Hydroxide (NaOH) at the Centers for Disease Control (CDC) has determined that:

Sodium hydroxide is very corrosive and can cause severe burns in all tissues that come in contact with it. Inhalation of low levels of sodium hydroxidc as dusts, mists or aerosols may cause irritation of the nose, throat, and respiratory airways. Inhalation of higher levels can produce swelling or spasms of the upper airway leading to obstruction and loss of measurable pulse; inflammation of the lungs and accumulation of fluid in the lungs may also occur.

Long-tern exposure to sodium hydroxide in the air may lead to ulceration of the nasal passages and chronic skin irritation.

152. In Delaware, where the ARAMARK Defendants are incorporated, the State of Delaware, Department of Health and Social Services, Division of Public Health, warns and advises:

Sodium Hydroxide is a "caustic acid, lye, sodium solid, and sodium hydrate.... It quickly absorbs carbon dioxide and water from the air. When near moisture, sodium hydroxide can burn or eat away at animal and vegetable tissue and some metal.... It generatcs heat while dissolving.

Sodium hydroxide can burn or eat away at any part of the body that is contacts. Breathing sodium hydroxide dust or mist causes mild or serious effects, depending

69

on the amount of exposure. Effects may include sneezing, sore throat or runny nose. Severe inflammation of the lungs can occur.

Swallowing sodium hydroxide may cause severe burns in the mouth, throat and stomach. Severe scaring of tissue and death may result. Symptoms of eating or drinking sodium hydroxide may include bleeding, throwing up or diarrhea. A drop in blood pressure may also occur. Damage may appear days after exposure.
Contact with skin can cause irritation or severe burns. Greater exposure can cause scarring.

Vapor and direct contact can cause eye irritation. Greater exposure can cause burns that could result in permanent damage to vision, including blindness. Long-term contact with lower strength solutions or dust can have a harmful effect on tissue.

\*   \*   \*   \*   \*

A lung function test may show the effects of exposure… An x-ray can also check for harmful effects.

153. According to *The New York Times*, sodium hydroxide poisoning is also known as lye poisoning and caustic soda poisoning.

154. Upon reasonable belief, Plaintiffs aver that another toxic chemical used by Defendant ARAMARK at CFCF and throughout PPS is ECOLAB Oasis 135 Power Force Premium Cleaner Degreaser.

155. The main ingredients in Oasis 135 are Phenoxyisopropanol, Triethanolamine, poly(oxy-1, 2-ethanedily), alpha.-undecyl-.omega.-hydroxy-, Sodium Benzoate and Sodium Xylene Sulfonate.

156. According to OSHA and the United States National Institutes of Health ("NIH"), Triethanolamine is a Secondary Hepatotoxin and causes Chronic Occupational Asthma. Chronic Occupational asthma is a lung disorder in which substances found in the workplace cause the airways of the lungs to swell and narrow, leading to attacks of wheezing, shortness of breath, chest tightness, and coughing.

70

157. OSHA and NIH have determined that Chronic Occupational Asthma has a latency/incubation period of months to years.[41]

158. According to OSHA, Chronic Occupational Asthma is an "illness characterized by intermittent breathing difficulty including chest tightness, wheezing, cough, and shortness of breath. It is frequently serious and sometimes fatal."

159. According to Science Lab.com's Material Safety Data Sheet (MSDS)[42] for Phenoxyisopropanol, Phenoxyisopropanol is "[h]azardous in ease of eye contact (irritant). Slightly hazardous in case of skin contact (irritant, permeator), of ingestion, of inhalation."

160. Upon reasonable belief, Plaintiffs aver that another toxic chemical used by Defendant ARAMARK at CFCF and throughout PPS is ECOLAB Greasestrip Plus.

161. The ECOLAB MSDS for Greasestrip Plus warns of "[p]otential acute health effects" in the form of "corrosive to eyes," "corrosive to the skin," and "severely irritating to the respiratory system."

162. Greasestrip Plus is comprised of the followings chemicals: Sodium Hydroxide, Ethanolamine, Sodium Gluconate and Laurly Dimethylamine Oxide.

163. TCI America's MSDS for Ethanolamine warns:

---

[41] According to the American Lung Association: "Occupational or work-related asthma is the most common form of occupational lung disease. An estimated 15 percent to 23 percent of new adult asthma cases in the United States are due to occupational exposures. These exposures in the workplace also can worsen pre-existing asthma. Symptoms usually occur while the worker is exposed at work but, in some cases, they develop several hours after the person leaves work and then subside before the worker returns to the job. In later stages of the disease, symptoms may occur away from work after exposure to common lung irritants such as air pollution or dust."

[42] A Material Safety Data Sheet (MSDS) provides workers and emergency personnel with procedures for handling or working with that substance in a safe manner, and includes information such as physical data (melting point, boiling point, flash point, etc.), toxicity, health effects, first aid, reactivity, storage, disposal, protective equipment, and spill-handling procedures.

*Harmful if ingested or inhaled. Minimize exposure to this material. Severe overexposure can result in injury or death. Corrosive to skin, eyes, and respiratory system. Liquid or spray mist may produce tissue damage, particularly in mucous membranes of the eyes, mouth and respiratory tract. Skin contact may produce burns. Eye contact can result in corneal damage or blindness. Inhalation of the spray mist may produce severe irritation of respiratory tract, characterized by coughing, choking, or shortness of breath. Corrosive materials may cause serious injury if ingested. Follow safe industrial hygiene practices and always wear proper protective equipment when handling this compound.*

*Repeated or prolonged contact with spray mist may produce chronic eye irritation and severe skin irritation. Repeated or prolonged exposure to spray mist may produce respiratory tract irritation leading to frequent attacks of bronchial infection.*

164. According to ScienceLab.com's MSDS for Sodium Gluconate, it is:

> *Hazardous in case of eye contact (irritant). Slightly hazardous in case of skin contact (irritant, permeator), of ingestion, of inhalation.*

165. In its MSDS for Sodium Gluconate, American Tartaric Products, Inc. warns:

> *Persons with pre-existing skin disorders, impaired respiratory function may be more susceptible to the effects of the substance.*

166. Ashland Chemical Company's MSDS for Sodium Gluconate notes:

> *Symptoms of Exposure*
> *Signs and symptoms of exposure to this material through breathing, swallowing, and/or passage of the material through the skin may include: stomach or intestinal upset (nausea, vomiting, diarrhea) irritation (nose, throat, airways).*

167. Spectrum Laboratory Product, Inc.'s MSDS for Laurly Dimethylamine Oxide advises:

> *Use a vapor respirator under conditions where exposure to the substance is apparent (e.g., generation of high concentrations of mist or vapor, inadequate ventilation, development of respiratory tract irritation), and engineering controls are not feasible. Be sure to use an approved/certified respirator or equivalent.*

> *Splash goggles. Full suit. Boots. Gloves. Suggested protective clothing might not be sufficient; consult a specialist BEFORE handling this product.*

168. The Occupational Safety and Health Act of 1970 (OSH Act) was passed to prevent workers from being killed or seriously harmed at work. The law requires employers to provide their employees with working conditions that are free of known dangers. The Act

created the Occupational Safety and Health Administration (OSHA), which sets and en-

forces protective workplace safety and health standards.

169. Defendant ARAMARK is subjected to the rules and regulations of the OSHA.

170. OSHA requires strict reporting of all workplace chemical accidents, as follows:

> *Basic requirement. You must record on the OSHA 300 Log the recordable injuries and illnesses of all employees on your payroll, whether they are labor, executive, hourly, salary, part-time, seasonal, or migrant workers. You also must record the recordable injuries and illnesses that occur to employees who are not on your payroll if you supervise these employees on a day-to-day basis. If your business is organized as a sole proprietorship or partnership, the owner or partners are not considered employees for recordkeeping purposes.*

29 CFR, Part 1904.31(a)(*emphasis added*).

171. Plaintiffs reasonably believe and aver that, from 1991 to date, there have been thousands

of inmate illnesses and injuries that have caused by exposure to the toxic chemicals used

throughout PPS by Defendant ARAMARK.[43]

172. None of those inmate illnesses and injuries was reported to OSHA.

173. According to the NIH's HAZ-MAP, several of the toxic chemicals used by Defendant

ARAMARK throughout PPS have extended "Latency/Incubation" periods, for example:

*Triethanolamine*, which causes Occupational Asthma (OC)[44] that is categorized as an

"Airway Disease", has a "Latency/Incubation" period of "Months to Years;" *Sodium Hy-

droxide*, which causes acute/chronic dermatitis that is categorized as an "Skin Disease",

has Latency/Incubation" period of "4 days to Years."

---

[43]Plaintiffs reasonably believe and aver that discovery will reveal that Defendant ARA-MARK compelled them to widely use the highly toxic, ECOLAB KEYSTONE LIME-A-WAY LIME SCALE REMOVER, without protective gear or training. The primary ingredient in this cleaner is uronium hydrogen sulphate which produces a highly toxic gas. Long-term exposure to the gas causes serious respiratory problems.

[44]According to OSHA, "Asthma is an illness characterized by intermittent breathing difficulty including chest tightness, wheezing, cough, and shortness of breath. It is frequently serious and sometimes fatal."

174. Upon reasonable belief Plaintiffs aver that Defendant ARAMARK and its employees, agents and servants have engaged in a series of discussions with the other Defendants, including, but not limited to Defendants CITY OF PHILADELPHIA, GIORLA, HERD-MAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, WHIT-TAKER, MOORE, MAY and ABELLOS and other city employees, agents and servants, and CORIZON and its employees to not maintain an OSHA 300 Log documenting injuries and inmate illnesses due to the exposure to toxic chemicals used throughout PPS by Defendant ARAMARK and to maliciously and recklessly suppress evidence of recordable injuries and illnesses.

175. The evidence of this concerted action is apparent in the way that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, WHITTAKER, MOORE, MAY and ABELLOS and other city employees, agents and servants, and CORIZON and its employees, agents and servants respond to inmates' complaints of injuries and illnesses due to the exposure to toxic chemicals used throughout PPS by Defendant ARAMARK, which is a deliberate, systemic, continuous and institutionalized pattern of denial of medical treatment and retaliation by firing the injured and sick inmates.

176. Plaintiffs reasonably believe and aver that as far back as April 1, 1999 PPS policy and decision-makers and other city policy and decision-makers within the government of the City of Philadelphia knew that inmates were being exposed to hazardous chemicals and materials, but did not provide any training as to how to safely handle those hazardous chemicals and materials.

74

177. Plaintiffs reasonably believe and aver that as far back as April 1, 1999 PPS policy and decision-makers and other city policy and decision-makers within the government of the City of Philadelphia knew that inmates were being exposed to hazardous chemicals and materials, but did not provide the required personal protective equipment in order to protect inmates from exposure to those hazardous chemicals and materials.

178. Plaintiffs reasonably believe and aver that as far back as April 1, 1999 PPS policy and decision-makers and other city policy and decision-makers within the government of the City of Philadelphia knew that inmates were being exposed to hazardous chemicals and materials, but did not develop or require its medical care providers at PPS to comply with MSDS or OSHA guidelines or protocols to provide medical treatment for inmates exposed to hazardous chemicals and materials.

179. Plaintiffs reasonably believe and aver that at all times relevant hereto, Defendant ARA-MARK knew of that exposing them and other similarly situated inmates to toxic chemicals did cause serious medical conditions and could cause serious medical conditions in the future, but in the pursuit of higher corporate profits were deliberately indifferent to the health, safety and well-being of Plaintiffs and other similarly situated inmates, and recklessly and maliciously caused Plaintiffs' injuries.

180. Plaintiffs reasonably believe and aver that, to date, Defendants ARAMARK, CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, WHITTAKER, MOORE, MAY and ABELLOS and other city policy and decision-makers within the government of the City of Philadelphia have recklessly and in deliberate indifference their rights, not investigated and/or audited Defendant ARAMARK's compliance with workplace safety rules and regulations at PPS.

75

181. Upon reasonable investigation, Plaintiffs have discovered that Defendant ARAMARK
     has a history alleged fraud, and health and safety violations[45], for example:

   a.  On December 13, 2012, Defendants CITY OF PHILADELPHIA and ARAMARK
       announced a $400,000.00 no-fault settlement between themselves to resolve allega-
       tions that Defendant ARAMARK and another company duped the City of Philadel-
       phia into believing they were complying with the City's "minority-, women- and
       disabled-owned business entity (M/W/DBE) laws when, in fact, there was simply a
       "circular billing arrangement" between the companies.

   b.  In January 2010, it was reported by *USAToday.com* that Defendant ARAMARK
       cafeteria at the Pennsylvania State capital building was cited for health code viola-
       tions that included, but was not limited to, "rodent infestation... problems with
       hand-washing procedures... inadequate temperature control for foods..." and other
       unsanitary conditions. On May 16, 2011, the *Associated Press* announced that a
       new company took over the cafeteria promising to do weekly inspections so that the
       previous problems do not reoccur.

   c.  In March 2013, *The Bangor Daily News* reported that the local sheriff found that
       Defendant ARAMARK has provided false per mail costs by submitting a contract
       that stated the per meal price was $3.99, but the actual cost was only $1.16.

---

[45]On its website, Defendant ARAMARK boasts: "ARAMARK Correctional Services (ACS)
provides a wide range of food, facility and other customized support to over 600 correctional fa-
cilities across North America. ACS prepares well over 1,000,000 meals per day for state and
municipal facilities,... More than a food service provider, ACS endeavors to go beyond for it
clients, delivering solutions to critical issues like recidivism, officer morale and retention, safety
and security, and *inmate behavior and health...*" It is possible that ARAMARK has injured sev-
eral thousand inmates.

d. Defendant ARAMARK has been cited and fined by United States Department of Environmental Protection Administration for Superfund Site violations.

e. In 2005, the Florida Supreme Court found that Defendant ARAMARK could be held strictly liable for contaminating neighboring properties.

f. On January 17, 2002, *The St. Petersburg Times* reported that Defendant ARA-MARK was found to have "diluted" inmate entrees often by substituting beef and turkey with "ketchup and tomato paste" and the State of Florida "assess[ed] $110,000 in fines against ARAMARK."

g. In the same newspaper article, *The St. Petersburg Times* reported that Defendant ARAMARK repeatedly served spoiled food, food contaminated with maggots and left overs that had the previous sauce washed off so as to appear to be a new meal.

h. In 2010 Defendant ARAMARK settled a class action lawsuit brought by workers in Philadelphia who were not paid overtime in violation of Pennsylvania and federal minimum wage laws.

i. In November 2009, Matt J. Whitworth, the United States Attorney for the Western District of Missouri, announced that a Defendant ARAMARK employee and the former food service director, Christopher Wenell[46], at the Richard Bolling Federal Building in Kansas City, Missouri, plead guilty in federal court to assisting an illegal alien who was using a false Social Security number in order to work in the cafeteria.

---

[46]Wenell admitted that he recruited an illegal alien from Mexico, to work for Defendant ARAMARK at the federal building.

j.  According to a February 17, 2009 *Courier-Post* article, a February 2, 2009 inspection revealed more than 200 rodent droppings, improper food storage and plumbing problems in the kitchen at the Camden County Correctional Facility.

k.  According to the September 20, 2005 edition of *The Patriot News*, Defendant AR-AMARK agreed to reimburse the county $65,000.00 after an audit revealed that it overbilled the county for Dauphin County Prison food service.  The investigation showed the county was billed for meals that were not made; the investigation was spurred by repeated inmate complaints.

l.  *The Herald-Leader*, a local newspaper in Kentucky reported on June 3, 2011 that an inmate at Eastern Kentucky Correctional Complex at West Liberty found a dead mouse in his soup May 1, 2011, leading to an investigation by corrections officials, according to state prison incident reports.  State Rep. Brent Yonts, D-Greenville, characterized the incident as the latest problem with Philadelphia-based Aramark Correctional Services, which has a $12 million contract with the state to provide prison food.  "It indicates what I call malpractice of their job," Yonts said.

m.  According to *PhillyMIC.org*, in 2008, Defendant ARAMARK failed three consecutive inspections by the Philadelphia Department of Health for its Children's Hospital food service operation.  "It is believed that ARAMARK has operated without a valid DOH license since taking over the food service operation in March 2006."

n.  In July 1999, Defendant ARAMARK settled a racial diserimination lawsuit by African-American prison workers for $3.75 million. The African-American prison workers claimed that they were stuck in "labor intensive and degrading jobs, as-

78

signments such as mopping floors, collecting trash and working the dishwasher and scullery area..." and were called "racial epithets" by white supervisors.

**Plaintiff Chal D. Kennedy, Sr.**

182. Plaintiff hereby incorporates by reference, Paragraphs 1 through 181, as though they are fully set forth herein.

183. Mr. Kennedy, Sr. was an inmate was imprisoned at CFCF from August 17, 2009 until April 2013.

184. During the time that Mr. Kennedy, Sr. was imprisoned at CFCF, he was an Inmate Building Representative for his housing units.

185. In that capacity, for more than 9 months, he personally participated in monthly meetings with Defendants FLAHERTY, MAY, WHITTAKER, MOORE, SILVA, KALU and other policy and decision makers from Defendants ARAMARK, CITY OF PHILADELPHIA and CORIZON; the meetings were known as the "*Building Representative Committee, C.F.C.F., Philadelphia, PA 19136 Warden's Monthly Meeting*."[47]

186. One of the topics discussed at those monthly meetings was the lack of protective clothing for inmates using toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals throughout the PPS, and inmates' injuries that resulted from long-term exposure to those toxic chemicals.

187. Another topic discussed at those monthly meetings was the lack adequate health care for inmates injured as of result of using toxic chemicals throughout the PPS, and inmates' injuries that resulted from long-term exposure to those toxic chemicals.

---

[47]At the end of each monthly meeting, the inmates' notes and comments were sent directly to Warden Delancy. See, e.g., "Warden's Monthly Meeting", October 25, 2010.

188. On behalf of the inmates, during those monthly meetings, Mr. Kennedy, Sr. repeatedly informed Defendants FLAHERTY, MAY, WHITTAKER, MOORE, SILVA, KALU and other policy and decision makers from Defendants ARAMARK, CITY OF PHILADEL-PHIA and CORIZON that inmates were not protected from toxic Ecolab Degreaser, Greasecntter Plus or Greasestrip Plus chemicals or other toxic chemicals, and many inmates were complaining about the adverse health effects that the toxic chemicals were having on them.

189. The monthly meetings were structured so that each contractor met separately with Mr. Kennedy, Sr., the other inmate building representative (*e.g.*, inmates Roger Pickens and Henderson) MAY, WHITTAKER, MOORE and other policy and decision makers from Defendant CITY OF PHILADELPHIA to hear and address the inmates' concerns.

190. Usually, the monthly meetings began with a review and update of the issues rose during the last meeting.

191. No matter how many times the inmate building representatives raised issues regarding the exposure to toxic chemicals and the lack of adequate health care and inmates injuries that resulted from long-term exposure to toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, the reply was either a collective "we're working on that" or dead silence by Defendants FLAHERTY, MAY, WHIT-TAKER, MOORE, SILVA, KALU and other policy and decision makers from Defendants ARAMARK, CITY OF PHILADELPHIA and CORIZON.

192. According to Plaintiff, Defendant FLAHERTY "promised to get protective gear almost three years ago, but never did."

193. Defendant BROWN often responded to Mr. Kennedy, Sr.'s demands for protective cloth-
ing with "when they get it, they'll get it to you. But right now, we need those ovens
cleaned."

194. Based upon his numerous up close and detailed interactions with Defendants FLAHER-
TY, MAY, WHITTAKER, MOORE, SILVA, KALU and other policy and decision mak-
ers from Defendants ARAMARK, CITY OF PHILADELPHIA and CORIZON, Plaintiff
reasonably believes and avers that those Defendants had already decided and agreed
amongst themselves to ignore inmate complaints about safety and illnesses and to contin-
ue to maliciously and recklessly expose inmates to the toxic Ecolab Degreaser,
Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant
ARAMARK was using throughout PPS and to maliciously and recklessly not provide
medical treatment for those injuries.

195. During each monthly meeting, either Defendant WHITTAKER or Defendant MOORE
took notes and kept official minutes of those meetings that was photocopied a female
employee of PPS and distributed to of the participants; at a later date, Defendant GIOR-
LA was personally informed of the inmate complaints by a committee that included an
Inmate Building Representative from CFCF.

196. Mr. Kennedy, Sr. worked in the Retherm Ovens on the A-2-2 and D-2-2 Housing Units at
CFCF from 2010 until his release from jail in April 2013.

197. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate
meals throughout the Philadelphia Prison System.

198. Mr. Kennedy, Sr. worked in the Retherm Oven 8 or more hours per day, 7 days-a-week.

199. Mr. Kennedy, Sr. was paid less than $2.00 per day.

81

200. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition: he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

201. And, as explained herein, he did not receive medical coverage for his job-related injuries.

202. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

203. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

204. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, several times a month, he cleaned the Retherm Ovens.

205. According to Plaintiff, the ReTherm Oven cleaning process is two-hour job, using toxic chemicals, spray bottles and scrub pads.

206. Typically, Plaintiff and other inmates were saturated with a toxic sludge by the time they finished cleaning the ReTherm Ovens; however, when Plaintiff returned to his housing unit often he was denied the use of the showers by Defendants JAY, BALMORE, SMITH and WILSON, thereby having no ability to decontaminate himself, and during those periods of time, Plaintiff reasonably believes that the toxic chemicals became embedded in his pores and soft tissues.

207. Plaintiff witnessed other inmates being denied the use of the showers by Defendants JAY, BALMORE, SMITH and WILSON, thereby having no ability to decontaminate themselves.

208. During the time that Mr. Kennedy, Sr. worked in the Retherm Oven, he was supervised by Defendant ARAMARK's "JOHN DOES" and "JANE DOES", and Defendant CITY OF PHILADELPHIA employees, Defendants BALMORE, STILES, LESLIE and BRADLEY who were the correctional officers assigned to kitchen areas during Mr. Kennedy, Sr.'s shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

209. Even though the product labels for the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

210. Mr. Kennedy, Sr. was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

211. Plaintiff was never provided with any training in how to use the toxic Ecolah Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

212. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

213. Mr. Kennedy, Sr. was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

83

214. Each time Mr. Kennedy, Sr. used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by Defendants STILES, LESLIE or BRADLEY, or one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

215. Prior to using the toxic chemicals, Mr. Kennedy, Sr. was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

216. In order to clean the Retherm Oven – which he did once-a-week – Mr. Kennedy, Sr. used toxic chemicals, nylon scrub pad and spray bottle.

217. He was never given a respirator mask or any other type of mask to protect him from the toxic mist and fumes emitted by the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

218. During the period of time that Mr. Kennedy, Sr. used the toxic Ecolab Degreaser or Greasecutter Plus chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven, he developed head and skin rashes, blurred vision, persistent coughs, shortness of breath, nose bleeds and headaches.

219. Mr. Kennedy, Sr. made numerous SICK CALL REQUEST related to the injuries he sustained as a direct result of long-term exposure to the toxic chemicals used by Defendant ARAMARK at PPS.

220. Defendant HELEN and other Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

84

221. Defendant HELEN's exact words were "we don't treat it, go back to your block."

222. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

223. Plaintiff reasonably believes and avers that the Defendant CORIZON employee who made that statement knew it was false, but it in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

224. Upon reasonable belief, Mr. Kennedy, Sr. avers that Defendants GIORLA, MAY, DELANEY, GAINEY, HERDMAN CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and HELEN and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. Kennedy, Sr. and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas and

85

Retherm Ovens so that Mr. Kennedy, Sr. and similarly situated inmates would not have any medical evidence of their injuries.

225. Mr. Kennedy, Sr.'s persistent coughs, shortness of breath, nose bleeds and headaches were symptoms of exposure to the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plns chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

226. Defendant ARAMARK did not report Mr. Kennedy, Sr.'s injuries as required by 29 CFR, Part 1904.31(a).

227. Althougb Mr. Kennedy, Sr. is no longer a "prisoner confined," has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on October 3, 2011. In his grievance, Mr. Kennedy, Sr. complained:

> *To Whom it may concern:*
> *I am writing this grievance because I have to ask the ARAMARK workers and there Supervisors for mask and protective clothing.*
>
> *Need protective clothing and mask.*
>
> *Talk with ARAMARK supervisors.*

228. Although Mr. Kennedy, Sr. is no longer a "prisoner confined," has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his November 5, 2012 grievance, Mr. Kennedy, Sr. complained:

> *I am writing this grievance because I have been denied medical treatment for the following: Shortness of Breath, Nose Bleeds, Head Aches.*
>
> *I would like to be seen.*

229. According to the distribution notations on the form, Mr. Kennedy, Sr.'s grievances were distribnted as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

86

230. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Mr. Kennedy, Sr.'s grievances.

231. By October 3, 2011, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

232. Upon reasonable information and belief, Mr. Kennedy, Sr. avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[48]

233. At all times relevant hereto, Mr. Kennedy, Sr. had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

234. Mr. Kennedy, Sr. has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Kennedy, Sr. a claim number.

235. Mr. Kennedy, Sr.'s medical records confirm that he made complaints about the conditions described in his March 24, 2013 grievance.

236. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Kennedy, Sr. their names.

---

[48]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

**Plaintiff Andrew Webb**

237. Plaintiff hereby incorporates by reference, Paragraphs 1 through 236, as though they are fully set forth herein.

238. During the past 6 months, Mr. Webb has worked in one of the Retherm Ovens at CFCF.

239. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

240. Mr. Webb worked in the Retherm Oven 5 or more days-a-week.

241. Mr. Webb was paid $2.00 per day.

242. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

243. And, as explained herein, he did not receive medical coverage for his job-related injuries.

244. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

245. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

246. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus, or Greasestrip Plus chemicals and, several times a month, he cleaned the Retherm Ovens.

247. During the time that Mr. Webb worked in the Retherm Oven, he was supervised by several of the "John Doe" and "Jane Doe" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a

blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

248. Defendant CITY OF PHILADELPHIA employees, Defendants GLOVER and GRA-HAM were the correctional officers assigned to kitchen areas during Mr. Webb's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

249. Even though the product labels for the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

250. Mr. Webb was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

251. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

252. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

253. Mr. Webb was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

254. Each time Mr. Webb used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

255. Prior to using the toxic chemicals, Mr. Webb was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

256. During the period of time that Mr. Webb used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven, he developed skin rashes.

257. By April 4, 2013, Mr. Webb noticed that he suffered from constant skin rashes.

258. On April 4, 2013, he made a SICK CALL REQUEST and stated: "I was cleaning up using degreaser maybe an hour or two later I felt a burning sensation under my skin and I paid it no attention until it didn't go away. Do you have any cream for this type of medical attention?"

259. There was no indication that Mr. Webb was ever seen by any Defendant CORIZON medical staff person for his complaint.

260. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

90

261. By that time, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARA-MARK employees compel inmates to use.

262. Plaintiff reasonably believe and aver that the Defendant CORIZON employees conspired with Defendants ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SIL-VA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

263. Upon reasonable belief, Mr. Webb avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLO, CORIZON, SILVA, KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. Webb and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic Eeolab De-greaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas and Retherm Ovens so that Mr. Webb and similarly situated inmates would not have any medical evidence of their injuries.

91

264. Mr. Webb's skin rashes were symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

265. Defendant ARAMARK did not report Mr. Webb's injuries as required by 29 CFR, Part 1904.31(a).

266. Mr. Webb has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on April 5, 2013.  In his grievance, Mr. B. Kennedy complained:

> *I was working in the kitchen cleaning up and using the degreaser.  Afterwards I felt a burning sensation under my skin which started to itch.  I went to sick call and they told me it was nothing they can do for me.  I asked for outside medical attention and was denied.*

267. According to the distribution notations on the form, Mr. Polison's grievance was distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

268. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Webb's grievance.

269. By that time, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

270. Upon reasonable information and belief, Mr. Webb avers that the Deputy Warden for Administration and Warden at CFCF have a custom, policy and practice of never re-

sponding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[49]

271. At all times relevant hereto, Mr. Webb had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

272. Mr. Webb has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Webb a claim number.

273. Mr. Webb's medical records confirm that he made complaints about the conditions described in his April 5, 2013 grievance.

274. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Webb their names.

### Plaintiff Brian Kennedy

275. Plaintiff hereby incorporates by reference, Paragraphs 1 through 274, as though they are fully set forth herein.

276. During the past 6 months, Mr. B. Kennedy has worked in one of the Retherm Ovens at CFCF.

277. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

278. Mr. B. Kennedy worked in the Retherm Oven 5 or more days-a-week.

279. Mr. B. Kennedy was paid $2.00 per day.

---

[49]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

280. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

281. And, as explained herein, he did not receive medical coverage for his job-related injuries.

282. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

283. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

284. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, several times a month, he cleaned the Retherm Ovens.

285. During the time that Mr. B. Kennedy worked in the Retherm Oven, he was supervised by several of the "John Doe" and "Jane Doe" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

286. Defendant CITY OF PHILADELPHIA employees, Defendants GLOVER and GRA-HAM were the correctional officers assigned to kitchen areas during Mr. B. Kennedy's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chem-

icals, but turned a blind eye to those risks as part of a custom, policy and practice of ex-
posing Plaintiff so that Defendants would not he exposed to the toxie chemicals.

287. Even though the product lahels for the chemicals warn of the serious "Health/Hygiene"
risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and
to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equip-
ment" in the form of rubber gloves, goggles and long sleeve elothing should he worn
when using the product.

288. Mr. B. Kennedy was never provided with rubber gloves, respirators, goggles and long
sleeve clothing.

289. Plaintiff was never provided with any training in how to use the toxic Ecolah Degreaser,
Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used hy Defend-
ant ARAMARK at PPS.

290. Plaintiff was never provided with any training in how to decontaminate himself after be-
ing exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemi-
cals or other toxic chemicals used by Defendant ARAMARK at PPS.

291. Mr. B. Kennedy was never provided with the Material Safety Data Sheets (MSDS) for
any of the toxic chemieals that he used.

292. Each time Mr. B. Kennedy used the toxic Ecolab Degreaser, Greasecutter Plus or
Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ROSS or other De-
fendant ARAMARK employees provided him with the toxic chemicals, or he was or-
dered by Defendant ROSS or another one of Defendant ARAMARK employees to get
the toxic chemicals from the warehouse.

95

293. Prior to using the toxic chemicals, Mr. B. Kennedy was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

294. During the period of time that Mr. B. Kennedy used the toxic Ecolab Degreaser or Greasecutter Plus chemicals Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven, he developed skin rashes.

295. In late August 2012, Mr. B. Kennedy suffered from skin rashes on his arms and neck area.

296. On September 1, 2012, he made a SICK CALL REQUEST and stated: "I have two rashes one on my arm another on my beck can I have some kind of treatment thank you!".

297. On September 9, 2012, he made a SICK CALL REQUEST and stated: "I have a rash on my arm can I have some hydrocortisone cream."

298. On or about April 23, 2013, Defendant ADAMS an employee of Defendant CORIZON told Mr. Polison "she's not getting involved in this mess" and told Mr. Polison that he would be fired from his job in the kitchen.

299. The Defendant CORIZON employee that saw Mr. B. Kennedy in response to SICK CALL REQUEST told him he was causing his injuries.

300. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

301. Plaintiff reasonably believe and aver that the Defendant CORIZON employee who made that statement knew it was false, but it in furtherance of a conspiracy Defendants, CORI-

96

ZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

302. Upon reasonable belief, Mr. B. Kennedy avers that Defendants CITY OF PHILADEL-PHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF AD-MINISTRATION, MAY and ABELLOS, CORIZON, SILVA, KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. B. Kennedy and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas and Retherm Ovens so that Mr. B. Kennedy and similarly situated inmates would not have any medical evidence of their injuries.

303. Mr. Kennedy's skin rashes were symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

304. Defendant ARAMARK did not report Mr. B. Kennedy's injuries as required by 29 CFR, Part 1904.31(a).

97

305. Mr. B. Kennedy has exhausted his administrative remedies by timely filing a Philadelphia

Prison System Inmate Grievance (Form 86-570) on March 24, 2013. In his grievance,

Mr. B. Kennedy complained:

> *I was working cleaning up and degreaser was in the water. Every since the water*
> *splashed on my skin I've been itching, having rashes and a burning sensation under*
> *my skin. The medical services told me they couldn't do anything to treat it. I asked*
> *to be sent out to a hospital but for some reason I can't get no compliance of help.*
>
> *I request to be see a physician from the outside.*

306. According to the distribution notations on the form, Mr. B. Kennedy's grievance was dis-

tributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt

of Filing."

307. To this date, neither the Deputy Warden for Administration, nor Warden at CFCF has re-

sponded to Mr. B. Kennedy's grievances.

308. By that time, there was no doubt Defendant CITY OF PHILADELPHIA's employees

were on notice that they had a health crisis caused by exposure to the toxic chemicals that

Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye

to Plaintiff's suffering.

309. Upon reasonable information and belief, Mr. B. Kennedy avers that the DEPUTY

WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy

and practice of never responding to inmate grievances so that when they are sued over the

conditions that the inmates have complained, they can profess ignorance of the inmates'

complaints.[50]

---

[50]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY em-
ployed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

310. At all times relevant hereto, Mr. B. Kennedy had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

311. Mr. B. Kennedy has given notice of claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. B. Kennedy a claim number.

312. Mr. B. Kennedy's medical records confirm that he made complaints about the conditions described in his March 24, 2013 grievance.

313. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. B. Kennedy their names.

## Plaintiff Clevis Burris

314. Plaintiff hereby incorporates by reference, Paragraphs 1 through 313, as though they are fully set forth herein.

315. According to Plaintiff, he is a "diabetic and has asthma."

316. During the past 19 months, Mr. Burris has worked in one of the Retherm Ovens on the A-2-1 Housing Unit at CFCF, during the night shift.

317. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

318. Mr. Burris worked in the Retherm Ovens *every day* from December 13, 2011 until he was released in May 2013.

319. Mr. Burris was paid $22.50 every two weeks.[51]

---

[51] According to Mr. Burris: "It's sad to say but that little $22.50 comes in handy every two weeks." He feared that he would be fired in "retaliation" if it became known that he was suing.

320. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

321. And, as explained herein, he did not receive medical coverage for his job-related injuries.

322. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

323. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.[52]

324. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals, and, four to five times a week, he cleaned the Retherm Ovens and he was saturated with a toxic sludge by the time they finished cleaning the ReTherm Ovens; however, when Plaintiff returned to his housing unit often he was denied the use of the showers by Defendants JAY, BALMORE, SMITH and WILSON, thereby having no ability to decontaminate himself, and during those periods of time, Plaintiff reasonably believes that the toxic chemicals became embedded in his pores and soft tissues

325. During the time that Mr. Burris worked in the Retherm Oven, he was supervised by several of the "John Doe" and "Jane Doe" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so

_____

[52]From time to time, Mr. Burris was threatened by correctional officers that wanted another inmate to work in that ReTherm area so that they could use the area as part of their drug and other contraband smuggling route.

they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

326. Defendant CITY OF PHILADELPHIA employees, Defendants GLOVER and GRA-HAM were the correctional officers assigned to kitchen areas during Mr. Burris' shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

327. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

328. Mr. Burris was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

329. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

330. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

101

331. Mr. Burris was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

332. Each time Mr. Burris used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals, one of Defendant ROSS or other Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by Defendant ROSS or another one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

333. Prior to using the toxic chemicals, Mr. Burris was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

334. During the period of time that Mr. Burris used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven, he developed skin rashes.

335. In early January 2012, Mr. Burris began to show signs of suffering from his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals.

336. On January 12, 2012, he made a SICK CALL REQUEST and stated:

*Astma acting up real bad Need inhalers hard for me to breath sometimes.*

337. On June 8, 2012, he made a SICK CALL REQUEST and stated:

*Stomach hurt eyes are blurry seeing white spots I think my diabetes are acting up.*

338. On August 29, 2012, he made a SICK CALL REQUEST and stated:

*Nose bleeding vometting think I might be coming down with the flew.*

339. Whenever Mr. Burris made it to call sec a Defendant CORIZON employee, he not properly examined or tested for exposure to the toxic chemicals used by Defendant AR-AMARK.

340. Instead, he was told to take an aspirin and "go lay down."

341. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

342. Plaintiff reasonably believe and aver that the Defendant CORIZON employee who made that statement knew it was false, but it in furtherance of a conspiracy Defendants, CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

343. Upon reasonable belief, Mr. Burris avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. Burris and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK's employees provided them to

103

clean work areas and Retherm Ovens so that Mr. Burris and similarly situated inmates would not have any medical evidence of their injuries.

344. Mr. Burris' injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

345. Defendant ARAMARK did not report Mr. Burris' injuries as required by 29 CFR, Part 1904.31(a).

346. Mr. Burris has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on March 8, 2012. In his grievance, Mr. Burris complained:

*Feeling very sick and nose was bleeding ask to go to medical and the CO whose name is Williams told me I could not go and ignored my Emergency call button then turned it off. I remained locked down for the rest of the night until I had to go back to work my head was spinning.*

*I think medical decision should be left up to medical department and not C.O.*

*C.O. need to be more attentive to inmate's medical needs. Request that C.O. be talked to about lack of professionalism.*

*Talked to C.O. Tried to talk to sergeant but sergeant didn't want to hear it now putting in grievance to Lt.*

347. Mr. Burris has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on May 17, 2012. In his grievance, Mr. Burris complained:

*Went to medical in the back of D-2-1 for Rush and Dizziness the nurse told me there was nothing wrong to go take a aspin and call it a day. My problem is I have seen this nurse about 4 to 5 times and everytime I see her she always is saying that there is nothing wrong with me, now its to the point that when I walked over there and see her I just leave, can you please change nurses so I can get the help I need.*

*To change the nurse. She is a fat old lady.*

104

> *Asked her why she always say that its nothing wrong, she told me I don't have the right to ask her that.*

348. According to the distribution notations on the form, Mr. Burris' grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

349. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Burris' grievances.

350. By May 17, 2012, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

351. Upon reasonable information and belief, Mr. Burris avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[53]

352. At all times relevant hereto, Mr. Burris had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

353. Mr. Burris has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Burris a claim number.

---

[53]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

354. Mr. Burris' medical records confirm that he made complaints about the conditions described in his March 8, 2012 and May 17. 2012 grievances.

355. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Burris their names.

## Plaintiff Charles Clark

356. Plaintiff hereby incorporates by reference, Paragraphs 1 through 355, as though they are fully set forth herein.

357. During the past 6 months, Mr. Clark has worked in one of the Retherm Ovens at CFCF.

358. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

359. Mr. Clark worked in the Retherm Oven 5 or more days-a-week.

360. Mr. Clark was paid $22.50 every two weeks.

361. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

362. And, as explained herein, he did not receive medical coverage for his job-related injuries.

363. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

364. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

365. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, four to five times a week, he cleaned the Retherm Ovens.

366. During the time that Mr. Clark worked in the Retherm Oven, he was supervised by several of the Defendant ARAMARK "John Does" and "Jane Does" and Defendant LEMON a Defendant ARAMARK employee and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

367. Defendant CITY OF PHILADELPHIA employee, Defendant BARNETT was one of the correctional officers assigned to kitchen areas during Mr. Clark's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

368. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

369. Mr. Clark was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

370. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic ehcmicals used by Defendant ARAMARK at PPS.

371. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

372. Mr. Clark was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

373. Each time Mr. Clark used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant LEMON or other Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by Defendant LEMON or another one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

374. Prior to using the toxic chemicals, Mr. Clark was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

375. During the period of time that Mr. Clark used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven, he developed illnesses related to toxic chemical exposure.

376. In early April 2013, Mr. Clark began to recognize the signs of suffering from his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

377. On April 10, 2013, he made a SICK CALL REQUEST and stated:

*Headaches, shortness of breath, and dizziness.*

378. On April 15, 2013, he made a SICK CALL REQUEST and stated:

*Blood in mucus when I blow my nose.*

379. As of this date, there was no evidence that Mr. Clark was treated by Defendant CORI-ZON's employees for these conditions.

380. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

381. Plaintiff reasonably believe and aver that the Defendant CORIZON employee who made that statement knew it was false, but it in furtherance of a conspiracy Defendants, CORI-ZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

382. Upon reasonable belief, Mr. Clark avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with De-fendant ARAMARK and its decision and policy makers to deny Mr. Clark and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemi-cals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas and Retherm Ovens so that Mr. Clark and similarly situated inmates would not have any medical evidence of their injuries.

383. Mr. Clark's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

384. Defendant ARAMARK did not report Mr. Clark's injuries as required by 29 CFR, Part 1904.31(a).

385. Mr. Clark has exhausted his administrative remedies by timely filing a Philadelphia Pris-on System Inmate Grievance (Form 86-570) on April 10, 2013. In his grievance, Mr. Clark complained:

> *I am writing this grievance in regards to my experiencing cracking of skin on my hands and shortness of breath and headaches after coming in contact with EcoLAB Greasecutter Plus while cleaning the ovens in the bakery area of the kitchen. I was never provided with a respirator or any eyewear which the safety concerns clearly state on the label are required, also Aramark employees never advised me to wear gloves while using this product. After I brought these concerns to Aramark em-ployees attention I was told I don't need glasses or a respirator.*

386. Mr. Clark has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570) on April 18, 2013. In his grievance, Mr.

Clark complained:

> *After complaining about the use of EcoLAB degreaser and it affects on me due lack*
> *of protective gear I was removed from my job in the bakery and placed in another*
> *ares in the kitchen by Ms. Lemon (ARA Supervisor) and C/O Barnett. There are*
> *numerous people being fired from their jobs for complaining. I cannot afford to be*
> *fired. I feel like I'm being retaliated against in violation of my first and fourteenth*
> *amendment rights by ARAMARK, CFCF Warden, the Commissioner of PPS and the*
> *City of Phila and Ms. Lemon. I think they are all conspiring to violate my constitu-*
> *tional rights.*
>
> *I would like to be reinstated in my job in the baker. I would like to receive damages*
> *in the amount of $150,000.00.*

387. According to the distribution notations on the form, Mr. Clark's grievances were distrib-

uted as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of

Filing."

388. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN

at CFCF has responded to Mr. Clark's grievances.

389. April 18, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees

were on notice that they had a health crisis caused by exposure to the toxic chemicals that

Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye

to Plaintiff's suffering.

390. Upon reasonable information and belief, Mr. Clark avers that the DEPUTY WARDEN

FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice

of never responding to inmate grievances so that when they are sued over the conditions

111

that the inmates have complained, they can profess ignorance of the inmates' complaints.[54]

391. At all times relevant hereto, Mr. Clark had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

392. Mr. Clark has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Clark a claim number.

393. Mr. Clark medical records confirm that he made complaints about the conditions described in his April 10, 2013 and April 18, 2013 grievances.

394. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Clark their names.

## Plaintiff Darnell Cunningham

395. Plaintiff hereby incorporates by reference, Paragraphs 1 through 394, as though they are fully set forth herein.

396. Until August 2012, Mr. Cunningham worked in one of the Retherm Ovens at CFCF.

397. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

398. Mr. Cunningham worked in the Retherm Oven 5 or more days-a-week.

399. Mr. Cunningham was paid $22.50 every two weeks.

400. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was

---

[54]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

112

never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

401. And, as explained herein, he did not receive medical coverage for his job-related injuries.

402. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

403. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

404. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, four to five times a week, he cleaned the Retherm Ovens.

405. During the time that Mr. Cunningham worked in the Retherm Oven, he was supervised by several of the Defendant ARAMARK "John Does" and "Jane Does" and Defendant LEMON a Defendant ARAMARK employee and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

406. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOE" and "JANE DOE" were the correctional officers assigned to kitchen areas during Mr. Cunningham's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned

113

a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

407. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

408. Mr. Cunningham was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

409. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

410. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

411. Mr. Cunningham was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

412. Each time Mr. Cunningham used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

114

413. Prior to using the toxic chemicals, Mr. Cunningham was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

414. During the period of time that Mr. Cunningham used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendant AR-AMARK employees provided him to clean his work areas and the Retherm Oven, he developed illnesses related to toxic chemical exposure.

415. In early March 2012, Mr. Cunningham began to recognize the signs of suffering from his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

416. From June 2012 through August 2012, he made several SICK CALL REQUESTS wherein he requested to be treated for illnesses related to his long-term exposure to the toxic chemicals that he had been compelled to use by Defendants employed by Defendants CITY OF PHILADELPHIA and ARAMARK.

417. Specifically, Mr. Cunningham requested medical treatment for bloody noise, headaches and bumps on his arms.

418. As of this date, there was no evidence that Mr. Cunningham was treated by Defendant CORIZON's employees for these conditions.

419. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

420. Plaintiff reasonably believe and aver that the Defendant CORIZON employees refused to treat him in the furtherance of a conspiracy Defendants, CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

421. Upon reasonable belief, Mr. Cunningham avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA. KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. Cunningham and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas and Retherm Ovens so that Mr. Cunningham and similarly situated inmates would not have any medical evidence of their injuries.

422. Mr. Cunningham's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

116

423. Defendant ARAMARK did not report Mr. Cunningham's injuries as required by 29 CFR, Part 1904.31(a).

424. Mr. Cunningham has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570).

425. According to the distribution notations on the form, Mr. Cunningham's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

426. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Cunningham's grievances.

427. However, Mr. Cunningham was fired from his job in the Retherm Oven.

428. There was no doubt that all times relevant to Mr. Cunningham's grievances, Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

429. Upon reasonable information and belief, Mr. Cunningham avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[55]

430. At all times relevant hereto, Mr. Cunningham had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a con-

---

[55]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

stitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

431. Mr. Cunningham has given notice of his claim to all Defendants to whom notice is required prior to bringing suit.  The City Defendants assigned Mr. Cunningham a claim number.

432. Mr. Cunningham's medical records confirm that he made complaints about the conditions described in his grievances.

433. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Cunningham their names.

**Plaintiff David Woodward**

434. Plaintiff hereby incorporates by reference, Paragraphs 1 through 433, as though they are fully set forth herein.

435. During the past 12 months, Mr. Woodward has worked in one of the Retherm Ovens at CFCF.

436. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

437. Mr. Woodward worked in the Retherm Oven 5 or more days-a-week.

438. Mr. Woodward was paid $22.50 every two weeks.

439. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

440. And, as explained herein, he did not receive medical coverage for his job-related injuries.

118

441. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

442. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

443. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, a couple times a week, he cleaned the Retherm Ovens.

444. During the time that Mr. Woodward worked in the Retherm Oven, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

445. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Woodward's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

446. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

119

447. Mr. Woodward was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

448. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plns chemicals or other toxic chemieals used by Defendant ARAMARK at PPS.

449. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

450. Mr. Woodward s was never provided with the Matcrial Safety Data Sheets (MSDS) for any of the toxic ehemicals that he used.

451. Each time Mr. Woodward used the toxic Ecolab Degreascr, Greaseeutter Plus or Greasestrip Plus chemicals or othcr toxic chemieals, one of Defendant ARAMARK employees provided him with the toxie chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

452. Prior to using the toxic chemicals, Mr. Woodward was not given any instructions on how to use the toxie chemicals safely; in fact, he was not given any instructions whatsoever.

453. During the period of time that Mr. Woodward used the toxie Eeolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the Retberm Oven, he developed skin rashes.

454. According to Mr. Woodward's PPS Progress Notes (Medical Chart), he was seen on December 3, 2012, and it is noted that he had "Scally/flaky feet. Pt. sates the sole of his feet is peeling… No s/s of Athletes foot."

455. In early April 2013, Mr. Woodward realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus ehemicals or other toxic chemicals.

456. On April 6, 2013, he made a SICK CALL REQUEST and stated:

> *Some degreaser spilled on my leg when I was pouring it in the bucket, and some got on my left knee, and my knee keep itching and it has a numb feeling. So I would appreciate if you could give me something for it. Also burning sensation under my skin. Thank you.*

457. On April 9, 2013, Mr. Woodward made a SICK CALL REQUEST and stated:

> *I would like to come get something for my knee, because some degreaser got on it and my knee is irritated, because it burns, and sometimes it has a numb feeling, this is the second time I wrote you's in reference of this problem, can I please get some type of help. Thank you.*

458. On April 13, 2013, he made a SICK CALL REQUEST and stated:

> *I would like to get something for my left knee, because it has stinging effects from degreaser that got on it, and I came down there last week, and nurse never gave me nothing for my pain, I would appreciate if you could help me with this, because my knee sting.*

459. Whenever Mr. Woodward saw a Defendant CORIZON employce, he was not properly examined or tested for exposure to the toxie chemicals used by Defendant ARAMARK.

460. Typically, Defendant CORIZON's employees told Plaintiff there was nothiug they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemieals.

461. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other

121

medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

462. By April 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

463. Plaintiff reasonably believe and aver that the Defendant CORIZON employee who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants, CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

464. Upon reasonable belief, Mr. Woodward avers that Defendants CITY OF PHILADELPH-IA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Mr. Woodward and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work are-

as and Retherm Ovens so that Mr. Woodward and similarly situated inmates would not have any medical evidence of their injuries.

465. Mr. Woodward's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

466. Defendant ARAMARK did not report Mr. Woodward's injuries as required by 29 CFR, Part 1904.31(a).

467. Mr. Woodward has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his grievance, Mr. Woodward complained:

*I was pouring degreaser in my mop bucket at work and some degreaser got on my left knee, and every since my knee have been itching, burning, and at time it even has a numb feeling. And I went to the doctor, they told me they couldn't do nothing to treat it, so I asked to be sent to the hospital, but they won't do anything to help me so I am suffering.*

*I asked to see doctor from the outside, that may know what's the problem since they don't seem to know.*

468. According to the distribution notations on the form, Mr. Woodward's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

469. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Woodward's grievances.

470. By that time, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that

123

Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

471. Upon reasonable information and belief, Mr. Woodward avers that the DEPUTY WAR-DEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[56]

472. At all times relevant hereto, Mr. Woodward had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

473. Mr. Woodward has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Woodward a claim number.

474. Mr. Woodward's medical records confirm that he made complaints about the conditions described in his grievance.

475. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Woodward their names.

## Plaintiff Earl Reedman

476. Plaintiff hereby incorporates by reference, Paragraphs 1 through 475, as though they are fully set forth herein.

477. During the past 12 months, Mr. Reedman has worked in the kitchen at CFCF.

478. Mr. Reedman worked in the kitchen 5 or more days-a-week.

---

[56]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

479. Mr. Reedman was paid $22.50 every two weeks.

480. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

481. And, as explained herein, he did not receive medical coverage for his job-related injuries.

482. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

483. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

484. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

485. During the time that Mr. Woodward worked in the Kitchen, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

486. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Reedman's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and prac-

125

tice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

487. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

488. Mr. Reedman was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

489. Mr. Reedman was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

490. Mr. Reedman was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

491. Mr. Reedman was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

492. Each time Mr. Reedman used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

493. Prior to using the toxic chemicals, Mr. Reedman was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

494. During the period of time that Mr. Reedman used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA's employees provided him to clean his work areas and the Retherm Oven, he developed skin rashes.

495. In early April 2013, Mr. Reedman realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

496. On April 11, 2013, he made a SICK CALL REQUEST and stated:

> *Would like to have my hands and arms checked due to burning & itching of the skin also would like to have some type of diet due to not able to keep food down for weeks.*

497. Whenever Mr. Reedman saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

498. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

499. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

500. By April 11, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

127

501. Plaintiff reasonably believe and aver that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants, CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his medical treatment in order to hide the true source of Plaintiff's injuries.

502. Upon reasonable belief, Mr. Reedman avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. Reedman and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Mr. Reedman and similarly situated inmates would not have any medieal evidence of their injuries.

503. Mr. Reedman's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen work areas.

128

504. Defendant ARAMARK did not report Mr. Reedman's injuries as required by 29 CFR, Part 1904.31(a).

505. Mr. Reedman has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his April 12, 2013 grievance, Mr. Reedman complained:

> *This grievance is being written to state that on 4/11/13 I was seen at sick call by Nurse Barbara McKennedy-Adams for itching and burning of my hands due to some type of rash like conditions from soap degreaser which is used in the kitchen at CF, CF by Aramark and or Prison for cleaning I was told by the Nurse she could not do any thing for me and told me to only thing she could do was remove me from kitchen duty and she could not give me any type of treatment what so ever for itching and burning Nurse Barbara McKennedy-Adams made no note to the records and gave back my slip!*
>
> *To solve this problem ASAP*
>
> *By going to medical of 4/11/13*

506. According to the distribution notations on the form, Mr. Reedman's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

507. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Reedman's grievances.

508. By April 12, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

509. Upon reasonable information and belief, Mr. Reedman avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the

conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[57]

510. At all times relevant hereto, Mr. Reedman had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

511. Mr. Reedman has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Reedman a claim number.

512. Mr. Reedman's medical records confirm that he made complaints about the conditions described in his grievance.

513. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Reedman their names.

### Plaintiff Evan Jordan

514. Plaintiff hereby incorporates by reference, Paragraphs 1 through 513, as though they are fully set forth herein.

515. During the past 12 months, Mr. Jordan has worked in one of the Retherm Ovens in the Restricted Housing Unit (A-2-1) at CFCF.

516. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

517. Mr. Jordan worked in the kitchen 5 or more days-a-week.

518. Mr. Jordan was paid $22.50 every two weeks.

---

[57]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

519. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

520. And, as explained herein, he did not receive medical coverage for his job-related injuries.

521. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

522. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

523. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

524. During the time that Mr. Jordan worked in the Retherm Oven, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

525. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Jordan's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind

131

eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

526. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

527. Mr. Jordan was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

528. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

529. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

530. Mr. Jordan was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

531. Each time Mr. Jordan used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

132

532. Prior to using the toxic chemicals, Mr. Jordan was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

533. During the period of time that Mr. Jordan used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the Re-therm Oven, he developed skin rashes.

534. In March 2013, Mr. Jordan realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

535. On March 16, 2013, he made a SICK CALL REQUEST and stated:

> *Ecolab Degreaser plus stripper chemical is causeing me irritation of the skin (plus redness) also I am and had a headache for the past few days and I never had a headache for this long its worrying me I need to see someone A.S.A.P[.]*

536. On March 17, 2013, Mr. Jordan made a SICK CALL REQUEST and stated:

> *I put in a sick call yesterday about the redness and irritation of my skin I need some kind of cream or something and I need something for the headache I am getting please. Thank you[.]*

537. On March 24, 2013, he made a SICK CALL REQUEST and stated:

> *I put a sick call slip in on the 21st about my nose bleeding I had another bleeding nose on the 23rd I was sleep and when I woke up and my nose was bleeding I don't know what going on but I would like to have my blood pressure checked I am still having headaches and skin is still irritated.[.]*

538. On April 15, 2013, he made a SICK CALL REQUEST and stated:

> *My nose was bleeding a little bit I had blood on my sheet when I woke up. I am having headaches and my face and arms broke out with a rash[.]*

539. Whenever Mr. Jordan saw a Defendant CORIZON employee, he was not properly exam-

ined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

540. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

541. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

542. By April 15, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

543. Plaintiff reasonably believe and aver that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

544. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant

CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

545. Mr. Jordan's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen work areas.

546. Defendant ARAMARK did not report Mr. Reedman's injuries as required by 29 CFR, Part 1904.31(a).

547. Mr. Jordan has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his March 20, 2013 grievance, Mr. Jordan complained:

> *To Warden*
> *I put in a sick call slip and i was seen on the 18th of this month. I have had a continuous headache and continuous rash on my face and arms I was given two small packet of hydrocortisone cream and I was told by the nurs that the jail will not give me anything for my headache and i will have to but some asprin from commissary I don't have a hole lot of money to be buying asprin from commissary and I am undergoing continuous stress all because of this Corizon stuff and Aramark is using that is not right.*
>
> *I would like to have prompt medical treatment and not have to pay for asprin off of commissary[.]*

548. Mr. Jordan has exhausted his administrative remedies by timely filing a Philadelphia

Prison System Inmate Grievance (Form 86-570). In his two-page April 15, 2013 griev-

ance, Mr. Jordan complained:

> *On this the 15th day of April. I was working on A1 pod when I came in contact*
> *again with chemical stuff. That Aramark and Corizon uses in this Jail to clean*
> *with. This stuff has given continuous headaches and a continuous rash to me on my*
> *face and arms already. And I have had nose bleeds from time to time. And I have*
> *put in a grievance about this situation before and never got a response. And now I*
> *have come in contact with this chemical stuff again. Because Willial Allen was*
> *spraying and wiping all the walls with the chemical stuff. He said the officer Ms.*
> *Branch told him to use it. I said to him don't you remember what I told you that*
> *stuff has done to me. He said to me officer Branch told him to put water in it and*
> *don't worry about it to do it or lose your job. As soon as I came in contact with Mr.*
> *Willial Allen spraying that chemical stuff I got instant headache and my face and*
> *arms are broke out with a rash again.*
>
> *This situation with this chemical stuff is a serious problem And my face and arms*
> *are broke out with a rash again and my nose was bleeding a little bit. I ask that*
> *they stop using that stuff.*
>
> *This is my second grievance and I would like to have a response to this one[.]*

549. According to the distribution notations on the form, Mr. Jordan's grievances were dis-

tributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt

of Filing."

550. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN

at CFCF has responded to Mr. Jordan's grievances.

551. By April 15, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employ-

ees were on notice that they had a health crisis caused by exposure to the toxic chemicals

that Defendant ARAMARK employees compel inmates to use, but simply turned a blind

eye to Plaintiff's suffering.

552. Upon reasonable information and belief, Mr. Jordan avers that the DEPUTY WARDEN

FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice

136

of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[58]

553. At all times relevant hereto, Mr. Jordan had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

554. Mr. Jordan has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Jordan a claim number.

555. Mr. Jordan's medical records confirm that he made complaints about the conditions described in his March 20, 2013 and April 15, 2013 grievances.

556. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Jordan their names.

## Plaintiff Jerome Polison

557. Plaintiff hereby incorporates by reference, Paragraphs 1 through 556, as though they are fully set forth herein.

558. In January 2013, Mr. Polison was assigned to work in the "Pit" and Retherm Oven at CFCF.

559. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

560. Mr. Polison worked in the "Pit" and Retherm Oven 7 days-a-week from 5:00 a.m. until 1 p.m.

---

[58]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

561. Mr. Polison was paid $2.00 per day.

562. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

563. And, as explained herein, he did not receive medical coverage for his job-related injuries.

564. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

565. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

566. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, at least twice-a-month, he cleaned the Retherm Ovens.

567. During the time that Mr. Polison worked in the "Pit" and Retherm Oven, he was supervised by Defendant ARAMARK employee Defendant ROSS and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

568. Defendant CITY OF PHILADELPHIA employees, Defendants GLOVER and GRAHAM were the correctional officers assigned to kitchen areas during Mr. Polison's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals,

but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

569. Even though the product labels for the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

570. Occasionally, Mr. Polison was provided with rubber gloves – when they were available.

571. He was never provided with respirators, goggles and long sleeve clothing.

572. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

573. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

574. Mr. Polison was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

575. Each time Mr. Polison used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ROSS or other Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by De-

139

fendant ROSS or another one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

576. Prior to using the toxic chemicals, Mr. Polison was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

577. During the period of time that Mr. Polison used the toxic Ecolah Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ROSS and other Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven, he developed skin rashes on his hands and forearms, breathing problems and an occasional bloody nose.

578. Defendant ARAMARK did not report Mr. Polison's injuries as required by 29 CFR, Part 1904.31(a).

579. In Spring 2013, Mr. Polison discovered that his skin rashes, breathing problems and occasional bloody noses were symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ROSS and other Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven.

580. Mr. Polison sought medical treatment from Defendant CORIZON and its medical staff at CFCF.

581. Specifically, on April 20, 2013, Mr. Polison made a Sick Call Request that he receive medical attention because his:

*Hands irritated and skin itching after use of degreaser at work in kitchen.*

140

582. On or about April 23, 2013, Defendant ADAMS an employee of Defendant CORIZON told Mr. Polison "she's not getting involved in this mess" and told Mr. Polison that he would be fired from his job in the kitchen.

583. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

584. By April 23, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

585. The only way that Defendant ADAMS and any other employee of Defendant CORIZON could have known that Mr. Polison and the other Plaintiffs were exercising their constitutional rights would have been through her communications with Defendants CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK.

586. Upon reasonable belief, Mr. Polison avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with De-

141

fendant ARAMARK and its decision and policy makers to deny Mr. Polison and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ROSS and other Defendant ARAMARK employees provided them to clean work areas and Retherm Ovens so that Mr. Polison and similarly situated inmates would not have any medical evidence of their injuries.

587. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

588. Even though Mr. Polison has clearly visible skin rashes and burns that any reasonable nurse could diagnose as a chemical burn or, at a minimum, a serious medical condition that required medical treatment, Defendant ADAMS did not provide Mr. Polison with any medical treatment and discharged him from the medical unit.

589. Mr. Polison returned to work and, within in minutes, he was told by Defendants GLOVER and GRAHAM that Defendant MAY had fired him for complaining about the skin rashes, breathing problems and an occasional bloody noses that were symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or

142

other toxic chemicals that Defendants ARAMARK, ROSS and other Defendant ARA-MARK employees provided him to clean his work areas and the Retherm Oven.

590. Mr. Polison reasonably believes and avers that he was fired in retaliation for exercising his constitutional rights to file a grievance, complaining and seeking medical treatment for the skin rashes, breathing problems and an occasional bloody noses that were symptoms of exposure to the toxic chemicals that Defendants ARAMARK, ROSS and other Defendant ARAMARK employees provided him to clean his work areas and the Retherm Oven because, to that date, he had been an excellent worker.

591. Mr. Polison has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on April 17, 2013. In his initial grievance, Mr. Polison complained:

> *I put in multiple sick call slips in concerning out break of skin and was told by medical staff, its nothing they can do.*
>
> *To be given some type of medical attention.*
>
> *Spoke with medical staff.*

592. Mr. Polison has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on April 22, 2013. In his that grievance, Mr. Polison complained:

> *I put in multiple sick call slips in concerning skin irritation and rash do [sic] use of degreaser at work in the kitchen. [W]hich I wasn't given any medical help.*
>
> *To be given something for condition.*
>
> *Talked to nurse.*

143

593. Mr. Polison has exhausted his administrative remedies by timely filing a Philadelphia

Prison System Inmate Grievance (Form 86-570) on April 29, 2013. In his that grievance,

Mr. Polison complained:

*Do [sic] to use of degreaser in kitchen which I was ordered to work with. I'm been injured. I've been breaking out on hand and rist [sic] causing constant itching an irritation, redness an swells. Stomach issues feeling like having to vomit often headaches, and even sometimes nose bleeding. I experience headaches often also. I put in sick call slips but no medical attention was provided. I was called in to have conference meeting with C/Os and ARAMARK Officials (Mr. Ross from ARA-MARK)(Sergeant Glover CFCF) C/Os (Grahm/Bethell and Leftwhich CFCF) where discussed issue further; I was threatened by medical staff (Corizon) that I would be removed from kitchen for talking about this, which I was fired very next day just as nurse Ms. Adams said.*

*Get job back, be paid back wages and in damages in the amount of $150,000.00.*

*Put in sick call slips, had meeting with staff, also filed prior Grievances as well to CFCF staff.*

594. According to the distribution notations on the form, Mr. Polison's grievance was distrib-

uted as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of

Filing."

595. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN

at CFCF has responded to Mr. Polison's grievances.

596. By April 29, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employ-

ees were on notice that they had a health crisis caused by exposure to the toxic chemicals

that Defendant ARAMARK employees compel inmates to use, but simply turned a blind

eye to Plaintiff's suffering.

597. Upon reasonable information and belief, Mr. Polison avers that the DEPUTY WARDEN

FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice

of never responding to inmate grievances so that when they are sued over the conditions

that the inmates have complained, they can profess ignorance of the inmates' complaints.[59]

598. At all times relevant hereto, Mr. Polison had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

599. Mr. Polison has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Polison a claim number.

600. Mr. Polison's medical records confirm that he made numerous complaints about the conditions described in his April 17, 2013, April 29, 2013 and April 29, 2013 grievances.

601. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Polison their names.

### Plaintiff Jimmy Thompson

602. Plaintiff hereby incorporates by reference, Paragraphs 1 through 601, as though they are fully set forth herein.

603. On September 26, 2012, Mr. Thompson was assigned to work in the D-1 Housing Unit Retherm Oven at CFCF.

604. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

605. Mr. Thompson worked in the Retherm Oven 5 days-a-week.

606. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was

---

[59]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

607. And, as explained herein, he did not receive medical coverage for his job-related injuries.

608. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

609. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

610. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, at least twice-a-month, he cleaned the Retherm Ovens.

611. Even though the product labels for the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product, no protective clothing was ever provided by any of the Defendants.

612. Each time Mr. Thompson used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

613. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

146

614. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

615. Mr. Thompson was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

616. In addition to working in the Retherm Oven, Mr. Thompson worked in the Unit Manager's Office on the D-1 Housing Unit at CFCF as a janitor/custodian worker beginning in March 2012.

617. In those capacities, he cleaned the offices, floors, countertops, walls, bathrooms, windows and doors using 3M chemical concentrates and disinfectants, floor strippers, waxes and finishes – often being ordered to mix various toxic chemicals by Defendants ARAMARK and CITY OF PHILADELPHIA's employees.

618. During the course of his employment, Mr. Thompson received hundreds of gallons of toxic chemicals from ARAMARK employees who did not wear name tags to conceal their identity.

619. Occasionally, he saw who he thought were ARAMARK Supervisory employees on inspection days.

620. His daily supervisors were the Unit Managers, PPS Correctional Officers, Defendants MAY, BARKSDALE, KENNEDY and ROSS and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

147

621. His skin, eyes, nasal passages and lungs were repeatedly exposed to those toxic concoctions due to a lack of protective clothing.

622. In early-October 2012, Mr. Thompson noticed a shortness of breath, blurriness in both eyes, sores and rashes on his right arm, both shins, left elbow and the tops of both feet.

623. On November 26, 2012, Mr. Thompson awoke at about 3:45 a.m. and realized that his nose was bleeding lightly.

624. In December 2012, Mr. Thompson started experiencing severe aches and sharp pains aronnd his eyes; these pains would last up to three days without a break.

625. Mr. Thompson made numerous Sick Call Requests, to no avail.

626. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

627. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIII, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

628. By that time, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic ehemicals that Defendant ARAMARK's employees compel inmates to use.

629. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers sueh as Defendants CITY OF PHILADELPHIA, GIORLA,

HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

630. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

631. Also, in December 2012, Mr. Thompson asked an unknown Defendant ARAMARK employee and Defendants BARKSDALE, BENTLY, KENNEDY and ROSS to provide protective work boots to prevent the toxic chemicals from eating through his sneakers and causing injuries to his feet.

632. To this date, Mr. Thompson has not been provided the work boots.

633. Around January 21-23, 2013, Mr. Thompson experienced another light nose bleed accompanied by severe aches and sharp pains around his eyes.

149

634. Defendant ARAMARK did not report Mr. Thompson's injuries as required by 29 CFR, Part 1904.31(a).

635. Mr. Thompson as exhausted his administrative remedies by timely filing several Philadelphia Prison System Inmate Grievances (Form 86-570).

636. In an April 4, 2013 grievance, Mr. Thompson complained:

> *On several occasions within the past 10 months I've went to medical seeking assistance with the following symptoms;*
> *(1) Rash and sores on my feet, elbow, arms and legs [sic].*
> *(2) Redness, irritation and blurriness in eyes.*
> *(3) Headaches, sharp and thriving pain in and around eyes.*
> *(4) Light bleeding and stuffiness in nose.*
>
> *I've visited a physician (while at C.F.C.F.) on numerous occasions (thru sick call) on these problems but I have yet to be informed of what the problems are and/or if they can be treated and corrected.*
>
> *I would , at least like to be referred to an specialist who can diagnose and/or treat the above symptoms.*

637. In a two-page April 29, 2013 grievance, Mr. Thompson complained:

> *I've been assigned to work in the Retherm on D1-Unit since September of 2012 until the present, during this time, I've been dealing with the following issues as a result of using chemicals and degreaser without proper equipment:*
>
> *(1) Shortness of breath when cleaning ovens, oven racks and over head oven vent*
> *(2) Sore like rashes on my feet, right arm, lower legs and left elbow*
> *(3) Irritation, redness and sharp headaching pain in/or around eyes*
> *(4) Light nose bleeding.*
>
> *On several occasions I've asked Aramark Personnell [sic] for respiratory masks and protective clothing, when they would bring supplies to the Unit's Retherm. On April 21, 2013 around about 9:00 am I asked an Aramark Employee (Female) about respiratory masks, I was informed that Aramark do not have them. On April 22, 2013 around 11:30 am I asked a different Aramark Employee do they have respiratory masks, I was informed no they have Beard and Hair nets. On April 22, 2013 around about 1:10 pm I asked three males employees who were dropping off the evening meal, do they have respiratory masks and I was informed by all three employees, almost simultaneously no, "that they don't have them in the kitchen."*

638. According to the distribution notations on the grievance forms, Mr. Thompson's griev-
ance was distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. In-
mate's Receipt of Filing."

639. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN
at CFCF has responded to Mr. Thompson's grievances.

640. By April 29, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employ-
ees were on notice that they had a health crisis caused by exposure to the toxic chemicals
that Defendant ARAMARK employees compel inmates to use, but simply turned a blind
eye to Plaintiff's suffering.

641. Upon reasonable information and belief, Mr. Thompson avers that the DEPUTY WAR-
DEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and
practice of never responding to inmate grievances so that when they are sued over the
conditions that the inmates have complained, they can profess ignorance of the inmates'
complaints.[60]

642. At all times relevant hereto, Mr. Thompson had a constitutional rights to demand medical
treatment after being injured due to long-term exposure to toxic chemicals and a constitu-
tional rights to file a grievance and petition for redress after being injured due to long-
term exposure to toxic chemicals.

643. Mr. Thompson has given notice of claim to all Defendants to whom notice is required
prior to bringing suit. The City Defendants assigned Mr. Thompson a claim number.

---

[60]This is exactly the strategy that Defendants GIORLA, HERDMAN, DELANEY and
GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD
(E.D.Pa. 2012).

151

644. Mr. Thompson's medical records confirm that he made numerous complaints about the conditions described in his April 4, 2013 and April 29, 2013 grievances.

645. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Thompson their names.

## Plaintiff Jóan Vasquez

646. Plaintiff hereby incorporates by reference, Paragraphs 1 through 645, as though they are fully set forth herein.

647. During the past 12 months, Mr. Vasquez has worked in one of the Retherm Ovens at CFCF.

648. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

649. Mr. Vasquez worked in the Retherm Ovens 5 or more days-a-week.

650. Mr. Vasquez was paid $22.50 every two weeks.

651. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

652. And, as explained herein, he did not receive medical coverage for his job-related injuries.

653. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

654. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

655. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Ovens.

656. During the time that Mr. Vasquez worked in the Retherm Oven, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

657. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Vasquez's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

658. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

659. Mr. Vasquez was never provided with respirators, goggles and long sleeve clothing.

660. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

153

661. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

662. Mr. Vasquez was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

663. Each time Mr. Vasquez used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

664. Prior to using the toxic chemicals, Mr. Vasquez was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

665. During the period of time that Mr. Vasquez used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA's employees provided him to clean his work areas and the Retherm Oven, he developed skin rashes and scaring.

666. In December 2012, Mr. Vasquez realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

667. On December 19, 2012, he made a SICK CALL REQUEST and stated:

*I have several rash like spots on my arms and neck area. They irritate and burn[.]*

668. In response to that SICK CALL REQUEST, Mr. Vasquez was prescribed Acetaminophen by the prison dentist, Dr. Gregory Barksdale, DDS, on January 10, 2013.

154

669. On February 14, 2013, Mr. Vasquez made a SICK CALL REQUEST and stated:

> *My eyes are itchy runny and red so is my nose. When I blow my nose there is blood on the tissue. It's been several days now and its very uncomfortable.*

670. On April 28, 2013, he made a SICK CALL REQUEST and stated:

> *My nose continue to run and my eyes are red and itchy the medicine that I buy on the commissary is not working. My symptoms are very uncomfortable.*

671. In response to that SICK CALL REQUEST, Mr. Vasquez was preseribed CTM and Ibuprofen by David Davis, on April 30, 2013.

672. Whenever Mr. Vasquez saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

673. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that eould have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical eonditions.

674. By April 28, 2013, there was no doubt Defendant CORIZON's employees were on notiee that rhey had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees eompel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

675. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as De-

155

fendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

676. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

677. Mr. Vasquez's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals Plus chemicals hat Defendant ARA-MARK employees provided him to clean his kitchen and oven work areas.

678. Defendant ARAMARK did not report Mr. Vasquez's injuries as required by 29 CFR, Part 1904.31(a).

679. Mr. Vasquez has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his February 5, 2013 grievance, Mr. Vasquez complained:

*My grievance is concerning the protective gear or equipment that we are supposed to be provided when working with eco-lab degreaser and stripper. I am a retherm worker and have been working since October of 2012. Every week on Sundays we are required to the ovens G.1 ready and have to use the degreaser and all that we*

156

> *are given are rubber gloves. This is a very strong and corrosive chemical and it leaves irritating marks on the skin where it makes contact also on the eyes. We are not provided goggles nor sleeves to protect our arms and upper chest and neck area.*
>
> *That proper protective equipment be provided for the retherm inmate workers.*
>
> *This is my first grievance.*

680. According to the distribution notations on the form, Mr. Vasquez's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

681. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Vasquez's grievances.

682. By February 5, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

683. Upon reasonable information and belief, Mr. Vasquez avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[61]

684. At all times relevant hereto, Mr. Vasquez had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitu-

---

[61]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

157

tional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

685. Mr. Vasquez has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Vasquez a claim number.

686. Mr. Vasquez's medical records confirm that he made complaints about the conditions described in his February 5, 2013 grievance.

687. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Vasqnez their names.

### Plaintiff Kenneth Collins

688. Plaintiff hereby incorporates by reference, Paragraphs 1 through 687, as though they are fully set forth herein.

689. During the past 12 months, Mr. Collins has worked in the kitchen at CFCF.

690. Mr. Collins worked in the kitchen 5 or more days-a-week.

691. Mr. Collins was paid $22.50 every two weeks.

692. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

693. And, as explained herein, he did not receive medical coverage for his job-related injuries.

694. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

695. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

696. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Oveus.

697. During the time that Mr. Collins worked in the kitchen, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

698. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Collins' shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

699. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

159

700. Mr. Collins was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

701. Mr. Collins was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

702. Mr. Collins was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

703. Mr. Collins was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

704. Each time Mr. Collins used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

705. Prior to using the toxic chemicals, Mr. Collins was not given any instructions on how to use the toxic chemicals safely; in fact, he was not given any instructions whatsoever.

706. During the period of time that Mr. Collins used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the kitcheu, he developed skin rashes and scaring.

707. In April 2013, Mr. Collins realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

160

708. On April 26, 2013, he made a SICK CALL REQUEST and stated:

> *To whom it may concern: At medical, here lately I've been having trouble breathing. I've also have been coughing up a little blood and I also been getting a burning and itching felling on my skin, can you take a look at me real soon[.]*

709. Whenever Mr. Collins saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

710. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

711. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

712. By April 26, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

713. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherauce of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-

MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

714. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated in-mates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work are-as so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

715. Mr. Collins' injuries were due to his long-term exposure to the toxic Ecolah Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen and oven work areas.

716. Defendant ARAMARK did not report Mr. Collins' injuries as required by 29 CFR, Part 1904.31(a).

717. Mr. Collins has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his April 27, 2013 grievance, Mr. Collins complained:

> *To whom it may concern: I Kenneth Collins was working at the kitchen on 4-27-13. I told the Officer Carter that I was not felling well and that I was coughing up a lit-tle blood and getting a burning and itching and itching felling on my skin C.O. Carter told me if I go see the Doctor and don't come back to work the rest of that that he was going to firer me, and he did firer me the same day. I did worked in the*

> *kitchen in the dishwashing room, where I no longer work as of the day. This isuse took place between 5:00 am and 1:00 pm 4-27-13.*

718. According to the distribution notations on the form, Mr. Collins' grievance was distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Reeeipt of Filing."

719. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Collins' grievance.

720. By April 27, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on noticc that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK cmployees compel inmates to usc, but simply turned a blind eyc to Plaintiff's suffering.

721. Upon reasonable information and belief, Mr. Collins avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of nevcr responding to inmate grievances so that when they are sued over the conditions that the inmates have complaincd, they can profcss ignorance of the inmates' complaints.[62]

722. At all times relevant hcreto, Mr. Collins had a constitutional rights to demand medieal treatment after being injured due to long-term exposurc to toxic chemicals and a constitutional rights to file a grievance and petition for redress after bcing injurcd due to long-term exposure to toxic chemicals.

723. Mr. Collins has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Collins a claim number.

---

[62]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

724. Mr. Collins' medical records confirm that he made complaints about the conditions described in his April 27, 2013 grievance.

725. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Collins their names.

## Plaintiff Kevin Benjamin

726. Plaintiff hereby incorporates by reference, Paragraphs 1 through 725, as though they are fully set forth herein.

727. During the past 12 months, Mr. Benjamin has worked in the kitchen at CFCF.

728. Mr. Benjamin worked in the kitchen and performed sanitation duties 5 or more days-a-week; he worked both morning and evening shifts.

729. Mr. Benjamin was paid $22.50 every two weeks.

730. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

731. And, as explained herein, he did not receive medical coverage for his job-related injuries.

732. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

733. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

734. Each day, he cleaned his work areas (pot room, floors, walls, *etc.*) using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

164

735. During the time that Mr. Benjamin worked in the kitchen, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees, and Defendants "MAKEBBA", "DENISE" and "TINETTA", also Defendant ARAMARK employees. and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

736. On inspection days, Mr. Benjamin interacted with Defendant ARAMARK employees, and Defendants "DAVE" and "ROB" and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

737. Defendant CITY OF PHILADELPHIA employees, Defendants BARNETT, CARTER, LEFTWICH, THOMAS and GRAHAM were the correctional officers assigned to kitchen areas during Mr. Benjamin's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

738. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

165

739. Mr. Benjamin was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

740. Plaintiff was never provided with any training in how to use the toxic Ecolah Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

741. Plaintiff was never provided with any training in how to decontaminate himself after beiug exposed use the toxic Eeolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

742. Mr. Benjamin as never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

743. Each time Mr. Benjamin used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

744. Prior to using the toxic chemicals, Mr. Benjamin was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

745. During the period of time that Mr. Benjamin used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA's employees provided him to clean his work areas and the kitchen, he developed skin rashes, sinus, nose bleeds and respiratory problems.

746. In March 2013, Mr. Benjamin realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus or other toxic chemicals.

747. On March 15, 2013, he made a SICK CALL REQUEST and stated:

> *I use a chemical call degreaser in the kitchen. It splash on my arms and legs. I have this burning sensation. Also have problem breathing.*

748. Whenever Mr. Benjamin saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

749. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

750. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

751. By March 15, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

752. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION,

167

MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

753. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

754. Mr. Benjamin's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen and oven work areas.

755. Defendant ARAMARK did not report Mr. Benjamin's injuries as required by 29 CFR, Part 1904.31(a).

756. Mr. Benjamin has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his March 14, 2013 grievance, Mr. Benjamin complained:

   *Ecolab – Degreaser Plus Danger: Causes severe chemical burns: Health Level 3.*

> *Dear Mr. Warden Degreaser is causing burning sensation on arms when using degreaser in spray mist when cleaning with it. Also toxis chemical splashes into eyes when cleaning without protective glasses and garment. Aramark is responsible for providing protective gear. Also some restpostorator problem with breating[.]*

757. According to the distribution notations on the form, Mr. Benjamin's grievance was distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

758. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Benjamin's grievance.

759. By March 14, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

760. Upon reasonable information and belief, Mr. Benjamin avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[63]

761. At all times relevant hereto, Mr. Benjamin had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

---

[63]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

762. Mr. Benjamin has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Benjamin a claim number.

763. Mr. Benjamin's medical records confirm that he made complaints about the conditions described in his March 14, 2013 grievance.

764. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Benjamin their names.

## Plaintiff Larcell Wagstaff

765. Plaintiff hereby incorporates by reference, Paragraphs 1 through 764, as though they are fully set forth herein.

766. During the past 30 months, Mr. Wagstaff has worked in one of the Retherm Ovens at CFCF.

767. Mr. Wagstaff worked 8 or more hours per day, 5 or more days-a-week.

768. Mr. Wagstaff was paid $22.50 every two weeks.

769. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

770. And, as explained herein, he did not receive medical coverage for his job-related injuries.

771. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

772. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

773. Each day, he cleaned his work areas and Retherm Ovens using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

774. During the time that Mr. Wagstaff worked in the Retherm Ovens, he was supervised by several of the "JANE DOES"[64] Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

775. On inspection days, Mr. Wagstaff interacted with 3 or 4 Defendant ARAMARK employees[65] and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

776. Defendant CITY OF PHILADELPHIA employees, Defendants PERRY and "JOHN DOES" were the correctional officers assigned to Retherm Ovens during Mr. Wagstaff's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

777. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

---

[64]Mr. Larcell has described these Defendants as being African-American and Hispanic females, and wearing "Black/Red/Green" uniforms with ARAMARK logs.

[65]Mr. Larcell has described these Defendants as being African-American and Caucasian males, and wearing plain clothes.

171

778. Mr. Wagstaff was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

779. However, Mr. Wagstaff did demand a mask from Defendant MAY and Defendant AR-AMARK employees, who told him that they would "check into it."

780. Mr. Wagstaff never received any masks.

781. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

782. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

783. Mr. Wagstaff was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

784. Each time Mr. Wagstaff used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

785. Prior to using the toxic chemicals, Mr. Wagstaff was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

786. During the period of time that Mr. Wagstaff used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the

172

Retherm Ovens, he developed skin rashes, dizziness, a persistent cough, daily nose bleeds and respiratory problems.

787. In March 2013, Mr. Wagstaff realized that there was a connection between the skin rashes, dizziness, a persistent cough, daily nose bleeds and respiratory problems and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

788. On March 7, 2013, he made a SICK CALL REQUEST and stated:

> *When cleaning Re-Therm Oven and Gail Degreaser is causeing burning sensation on arms and itching under skin and burning and dry eyes Restpostorator problem with breathing when work out.*

789. Whenever Mr. Wagstaff saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

790. In fact, there is a notation on Mr. Wagstaff's March 7, 2013 SICK CALL REQUEST made a Defendant CORIZON employee that a "PA referral for further evaluation" was made, but none was ever made.

791. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

792. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

793. By March 7, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant

173

ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

794. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

795. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

174

796. Mr. Wagstaff's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen and oven work areas.

797. Defendant ARAMARK did not report Mr. Wagstaff's injuries as required by 29 CFR, Part 1904.31(a).

798. Mr. Wagstaff has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his March 8, 2013 grievance, Mr. Wagstaff complained:

> *ECOLAB – Degreaser Plus*
> *DANGER: causes severe chemical*
> *BURN: HEALTH LEVEL – (3)*
>
> *Dear Warden, Degreaser is causeing burning sensation on arms when using degreaser in spray mist when cleaning Re-Therm Oven and Grill in Re-Therm A-2 second floor Also toxic chemical splashes into eyes some time when cleaning without protective glasses. The instruction on the bottle sat to wear protective glasses and garment. ARAMARK is responsible for providing protective gear. Also some restpostorator problem with breathing. Thank you[.]*

799. According to the distribution notations on the form, Mr. Wagstaff's grievance was distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

800. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Wagstaff's grievance.

801. By March 8, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

175

802. Upon reasonable information and belief, Mr. Wagstaff avers that the DEPUTY WAR-DEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[66]

803. At all times relevant hereto, Mr. Wagstaff had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

804. Mr. Wagstaff has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Wagstaff a claim number.

805. Mr. Wagstaff's medical records confirm that he made complaints about the conditions described in his March 8, 2013 grievance.

806. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Wagstaff their names.

### Plaintiff Luis Lopez

807. Plaintiff hereby incorporates by reference, Paragraphs 1 through 806, as though they are fully set forth herein.

808. During the past 12 months, Mr. Lopez has worked in the kitchen at CFCF.

809. Mr. Lopez worked 8 or more hours per day, 5 or more days-a-week.

810. Mr. Lopez was paid $22.50 every two weeks.

---

[66]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

176

811. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

812. And, as explained herein, he did not receive medical coverage for his job-related injuries.

813. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

814. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

815. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

816. During the time that Mr. Lopez worked in the kitchen, he was supervised by several of the "JANE DOES" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

817. Defendant CITY OF PHILADELPHIA employees, Defendant BARNETT and "JOHN DOES" were the correctional officers assigned to the kitchen during Mr. Lopez' shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

818. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract

177

irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

819. Mr. Lopez was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

820. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic ehemicals used by Defendant ARAMARK at PPS.

821. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxie Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus ehcmicals or other toxic chemicals used by Defendant ARAMARK at PPS.

822. Mr. Lopez was never provided with the Material Safety Data Sheets (MSDS) for any of the toxie ehcmicals that he used.

823. Each time Mr. Lopez used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

824. Prior to using the toxic chemicals, Mr. Lopez was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

825. During the period of time that Mr. Lopez used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus and other chemicals Defendants ARAMARK or CITY OF

178

PHILADELPHIA employees provided him to elean his work areas, he developed skin rashes.

826. In March 2013, Mr. Lopez realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

827. On April 13, 2013, he made a SICK CALL REQUEST and stated:

> *While working in the kitchen I was cleaning up the walls with degreaser and the next day I had a burning sensation under my skin Itchy and rash developed can you give me any type of ointment or treatment for this[.]*

828. Whenever Mr. Lopez saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

829. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

830. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

831. By April 13, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

832. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a

179

conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

833. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

834. Mr. Lopez' injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen and oven work areas.

835. Defendant ARAMARK did not report Mr. Lopez' injuries as required by 29 CFR, Part 1904.31(a).

836. Mr. Lopez has exhausted his administrative remedies by timely filing a Philadelphia

Prison System Inmate Grievance (Form 86-570). In his April 16, 2013 grievance, Mr.

Lopez complained:

> *On 4-16-13 I went to sick call to be seen about a rash and burning on my skin and was told that theres nothing that can be done no ointment or anything I was also told that "per" Warden and Majors order I have to be moved from the kitchen fired from my job and transferred because theres nothing they can do about it. The nurse @ sick call told me this.*
>
> *I shouldn't be moved from my job and need medical attention medication.*

837. Mr. Lopez has exhausted his administrative remedies by timely filing a Philadelphia

Prison System Inmate Grievance (Form 86-570). In his April 18, 2013 grievance, Mr.

Benjamin complained:

> *On 4-12-13 while working in the kitchen I was cleaning walls and floors with degreaser and the next day I had a burning sensation under my skin my skin felt itchy with a rash I put in several sick call slips and was given nothing for the rash no ointment or treatment was told theres nothing for that. While in the kitchen I told C/O Barnett about the situation and nothing has been done.*
>
> *Need medical attention*
>
> *Ask kitchen officers to see medical professional was told no.*

838. According to the distribution notations on the form, Mr. Lopez' grievances were distrib-

uted as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of

Filing."

839. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN

at CFCF has responded to Mr. Lopez grievances.

840. By April 18, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employ-

ees were on notice that they had a health crisis caused by exposure to the toxic chemicals

181

that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

841. Upon reasonable information and belief, Mr. Lopez avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[67]

842. At all times relevant hereto, Mr. Lopez had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

843. Mr. Lopez has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Lopez a claim number.

844. Mr. Lopez' medical records confirm that he made complaints about the conditions described in his April 16, 2013 and April 18, 2013 grievances.

845. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Lopez their names.

### Plaintiff Marcello Foy

846. Plaintiff hereby incorporates by reference, Paragraphs 1 through 845, as though they are fully set forth herein.

847. During the past 12 months, Mr. Foy has worked in the kitchen at CFCF.

848. Mr. Foy worked in the kitchen 5 or more days-a-week.

---

[67]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

849. Mr. Foy was paid $22.50 every two weeks.

850. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

851. And, as explained herein, he did not receive medical coverage for his job-related injuries.

852. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

853. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

854. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Ovens.

855. During the time that Mr. Foy worked in the kitchen, he was supervised by several of the "JOHN DOE" and "JANE DOE" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

856. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Collins' shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

183

857. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

858. Mr. Foy was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

859. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

860. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

861. Mr. Foy was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

862. Each time Mr. Foy used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

863. Prior to using the toxic chemicals, Mr. Foy was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

184

864. During the period of time that Mr. Foy used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the kitchen, he developed skin rashes and scaring.

865. In April 2013, Mr. Foy realized that there was a connection between the skin rashes and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

866. On April 25, 2013, he made a SICK CALL REQUEST and stated:

> *I was working in the kitchen and while doing so the (Degreaser) that I was using burnt my hands and arms. I've been putting lot on it to sooth the burning sensation but it does not help much...*

867. Whenever Mr. Foy saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

868. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

869. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

870. By April 26, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

185

871. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

872. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

873. Mr. Foy's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen and oven work areas.

186

874. Defendant ARAMARK did not report Mr. Foy's injuries as required by 29 CFR, Part 1904.31(a).

875. Mr. Foy has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his grievance, Mr. Foy complained:

> *I was working in kitchen using the (Degreaser) and I started feeling a burning sensation on my arm and I went to sick call and after they told me there was nothing they could do; so I asked for outside medical attention and I was denied!*

876. According to the distribution notations on the form, Mr. Foy's grievance was distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

877. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Foy's grievance.

878. By that time, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

879. Upon reasonable information and belief, Mr. Foy avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[68]

880. At all times relevant hereto, Mr. Foy had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitution-

---

[68]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

al rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

881. Mr. Foy has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Foy a claim number.

882. Mr. Foy's medical records confirm that he made complaints about the conditions described in his April 27, 2013 grievance.

883. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Foy their names.

## Plaintiff Raheem Pleasant

884. Plaintiff hereby incorporates by reference, Paragraphs 1 through 883, as though they are fully set forth herein.

885. In September 2011, Mr. Pleasant was assigned to work in the Bakery at CFCF.

886. The Bakery Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

887. Mr. Pleasant worked at least 5 days-a-week in Bakery and in the pot room.

888. Mr. Pleasant was paid $22.50 every two weeks.

889. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

890. And, as explained herein, he did not receive medical coverage for his job-related injuries.

891. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

188

892. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

893. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, and, at least twice-a-month, he cleaned the Bakery Ovens.

894. During the time that Mr. Pleasant worked in the Bakery, he was supervised by Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

895. Defendant CITY OF PHILADELPHIA employees, Defendants GLOVER and GRAHAM were the correctional officers assigned to kitchen areas during Mr. Pleasant's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

896. Even though the product labels for the chemicals warn of the serious "Health/Hygeine" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

897. Mr. Pleasant was never provided with gloves, respirators, goggles and long sleeve clothing.

189

898. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

899. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greaseeutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

900. Mr. Pleasant was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

901. Each time Mr. Pleasant used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, Defendant "MAKEBBA" or another one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants, ARAMARK, "MAKEBBA" and other Defendant ARAMARK employees to get the toxic chemicals from the warehouse.

902. During the period of time that Mr. Pleasant was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendants, ARAMARK, "MAKEBBA" and other Defendant ARAMARK employees provided him to clean his work areas and the Bakery Oven, he developed skin rashes on his hands and forearms, breathing problems and an occasional bloody nose.

903. In Spring 2013, Mr. Pleasant discovered that his skin rashes, breathing problems and occasional bloody noses were symptoms of exposure to the toxic Ecolab Degreaser,

Greaseeutter Plus or Greasestrip Plus chemicals or other toxie chemicals that Defendant

ARAMARK employees provided him to clean his work areas and the Bakery Oven.

904. Mr. Pleasant sought medical treatment from Defendant CORIZON and its medical staff

at CFCF.

905. Specifically, on April 20, 2013, Mr. Pleasant requested that he receive medical attention,

as follows:

> *I need some medical assistance because for the last couple of weeks or so I'd been
> having rashes on my hands and arms and I've been itching a lot lately. I don't
> know what to do and what I need to cure it. Can you please Help me in this matter.
> Thank you Raheem Pleasant.*

906. In April 2013, Defendant "JANE DOE" a nurse employed by Defendant CORIZON told

Mr. Pleasant "she's not helping him sue ARAMARK" and told Mr. Pleasant that he

would be fired from his job in the kitchen.

907. However, at all times relevant hereto, there were numerous widely known first aid and

treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other

medical professionals that could have resulted in a proper diagnosis and the proper treat-

ment of Plaintiff's serious medical conditions.

908. By April 2013, there was no doubt Defendant CORIZON's employees were on notice

that they had a health crisis caused by exposure to the toxic chemicals that Defendant

ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plain-

tiff's suffering.

909. The only way that Defendant "JANE DOE" and any other employee of Defendant

CORIZON could have known that Mr. Pleasant and the other Plaintiffs were exercising

their constitutional rights would have been through her communications with Defendants

CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY

OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WAR-DEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK.

910. Upon reasonable belief, Mr. Pleasant avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and ADAMS and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Mr. Pleasant and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendants, ARAMARK, "MAKEBBA" and other Defendant ARAMARK employees provided them to clean work areas and the Ovens so that Mr. Pleasant and similarly situated inmates would not have any medical evidence of their injuries.

911. Even though Mr. Pleasant has clearly visible skin rashes and burns that any reasonable nurse could diagnose as a chemical burn or, at a minimum, a serious medical condition that required medical treatment, Defendant "JANE DOE" did not provide Mr. Pleasant with any medical treatment and discharged him from the medical unit.

912. Mr. Pleasant returned to work and, within in minutes, at approximately 10:45 a.m., he was told by Defendant GLOVER that Defendant MAY had fired him for complaining about the skin rashes, breathing problems and an occasional bloody noses that were symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendants ARAMARK, "MAKEBBA" and

192

other Defendant ARAMARK employees provided him to clean his work areas and the Bakery Oven.

913. Mr. Pleasant reasonably believes and avers that he was fired in retaliation for exercising his constitutional rights to file a grievance, complaining and seeking medical treatment for the skin rashes, breathing problems and an occasional bloody noses that were symptoms of exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendants ARAMARK, "MAKEBBA" and other Defendant ARAMARK employees provided him to clean his work areas and the Bakery Oven because, to that date, he had been an excellent worker for 16 months.

914. Mr. Pleasant has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570) on April 23, 2013. In his grievance, Mr. Pleasant complained:

> *On April 22$^{nd}$2013 I went to sick call because for the last 19 months of me being a kitchen worker where my assigned area was the Bakery, my supervisor who is a Aramark employee who's name is Veronica Lemon told me to clean ovens twice a month with the toxic chemical degreaser. She never at anytime during my usage of the chemical told me that it was toxic and she never gave me the proper equipment for handling the chemical. I put in a sick call slip months before because I's gotten sick from a biscuit I ate that was cooked in the same ovens I had to clean. On the 22nd of April 2013 the nurse who is employed by Corizon Company told me it was noting she can do about the rashes and burning sensation I felt from this chemical. I was fired from my Job because of this matter. Sergeant Glover told me I was fired on April 23, 2013.*
>
> *I was retaliated against in violation of my first and fourteenth amendment rights for complaining about the toxic degreaser. Aramark, the warden, my supervisor, the commissioner of prisons and the City of Philadelphia are conspiring to violate my constitutional rights.*
>
> *I am asking to be reinstated in my Job and receive back pay and damages in the amount of $150,000.00.*

915. According to the distribution notations on Form 86-570, Mr. Pleasant's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

916. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Pleasant's grievances.

917. By April 23, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

918. Upon reasonable information and belief, Mr. Pleasant avers that the Deputy Warden for Administration and Warden at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[69]

919. At all times relevant hereto, Mr. Pleasant had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

920. Mr. Pleasant has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Pleasant a claim number.

921. Mr. Thompson's medical records confirm that he made numerous complaints about the conditions described in his April 23, 2013 grievance.

---

[69]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

194

922. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Thompson their names.

## Plaintiff Ronald Smith

923. Plaintiff hereby incorporates by reference, Paragraphs 1 through 922, as though they are fully set forth herein.

924. During the past 12 months, Mr. Smith has worked in the Bakery at CFCF.

925. Mr. Smith worked in the kitchen 5 or more days-a-week.

926. Mr. Smith was paid $22.50 every two weeks.

927. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

928. And, as explained herein, he did not receive medical coverage for his job-related injuries.

929. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

930. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

931. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Ovens.

932. During the time that Mr. Smith worked in the kitchen, he was supervised by several of the "JOHN DOES" and "JANE DOES" Defendant ARAMARK employees and Defendant LEMON and those Defendants knew of the dangers of Plaintiff being exposed to tox-

195

ic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

933. Defendant CITY OF PHILADELPHIA employees, Defendants GLOVER and "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Smith's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

934. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

935. Mr. Smith was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

936. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

937. Plaintiff was never provided with any training in how to decontaminate himself after being exposed use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

938. Mr. Smith was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

939. Each time Mr. Smith asked about protective clothing and safety training, he was told by Defendants LEMON to "just get the job done or that he would be fired."

940. Each time Mr. Smith used the toxic Eeolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

941. Prior to using the toxic chemicals, Mr. Smith was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

942. During the period of time that Mr. Smith used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the kitchen, he developed skin rashes and breathing problems.

943. In April 2013, Mr. Smith realized that there was a connection between the skin rashes and breathing problems and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

944. On April 22, 2013, he made a SICK CALL REQUEST and stated:

> *To whom it may concern*
> *I have been feeling irritation in my hands periodically on & off iching, pealing of my skin & sometimes burning beneath my skin on both hands.  I notice these things been happening for a few weeks now, sense I been working with degreaser & other chemicals.*

945. Whenever Mr. Smith saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

946. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

947. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

948. By April 22, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

949. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

950. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant

198

CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

951. Mr. Smith's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK's employees provided him to clean his kitchen and oven work areas.

952. Defendant ARAMARK did not report Mr. Smith's injuries as required by 29 CFR, Part 1904.31(a).

953. Mr. Smith has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his April 22, 2013 grievance, Mr. Smith complained:

*To whom it may concern, I would like to inform you of my recent and present conditions which I believe was caused by cleaning solutions such as "Ammonia," Greasecutter and other toxic chemicals. I noticed lately my hands been iching, pealing and burning beneth my skin on top of my hand periodicly. I am also having problems breathing from time to time. I am an inmate at C.F.CF where I am currently employed by staff C/O's as a AM kitchen worker where I was placed in the Bakery to help ARAMARK staff Ms. "LEMON" My job description contained of baking cakes, pies, cookies, muffins and cleaning my work are which included scrubbing walkin ovens with degreaser while standing at High "Temp." I was often ordered to use those toxic chemicals against my will on several occasions throughout the time of my working in the Bakery. I filled out two sick call slips in which I never got a response to, and I just submitted another today[.]*

*I filled out a sick call slip several times which I have gotten no response to[.]*

199

954. Mr. Smith has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his April 25, 2013 grievance, Mr. Smith complained:

> *To whom it may concern. I am an inmate at C.F.CF and I would like to notify you of matter in which I believe should have been handled in a more professional and respectful manner. I must inform you that I am a AM kitchen worker who recently notified Nurse/Staff of conditions in which I accrued from working with toxic chemicals. These conditions includes iching & pealing skin & burning on both hands periodicly. As well as having problems breathing from time to time. These are conditions which I have never experienced before coming in contact with Ammonia, Greasecutter and other chemicals. I submitted three sick call slips in which only the last one got a response by the Nurse. The Nurse asked several question involving recent & present matter, but then I was denied medical treatment & told that I would be moved from the kitchen all together. I am very unpleased and I feel like my rights are being violated because I am a inmate. I will be contacting my attorney due to my pain and suffering & if this matter continues to be treated poorly I will be filing a lawsuit.*
>
> *I "Ronald Smith" notified staff several times of this issue but was treated wrongly.*

955. According to the distribution notations on the form, Mr. Smith's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

956. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Smith's grievances.

957. By April 25, 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

958. Upon reasonable information and belief, Mr. Smith avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions

that the inmates have complained, they can profess ignorance of the inmates' complaints.[70]

959. At all times relevant hereto, Mr. Smith had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

960. Mr. Smith has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Smith a claim number.

961. Mr. Smith's medical records confirm that he made complaints about the conditions described in his April 22, 2013 and April 25, 2013 grievances.

962. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Smith their names.

### Plaintiff Thomas Daniels

963. Plaintiff hereby incorporates by reference, Paragraphs 1 through 962, as though they are fully set forth herein.

964. During the past 12 months, Mr. Daniels has worked in one of the Retherm Ovens at CFCF.

965. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

966. Mr. Daniels worked in the Retherm Ovens 5 or more days-a-week.

967. Mr. Daniels s was paid $22.50 every two weeks.

---

[70]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

968. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

969. And, as explained herein, he did not receive medical coverage for his job-related injuries.

970. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

971. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

972. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Ovens.

973. During the time that Mr. Thomas worked in the kitchen, he was supervised by several of the "JOHN DOES" and "JANE DOES" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals.

974. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to kitchen areas during Mr. Daniels' shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so they would not be exposed to the toxic chemicals.

202

975. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

976. Mr. Daniels was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

977. Plaintiff was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

978. Plaintiff was never provided with any training in how to decontaminate himself after being exposed to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

979. Mr. Daniels was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

980. Each time Mr. Daniels used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

981. Prior to using the toxic chemicals, Mr. Daniels was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

203

982. During the period of time that Mr. Daniels used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the kitchen, he developed skin rashes and breathing problems.

983. In April 2013, Mr. Daniels realized that there was a connection between the skin rashes and breathing problems and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

984. On April 12, 2013, he made a SICK CALL REQUEST and stated:

> *Having trouble breathing and when I blow my nose a little blood shows up on the tissue.*

985. There was no record that Mr. Daniels ever saw a Defendant CORIZON employee; thus, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

986. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

987. By April 12, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

988. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison de-

204

cision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

989. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolah Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

990. Mr. Daniels' injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided him to clean his kitchen and oven work areas.

991. Defendant ARAMARK did not report Mr. Daniels' injuries as required by 29 CFR, Part 1904.31(a).

992. Mr. Daniels has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570).

993. According to the distribution notations on the form, Mr. Daniels' grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

994. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Daniels' grievances.

995. By April 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

996. Upon reasonable information and belief, Mr. Daniels avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[71]

997. At all times relevant hereto, Mr. Daniels had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

998. Mr. Daniels has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Smith a claim number.

999. Mr. Daniels' medical records confirm that he made complaints about the conditions described in his April 2013 grievance.

---

[71]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

1000. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Daniels their names.

## Plaintiff William Allen

1001. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1000, as though they are fully set forth herein.

1002. During the past 12 months, Mr. Allen has worked in one of the Retherm Ovens in A-1 Housing Unit at CFCF.

1003. Mr. Allen worked in the Retherm Ovens 5 or more days-a-week.

1004. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

1005. Mr. Allen was paid $22.50 every two weeks.

1006. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

1007. And, as explained herein, he did not receive medical coverage for his job-related injuries.

1008. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

1009. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

1010. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Ovens.

207

1011. During the time that Mr. Allen worked in the kitchen, he was supervised by several of the "JOHN DOES" and "JANE DOES" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

1012. Defendant CITY OF PHILADELPHIA employees, Defendants BRANCH, LEE, "JOHN DOES" and "JANE DOES" were the correctional officers assigned to Retherm Oven areas during Mr. Allen's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

1013. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract irritation,… [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

1014. Mr. Allen was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

1015. Mr. Allen was never provided with any training in how to use toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals Plns chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

1016. Mr. Allen was never provided with any training in how to decontaminate himself after being exposed to toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

1017. Mr. Allen was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

1018. Each time Mr. Allen used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

1019. Prior to using the toxic chemicals, Mr. Allen was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

1020. During the period of time that Mr. Allen used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the kitchen, he developed skin rashes and breathing problems.

1021. In April 2013, Mr. Allen realized that there was a connection between the skin rashes and breathing problems and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

1022. In April 2013, he made several SICK CALL REQUESTS.

1023. There was no record that Mr. Allen ever saw a Defendant CORIZON employee; thus, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

1024. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

1025. By April 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

1026. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARAMARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

1027. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARAMARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals

210

such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other

toxic chemicals that Defendant ARAMARK employees provided them to clean work are-

as so that Plaintiff and similarly situated inmates would not have any medical evidence of

their injuries.

1028.  Mr. Allen's injuries were due to his long-term exposure to the toxic Ecolab Degreaser,

Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant

ARAMARK employees provided him to clean his kitchen and oven work areas.

1029.  Defendant ARAMARK did not report Mr. Allen's injuries as required by 29 CFR, Part

1904.31(a).

1030.  Mr. Allen has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). On April 15, 2013. In his two-page griev-

ance, Mr. Allen complained:

*On this day April 15th I went to work as always I was informed that it was to be an
inspection. So I went to get my cleaning supplys we have something called Kurd
Kutter it's an earth friendly cleanser. But just as I was about to use it CO. Branch
came to me and said "what are you afraid to use the degreaser?" I said to CO.
Branch it makes me itch and it burns my eyes it has also given me nose bleeds. And
her response was all "just mix it with water." I refused so she did and gave it to
me and said don't try what Evans is doing. I said what's that. She replyed that
"niggers trying to putting in a lawsuit on us." Once again the threat of my job
came in to play. As I started cleaning Jordan came pass and said don't you know
what that stuff does to you I said yeah I know. He said why you usen it? I told him
CO Branch told me to. I asked for gloves glasses & mask. CO. Branch reply was,
we ain't got none. While I sprayed it CO. Lee got to coughing and ran out of the
way saying that shit burns. Yeah I know that's why I ask for a mask and gloves.*

*Ask for gloves & glasses & gloves.*

*I wrote this grievance.*

1031. Mr. Allen has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570).  On April 25, 2013, in his two-page grievance, Mr. Allen complained:

> *I have continually ask for gloves & glasses I work in the Retherm down A1.  When ARAMARK Workers bring the food I would ask them for above articles.  I ask for them because when this Degreaser was bing sprayed it would have use coughing also burning our eyes I have rashes on my arms from using this stuff.  I have been around this Degreaser sense 7-11-12 I work the 7-3 shift Also my nostrils stay dry and scabbed Although I've put in sick call slips I've gotten no relief.  If you ask for to much or what you should have you get threaten with your job.*
>
> *Please help me in this matter[.]*
>
> *I would like to have what we ask for to keep us from harm[.]*

1032. According to the distribution notations on the form, Mr. Allen's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

1033. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Allen's grievances.

1034. By April 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

1035. Upon reasonable information and belief, Mr. Allen avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions

that the inmates have complained, they can profess ignorance of the inmates' complaints.[72]

1036.   At all times relevant hereto, Mr. Allen had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

1037.   Mr. Allen has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Allen a claim number.

1038.   Mr. Allen's medical records confirm that he made complaints about the conditions described in his April 2013 grievance.

1039.   In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Allen their names.

### Plaintiff Walter Person

1040.   Plaintiff hereby incorporates by reference, Paragraphs 1 through 1039, as though they are fully set forth herein.

1041.   During the past 12 months, Mr. Person has worked in one of the Retherm Ovens and kitchen areas at CFCF.

1042.   Mr. Person worked in the 5 or more days-a-week; he worked the 5 a.m. to 1 p.m. shift.

1043.   The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

1044.   Mr. Person was paid $22.50 every two weeks.

---

[72]This is exactly the straregy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS. *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

1045. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

1046. And, as explained herein, he did not receive medical coverage for his job-related injuries.

1047. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

1048. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to capricious disciplinary actions.

1049. Each day, he cleaned his work areas using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals; and once-a-week he cleaned the Retherm Ovens.

1050. During the time that Mr. Person worked in the kitchen, he was supervised by several of the "JOHN DOES" and "JANE DOES[73]" Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

1051. Defendant CITY OF PHILADELPHIA employees, Defendants "JOHN DOES" and "JANE DOES" were the correctional officers assigned to Retherm Oven areas during Mr. Person's shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

---

[73]Plaintiff reasonably believes and avers that one of these Defendants is named "Lorella" – a light skinned African-American female.

1052. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,... respiratory tract irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

1053. Mr. Person was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

1054. Mr. Person was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

1055. Mr. Person was never provided with any training in how to decontaminate himself after being exposed to toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

1056. Mr. Person was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that he used.

1057. Each time Mr. Person used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK employees provided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the warehouse.

1058. Prior to using the toxic chemicals, Mr. Person was not given any instructions on how to use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

1059. During the period of time that Mr. Person used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or CITY OF PHILADELPHIA employees provided him to clean his work areas and the kitchen, he developed skin rashes and breathing problems.

1060. In April 2013, Mr. Person realized that there was a connection between the skin rashes and breathing problems and his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

1061. On April 13, 2013, he made a SICK CALL REQUEST:

> *While working in the kitchen using the (degreaser) I felt a burning sensation on my arms I was wondering is they're anything that you can do to stop the burning pain.*

1062. There was no record that Mr. Person was properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.[74]

1063. However, at all times relevant hereto, there were numerous widely known first aid and treatment guidelines established by OSHA, NIH, CDC, industrial hygienist and other medical professionals that could have resulted in a proper diagnosis and the proper treatment of Plaintiff's serious medical conditions.

1064. By April 13, 2013, there was no doubt Defendant CORIZON's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

1065. Plaintiff reasonably believes and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a

---

[74]On May 12, 2013, Plaintiff was told by a CORIZON employee whom he describes as a "heavy set African-American female" that he was going to lose his job and put in the "hole" for complaining about the rash on his arms.

216

conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers such as Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

1066. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic Ecolah Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

1067. Mr. Person's injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals Defendant AR-AMARK employees provided him to clean his kitchen and oven work areas.

1068. Defendant ARAMARK did not report Mr. Person's injuries as required by 29 CFR, Part 1904.31(a).

1069.  Mr. Person has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570).  On April 14, 2013, in his grievance, Mr. Person complained:

> *I was working in the kitchen using the degreaser and I starting feeling a burning sensation on my arm and I went to sick call and after they told me it was nothing they could do for me so I asked for an outside medical attention and I was denied. They also threatened to fire me from my job in the kitchen, especially when I said I wanted to be compensated (U.S. currency $150,000 dollars) for my injuries.*

1070.  According to the distribution notations on the form, Mr. Allen's grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

1071.  To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Person's grievance.

1072.  By April 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

1073.  Upon reasonable information and belief, Mr. Person avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[75]

1074.  At all times relevant hereto, Mr. Person had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitu-

---

[75]This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, *et al.*, 12-CV-2412-LDD (E.D.Pa. 2012).

tional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

1075. Mr. Allen has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Allen a claim number.

1076. Mr. Person's medical records confirm that he made complaints about the conditions described in his April 2013 grievance.

1077. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Person their names.

## Plaintiff Warren Evans

1078. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1077, as though they are fully set forth herein.

1079. During the past 12 months, Mr. Evans has worked in one of the Retherm Ovens at CFCF.

1080. The Retherm Oven is a radiant or convection heated oven used to cook or reheat inmate meals throughout the Philadelphia Prison System.

1081. Mr. Evans worked 8 or more hours per day, 7 days-a-week.

1082. Mr. Evans was paid $22.50 every two weeks.

1083. He was never paid overtime; he was never paid for holidays; he was never given sick days; he was never given worker's compensation; he was never given a bonus; he was never given money for college tuition; he never had the opportunity to contribute to a retirement plan; he never had the opportunity to purchase stock in ARAMARK.

1084. And, as explained herein, he did not receive medical coverage for his job-related injuries.

1085. Plaintiff reasonably believes and avers, in complete deliberate indifference to his constitutional rights, he was treated worse than a worker in a foreign labor camp.

1086. If Plaintiff did not provide all the labor that the Defendants demanded, Plaintiff would be subjected to caprieious disciplinary actions.

1087. Each day, he cleaned his work areas and 5 days a week he cleaned the Retherm Ovens using the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

1088. During the time that Mr. Evans worked in the Retherm Ovens, he was supervised by several of the "JANE DOES"[76] Defendant ARAMARK employees and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

1089. On inspection days, Mr. Evans interacted with 3 or 4 Defendant ARAMARK employees[77] and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

1090. Defendant CITY OF PHILADELPHIA employees, Defendants GAINEY, MILTON and "JOHN DOES" were the correctional officers assigned to the Retherm Ovens during Mr. Evans' shifts and those Defendants knew of the dangers of Plaintiff being exposed to toxic chemicals, but turned a blind eye to those risks as part of a custom, policy and practice of exposing Plaintiff so that Defendants would not be exposed to the toxic chemicals.

1091. Even though the product labels for some of the chemicals warn of the serious "Health/Hygiene" risks such as "[d]igestive tract, eye and skin burns,… respiratory tract

---

[76]Mr. Evans has described these Defendants as being African-American and Hispanic females, and wearing "Black/Red/Green" uniforms with ARAMARK logs.

[77]Mr. Evans has described one these Defendants as named "Tiffany" and an "old lady."

irritation,... [and to] avoid breathing vapors, spray or mists" and instruct that "Personal Protection Equipment" in the form of rubber gloves, goggles and long sleeve clothing should be worn when using the product.

1092. Mr. Evans was never provided with rubber gloves, respirators, goggles and long sleeve clothing.

1093. However, Mr. Evans did demand long sleeve clothing, masks and goggles from Defendants MAY, ABELLOS, DEAN and Defendant ARAMARK's employees.

1094. When he demanded the long sleeve clothing, masks and goggles, Mr. Evans explained to each Defendant that he needed the protective clothing to protect himself from exposure the toxic chemicals.

1095. Mr. Evans showed Defendants MAY, ABELLOS, DEAN and Defendant ARAMARK's employees the burns and scaring on his hands and arms that chemicals had caused.

1096. Mr. Evans never received any masks or goggles.

1097. Mr. Evans was never provided with any training in how to use the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

1098. Mr. Evans was never provided with any training in how to decontaminate himself after being exposed to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by Defendant ARAMARK at PPS.

1099. Mr. Evans was never provided with the Material Safety Data Sheets (MSDS) for any of the toxic chemicals that be used.

1100. Each time Mr. Evans used the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals, one of Defendant ARAMARK's employees pro-

221

vided him with the toxic chemicals, or he was ordered by one of Defendants ARAMARK
or CITY OF PHILADELPHIA's employees to get the toxic chemicals from the ware-
house.

1101.  Usually, the toxic chemicals were delivered on Tuesdays, at approximately 10:00 a.m.

1102.  Prior to using the toxic chemicals, Mr. Evans was not given any instructions on how to
use the toxic chemical safely; in fact, he was not given any instructions whatsoever.

1103.  During the period of time that Mr. Evans used the toxic Ecolab Degreaser, Greasecutter
Plus or Greasestrip Plus chemicals or other toxic chemicals Defendants ARAMARK or
CITY OF PHILADELPHIA employees provided him to clean his work areas and the Re-
therm Ovens, he developed itchy and watery eyes, skin rashes, dizziness, a persistent
cough, daily nose bleeds, headaches, shortness of hreath and respiratory problems.

1104.  In January 2013, Mr. Evans realized that there was a connection between the developed
itchy and watery eyes, skin rashes, dizziness, a persistent cough, daily nose bleeds, head-
aches, shortness of hreath and respiratory problems and his long-term exposure to the
toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic
chemicals.

1105.  On January 26, 2013, he made a SICK CALL REQUEST and stated:

> *I need to see my cronic Doctor about my nose have been bleeding for over 3 weeks
> from the Degreasecutter Plus.  I work in A-1 Retherm Kitchen I clean the oven eve-
> ryday when I spray the grill and clean them without mask and glasses my nose
> bleed from inhaleing fumes – I been working A-1 Retherm from Jan – 2012 to Jan –
> 2013 one hold year.  Chemical bottle is Health Level (3).*

1106.  On February 10, 2013, he made a SICK CALL REQUEST and stated:

> *Degreaser irritate skin on both arm.  Redness and bumps (small).  Also Degreaser
> make nose bleed after spraying Degreaser on oven and grill when cleaning in Re-
> Therm Kitchen – other worker are also working under same conditions – no mask,
> no glasses and no long sleeve garment – need medical attention.*

222

1107.  On February 11, 2013. he made a SICK CALL REQUEST and stated:

> *I need to see a real doctor and not a medical nurse to assess my medical condition about nose bleeding and arms irritation (redness) from Degreaser Plus Chemical when cleaning oven and grill – A2 – Re-Therm worker also mention about Degreaser make them cough without a mask. I work at A-1 – Re-Therm. Also splashes in eyes.*

1108.  On March 4, 2013, he made a SICK CALL REQUEST and stated:

> *Degreaser splash in left eye and cause irritation and some redness – also irritation on arms from spray mist being in the air and having no protected glasses or garment on the arm in the Re-Therm kitchen when cleaning ovens and grills.*

1109.  On Mareh 5, 2013, he made a SICK CALL REQUEST and stated:

> *I need to see the eye doctor to look at my eyes for second opinion about Degreaser splashing in my eyes while working in Re-Therm kitchen – Inmate witness splashing in eye (left). I need a vision assessment because I wear reading glasses and vision is changing.*

1110.  On March 15, 2013, he made a SICK CALL REQUEST and stated:

> *Nose still bleeding from Degreaser when spraying Re-Therm Ovens And Grills. Plus arm irritation from splashing when cleaning ovens and grills without garment covering arms and no face mask for restprorator breathing & lungs.*

1111.  On March 17, 2013, hc made a SICK CALL REQUEST and stated:

> *Degreaser causing nose to bleed I'm starting to get headaches. I do not take any medicine for head pains because I haven't any before now. I do not take pain pills for head.*

1112.  On March 23, 2013, he madc a SICK CALL REQUEST and stated:

> *On 3/23/13 I got up to wash my face and hands when washing face I blow my nose and blood came out on my wash cloth. Inmate that is in my cell was up getting ready for work – witness the event. Name Clive Coley 1016810.*

1113.  On April 30, 2013, he made a SICK CALL REQUEST and stated:

> *I will be informing my attorney about this matter.*
> *My nose have been bleeding again, since 4/28/13 to 4/30/13, I was suppose to see a Medical Doctor about this situation but I was never called down to medical. According to the medical "Need To Know List" because it is not a "Lost of Limb"*

223

> *that is why I have not been seen by a Medical Doctor – that list is misleading to the health and safety of inmate.*

1114. Whenever Mr. Evans saw a Defendant CORIZON employee, he was not properly examined or tested for exposure to the toxic chemicals used by Defendant ARAMARK.

1115. In particular, on March 22, 2013, Mr. Evans went the CFCF medical unit staffed by Defendant CORIZON's employees for a serious right eye injury that Plaintiff reasonably believed was eaused by repeated splashing of toxic chemieals into his eyes; Defendant CORIZON's employees told Plaintiff that hc would be sent to WILLS EYE; to this date, Plaintiff has not becn sent to WILLS EYE, however. he is losing vision in his right eye.

1116. Typically, Defendant CORIZON's employees told Plaintiff there was nothing they could do to treat his illnesses and conditions that resulted from long-term exposure to toxic chemicals.

1117. However, at all times relevant hereto, there were numerous widely known first aid and trcatment guidelines established by OSHA, NIH, CDC, industrial hygienist and othcr medical professionals that could have resulted in a propcr diagnosis and the proper treatment of Plaintiff's serious medical conditions.

1118. By January 26, 2013, there was no doubt Defendant CORIZON's cmployecs were on notice that they had a health crisis caused by cxposure to thc toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

1119. Plaintiff reasonably bclieves and avers that the Defendant CORIZON employees who failed to properly and timely treat his serious medical condition did so in furtherance of a conspiracy Defendants CORIZON, ARAMARK, CITY OF PHILADELPHIA prison decision and policy-makers sueh as Defendants CITY OF PHILADELPHIA, GIORLA,

HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMINISTRATION, MAY and ABELLOS, Defendant CORIZON decision and policy-makers such as Defendants SILVA and KALU and whoever served in that capacity at Defendant ARA-MARK to deny Plaintiff an informed choice about his illness and medical treatment in order to hide the true source of Plaintiff's injuries.

1120. Upon reasonable belief, Plaintiff avers that Defendants CITY OF PHILADELPHIA, GIORLA, HERDMAN, DELANEY, GAINEY, DEPUTY WARDEN OF ADMIN-ISTRATION, MAY, ABELLOS, CORIZON, SILVA, KALU and other Defendant CORIZON medical staff at CFCF entered an unlawful agreement with Defendant ARA-MARK and its decision and policy makers to deny Plaintiff and similarly situated inmates who sought medical treatment for symptoms of exposure to the toxic chemicals such as toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK's employees provided them to clean work areas so that Plaintiff and similarly situated inmates would not have any medical evidence of their injuries.

1121. Mr. Evans' injuries were due to his long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals that Defendant ARAMARK's employees provided him to clean his kitchen and oven work areas.

1122. Defendant ARAMARK did not report Mr. Evans' injuries as required by 29 CFR, Part 1904.31(a).

1123. Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Prison System Inmate Grievance (Form 86-570). In his January 28, 2013 grievance, Mr. Evans complained:

*To The Warden:*

*I been working A-1 Re-Therm for over a year my job is serving the food and cleaning the Re-Therm oven when they are dirty with grime. I use Degreasecutter Plus spraying the Degreasecutter inside the oven and on the grill provided by ARA-MARK worker. The Degreaser is making my nose bleed after long use of breathing for over a year now. ARAMARK is suppose to provide work with eye glasses and mask none was given over a year now. The Degreasecutter Plus chemical is a Health Level 3 – serious. I walk to nurse and she it is ARAMARK responsibility to provide proper safety provisions. Please respond back.*

*Thank you Warren Evans.*

*ARAMARK should provide all provision when using any toxic chemical that is hazard to your health. Such as: Gloves. Glasses. Mask and apron – Health level (3).*

1124.  Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). In his March 20, 2013 grievance, Mr. Ev-

ans complained:

*To The Warden – I was release from working in the Re-Therm kitchen because of the Degrease chemical situation I need another job, that was my only income. I believe that I was fired because the chemical reports I went to see the Nurse and she said I am going to have to find another job. I have been working in the Re Therm kitchen for over a year, not one complaint sent I have been there.*

*I need another job.*

1125.  Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). In his March 23, 2013 grievance, Mr. Ev-

ans complained:

*On 3/18/13 I was fire from working in the Re-Therm kitchen because I filed a medial law suite and I warn other inmate of the danger of using the Ecolab Degreaser chemical without the proper protected gear. Such as glasses, masks, long sleeve garment and boots. I was not given another job. Why?*

*I believe this was a form of punishment because I warn other inmates of the danger of Ecolab chemical. Retaliation and discrimination Act is unjustify – if this chemical leak-out to the Mefor and news paper and Facebook about chemical it could set off a chain reaction. Read EXEKIEL 33:1-9. The Watchman.*

226

*I want another job and back pay if any is lose. If you was in my shoes what would you do*

*Don't say anything – Dumb!*

1126. Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). In his April 12, 2013 grievance, Mr. Evans

complained:

> *To The Warden,*
> *It is a prison policy to pay an inmate who is on the prison payroll, I have not re-*
> *ceived my pay for the second half of the month of March. I talked with the social*
> *worker about this matter and he checked the computer and said I was still on the*
> *payroll. I was never TERMINATED, and that I am still on payroll. Please put pay-*
> *roll money on my account. Thank you.*

1127. Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). In his April 14, 2013 grievance, Mr. Evans

complained:

> *On 4/14/13 8:30 A.M. in the morning a female officer named Lt. Dean and C.O.*
> *Miss Anderson was present, Lt. Dean was informing us (inmates) while we were*
> *eating breakfast about the new Administration Rule that would be starting on*
> *4/15/13. Lt. Dean asked all inmate that was present if they have any Question they*
> *wanted to address. I oppose the question about the prison policy of paying inmate*
> *who is on the prison payroll, I am on the payroll and I have not received any pay-*
> *ment for the second half of the month of March from the sixteenth to the first of*
> *April, every one else was payed except me. Lt. Dean said it is a prison policy to pay*
> *any inmate who have a working armband regardless if they are working or not.*
> *The reason I am not working in Re-Therm Kitchen is because of Medical issue, still*
> *they are suppose to pay me and re classify me for another job.*
>
> *I want to be payed like any other inmate who is on the C.F.CF payroll system and*
> *re Classify like everybody else who had the same medical issue and was payed and*
> *reclassify.*

1128. Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). In an April 22, 2013 grievance, Mr. Evans

complained:

> *To Commissioner: Louis Giorla:*
>
> *This grievance is in reference to a medical issue that I am experiencing within the Phila. Prison System that I think you need to be aware of...*
>
> *Approximately 4 weeks ago, I initiated a lawsuit against the Phila. Prison System due to an eye injury I received while working as a retherm worker. Coincidently, after this lawsuit was initiated, without provocation. I have serious health issues as well and I'm unable to eat the food within the system. I was placed on a special diet by the prison medical staff in which I am to receive a special health shake 3 times daily. I find it coincidental that I stopped receiving these health shakes immediately after I was terminated.*
>
> *I am requesting my health shakes as per prison policy along with my pay which I didn't receive while working as a retherm worker.*

1129. Mr. Evans has exhausted his administrative remedies by timely filing a Philadelphia Pris-

on System Inmate Grievance (Form 86-570). In another two-page grievance, Mr. Evans

complained:

> *To Commissioner: Louis Giorla:*
>
> *This grievance is in reference: to a retaliatory act by prison administration in or around the beginning of February of this year by myself for the use of a toxic chemical that is being used within the prison system. This chemical is a degreaser and stripper used in the kitchen of the PPS known as "Ecolab Degreaser & Stripper." This is my problem. I was hired as a retherm worker in the kitchen of the Phila. Prison System. while being exposed to toxic chemicals without adequate protection against such hazardous materials and chemicals. After about a year of exposure to these chemicals, I blew my nose and one day I noticed blood with mucous.*
>
> *I also sustained injury to my left eye as well. It was then that I seeked medical treatment by a prison physician in which I was denied treatment. I informed other workers about the conditions in the kitchen are. They also filed lawsuits with the prison system which then became a class action suit. I believe that I alone was the only one punished as an act of retaliation. I'm still on authorize worker under prison policy but I'm not being paid. All other workers related to this lawsuit have been reassigned other positions with the exception of myself. My attorney will also be notified of this unprofessional act of retaliation in order to advise me as to what type of compensation to be awarded.*
>
> *All I'm seeking is the pay which I deserve for the hours rendered according to period or periods worked.*

1130. According to the distribution notations on the form, Mr. Evans' grievances were distributed as follows: "1. Deputy Warden for Administration 2. Warden 3. Inmate's Receipt of Filing."

1131. To this date, neither the DEPUTY WARDEN FOR ADMINISTRATION, nor WARDEN at CFCF has responded to Mr. Evans' grievances.

1132. By late winter and Spring 2013, there was no doubt Defendant CITY OF PHILADELPHIA's employees were on notice that they had a health crisis caused by exposure to the toxic chemicals that Defendant ARAMARK's employees compel inmates to use, but simply turned a blind eye to Plaintiff's suffering.

1133. Upon reasonable information and belief, Mr. Evans avers that the DEPUTY WARDEN FOR ADMINISTRATION and WARDEN at CFCF have a custom, policy and practice of never responding to inmate grievances so that when they are sued over the conditions that the inmates have complained, they can profess ignorance of the inmates' complaints.[78]

1134. At all times relevant hereto, Mr. Evans had a constitutional rights to demand medical treatment after being injured due to long-term exposure to toxic chemicals and a constitutional rights to file a grievance and petition for redress after being injured due to long-term exposure to toxic chemicals.

1135. Mr. Evans has given notice of his claim to all Defendants to whom notice is required prior to bringing suit. The City Defendants assigned Mr. Evans a claim number.

1136. Mr. Evans' medical records confirm that he made complaints about the conditions described in his numerous grievances.

---

[78] This is exactly the strategy that Defendants GIORLA, DELANEY and GAINEY employed in the case of Williams v. CORIZON f/k/a PHS, et al., 12-CV-2412-LDD (E.D.Pa. 2012).

1137. In an attempt to conceal their identities, CORIZON employees at CFCF do not wear name tags and would not give Mr. Evans their names.

1138. At no time prior to their work in the ReTherm Ovens, Bakery Ovens, "Pit," Kitchen, Unit Management Offices and other areas through CFCF and enduring long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals used by the Defendants, did Plaintiffs have or demonstrate any of conditions, symptoms and illnesses complained of herein; for their Defendant CITY of PHILADELPHIA's employees at PPS failed to complete the required inmate injury/incident reports as part of a cover-up of Plaintiffs injuries that resulted from long-term exposure to the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other toxic chemicals.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATIONS OF CONSTITUTIONAL AMENDMENTS, CIVIL RIGHTS AND OTHER FEDERAL LAWS

1139. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1138, as though they are fully set forth herein.

1140. All Defendants, acting under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, have knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent to the constitutional, civil and other federally guaranteed rights of Plaintiffs, to wit:

   a.   Defendants were deliberately indifferent to the known hazardous conditions and the toxic Ecolab Degreaser, Greasecutter Plus or Greasestrip Plus chemicals or other

230

toxic chemicals in the ReTherm Ovens, Bakery Ovens, "Pit," Kitchen, Unit Management Offices and other areas through CFCF were Plaintiffs worked and were deliberately indifferent to Plaintiffs' serious medical conditions in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

b.    Defendants disregarded the systemic and widespread toxic and hazardous conditions in the ReTherm Ovens, Bakery Ovens, "Pit," Kitchen, Unit Management Offices and other areas through CFCF in which Plaintiffs worked in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

c.    Defendants systematically and continuous failed to follow official policies, rules warnings, guidelines and regulations, including important health and safety regulations, and maintained an unofficial custom, policy and practice that created a substantial risk to the health, safety and welfare of Plaintiffs in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

d.    Defendants knowing, intentional, willful, malicious, wanton, grossly negligent, reckless and deliberate indifference and refusal to correct the known systemic and widespread toxic and hazardous conditions in the ReTherm Ovens, Bakery Ovens, "Pit," Kitchen, Unit Management Offices and other areas through CFCF in which Plaintiffs worked constitutes deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

e.    Defendants' actions were motivated by Plaintiffs' race as evidenced by Defendant Branch's statement: *"niggers trying to putting in a lawsuit on us"* in violation the Fourteenth Amendment to the United States Constitution.

231

1141. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional eustom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## SECOND CLAIM FOR RELIEF
## MONELL CLAIM
## CITY OF PHILADELPHIA

1142. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1141, as though they are fully set forth herein.

1143. For years, Defendant CITY OF PHILADELPHIA's PPS policy makers and other decision making officials acted with deliberate indifference to the safety and medical needs of Plaintiffs while they were inmates at PPS.

1144. For years, Defendant CITY OF PHILADELPHIA's PPS policy makers and other decision making officials at PPS adopted a custom, policy and practice of willful silence and willful subjection of Plaintiff to the day-to-day malicious, reckless, negligent and deliberately indifferent treatment by Defendants ARAMARK and CORIZON and their employees that was so widespread that it became the policy of Defendant CITY OF PHILA-DELPHIA and amounted to cruel and unusual punishment.

1145. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and con-

232

tinues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

### THIRD CLAIM FOR RELIEF
### MONELL CLAIM
### DEFENDANT CORIZON

1146. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1145, as though they are fully set forth herein.

1147. As a provider of medical services at PPS, Defendant CORIZON acts under the color of state law.

1148. For years, Defendant CORIZON's policy makers and other decision making officials at PPS, including, but not limited to Defendants SILVA and KALU acted with deliberate indifference to the medical needs of Plaintiffs while they inmates at PPS.

1149. For years, Defendant CORIZON's policy makers and other decision making officials at PPS, including, but not limited to Defendants SILVA and KALU adopted a custom, policy and practice of willful silence and willful subjection of Plaintiffs to the day-to-day malicious, reckless, negligent and deliberately indifferent treatment by CORIZON and its employees that was so widespread that it became the policy of Defendant CORIZON and amounted to cruel and unusual punishment.

1150. As a result of Defendant CORIZON's policy makers and other decision making officials at PPS, including, but not limited to Defendants SILVA and KALU knowing, intentional, willful, malicious, wanton, gross negligent, reckless, deliberately indifferent conduct, custom, policy and practice of willful silence and willful subjection of Plaintiff to the day-to-day incompetent, negligent and deliberately indifferent treatment by Defendant CORIZON and its employees, Plaintiff have suffered and continues to suffer great pain

and suffering, emotional distress, mental anguish and loss of their constitutional, other federal and state rights.

### FOURTH CLAIM FOR RELIEF
### MONELL CLAIM
### DEFENDANT ARAMARK

1151. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1150, as though they are fully set forth herein.

1152. As alleged herein, as a provider of food and related services at PPS, Defendant ARA-MARK has conspired with other Defendants acting under the color of state law, including, but not limited to Defendants SILVA, KALU, WHITTAKER, MOORE, MAY, DEAN, BALMORE, BROWN, GRAHAM and ADAMS.

1153. For years, Defendant ARAMARK's policy makers and other decision making officials at PPS, including, but not limited to Defendants FLAHERTY, ROSS, "MAKEBBA," and LEMON acted with deliberate indifference to the health and safety needs of Plaintiffs while they were inmates at PPS.

1154. For years, Defendant ARAMARK's policy makers and other decision making officials at PPS, including, but not limited to, Defendants FLAHERTY, ROSS, "MAKEBBA," and LEMON adopted a custom, policy and practice of willful silence and willful subjection of Plaintiffs to the day-to-day malicious, reckless, negligent and deliberately indifferent treatment by ARAMARK and its employees that was so widespread that it became the policy of Defendant ARAMARK and amounted to cruel and unusual punishment.

1155. As a result of Defendant ARAMARK's policy makers and other decision making officials at PPS, including, but not limited to, Defendants SILVA and KALU knowing, intentional, willful, malicious, wanton, gross negligent, reckless, deliberately indifferent con-

duct, custom, policy and practice of willful silence and willful subjection of Plaintiff to the day-to-day incompetent, negligent and deliberately indifferent treatment by Defendant ARAMARK and its employees, Plaintiff have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, other federal and state rights.

### FIFTH CLAIM FOR RELIEF
### FAILURE TO SUPERVISE PPS EMPLOYEES AND PRIVATE CONTRACTORS
### CITY OF PHILADELPHIA

1156. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1155, as though they are fully set forth herein.

1157. Defendant CITY OF PHILADELPHIA has been on notice of acts of deliberate indifference by its employees and private contractors at PPS for many years.

1158. Defendant CITY OF PHILADELPHIA has knowingly, wrongfully, willfully, maliciously, wantonly, grossly negligent and indifferently failed to supervise its employees and private contractors at PPS for many years, or take any meaningful corrective action even though he could have by simply complying with the constitution, implementing additional training, implementing different disciplinary practices, implementing different hiring and firing practices, providing effective supervision and not covering up or ignoring past misconduct against PPS inmates and other official misconduct by its employees and private contractors at PPS for many years.

1159. In this case, Defendant CITY OF PHILADELPHIA's knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent to Plaintiffs' rights failed to properly supervise its employees and private contractors is the mov-

235

ing force behind the violations and injuries alleged by Plaintiffs and amounted to cruel and unusual punishment.

1160. As a result of Defendant's knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## SIXTH CLAIM FOR RELIEF
## FAILURE TO SUPERVISE – CORIZON

1161. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1160, as though they are fully set forth herein.

1162. Defendant CORIZON and its policy and decision makers have been on notice of acts of deliberate indifference and negligence by CORIZON and the individually named medical professionals at PPS for many years.

1163. Defendant CORIZON and its policy and decision makers have knowingly, wrongfully, willfully, maliciously, wantonly, grossly negligent and indifferently failed to supervise its employees or take any meaningful corrective action even though it could have by simply complying with the constitution, implementing additional training, implementing different disciplinary practices, implementing different hiring and firing practices, providing effective supervision and not covering up or ignoring past misconduct against PPS inmates and other official misconduct by PHS employees.

1164. In this case, Defendant CORIZON and its policy and decision makers' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately

indifferent Plaintiffs' rights failed to properly supervise CORIZON and the individually named medical professionals and other medical staff at PPS amounted to cruel and unusual punishment.

1165. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, reeklessly and deliberately indifferent actions under the eolor of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their eonstitutional, civil, other federal and state rights.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

1166. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1165, as though they are fully set forth herein.

1167. Defendants CITY OF PHILADELPHIA, CORIZON and the individually named medical professionals entered into contracts to provide medical services to Plaintiffs.

1168. Plaintiffs were a direct party or a third party heneficiary to the contracts between Defendants CITY OF PHILADELPHIA, CORIZON and the individually named medical professionals.

1169. Defendants CITY OF PHILADELPHIA, CORIZON and the individually named medical professionals have, without legal justification, knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent to Plaintiffs' rights failed to provide medical serviccs without deliberate iudifference to Plaintiffs' constitutional rights.

1170. Defendants CITY OF PHILADELPHIA, CORIZON and the individually named medical professionals' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## EIGHTH CLAIM FOR RELIEF
## STATE CREATED DANGER
## CITY OF PHILADELPHIA

1171. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1170, as though they are fully set forth herein.

1172. Defendant CITY OF PHILADELPHIA was responsible for the health, safety, well-being and provision of health care to Plaintiffs while they were prisoners at PPS.

1173. Defendant CITY OF PHILADELPHIA contracted with Defendant CORIZON to provide health care services that Defendant CITY OF PHILADELPHIA knew or should have known Defendant CORIZON was not qualified to provide or would not provide in a lawful manner.

1174. Defendant CITY OF PHILADELPHIA contracted with Defendant ARAMARK to provide food and related services that Defendant CITY OF PHILADELPHIA knew or should have known Defendant ARAMARK was not qualified to provide or would not provide in a lawful manner.

1175. Defendant CITY OF PHILADELPHIA expressly or tacitly agreed to act and did expressly or tacitly act under the color of state law, knowingly, intentionally, willfully, mali-

238

ciously, wantonly, grossly negligent, recklessly and with deliberate indifference, in concert and conspiracy with each other and others to violate Plaintiffs' constitutional rights as stated herein.

1176. As stated throughout this Complaint, Plaintiffs were harmed by Defendant CORIZON and its employees' failure provide proper medical treatment; the harm ultimately caused to Plaintiffs was foreseeable and fairly direct because Defendant CORIZON acted in willful disregard for Plaintiffs' safety; and Defendant CORIZON used its authority to create an opportunity for danger that otherwise would not have existed but for Defendant CITY OF PHILADELPHIA contracting with Defendant CORIZON.

1177. As stated throughout this Complaint, Plaintiffs were harmed by Defendant ARAMARK and its employees' failure provide proper food services and related services and to exploit Plaintiffs for private profit; the harm ultimately caused to Plaintiffs was foreseeable and fairly direct because Defendant ARAMARK acted in willful disregard for Plaintiffs' safety; and Defendant ARAMARK used its authority to create an opportunity for danger that otherwise would not have existed but for Defendant CITY OF PHILADELPHIA contracting with Defendant ARAMARK.

1178. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

### NINTH CLAIM FOR RELIEF
### STATE TORT LAW CLAIMS – NEGLIGENCE

## CORIZON

1179.  Plaintiff hereby incorporates by reference, Paragraphs 1 through 1178, as though they are fully set forth herein.

1180.  Defendant CORIZON and its employees at PPS had a duty to comply with generally accepted standards of care in their medical evaluations and treatment of Plaintiffs.

1181.  In negligently examining and treating Plaintiffs, CORIZON and its employees at PPS violated their duty of care to Plaintiffs.

1182.  Defendant CORIZON and its employees at PPS violations of their duty of care to Plaintiff was a direct and proximate cause and a substantial factor in bringing about Plaintiffs' damages outlined above, and, as a result, Defendants are liable to Plaintiffs.

1183.  Because the individually-named Defendants were employees of Defendant CORIZON and its employees at PPS and were acting as agents, servants, and/or employees of Defendant CORIZON and were acting within the scope and course of their employment, and under the direct control and supervision of Defendant CORIZON and its policy and decision makers, Defendant CORIZON is liable an on the basis of *respondeat superior* liability.

1184.  As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

### TENTH CLAIM FOR RELIEF
### STATE TORT LAW CLAIMS – NEGLIGENCE

240

### ARAMARK

1185. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1184, as though they are fully set forth herein.

1186. Defendant ARAMARK and its employees at PPS had a duty to comply with generally accepted standards of care in their medical evaluations and treatment of Plaintiffs.

1187. In negligently examining and treating Plaintiffs, ARAMARK and its employees at PPS violated their duty of care to Plaintiffs.

1188. Defendant ARAMARK and its employees at PPS violations of their duty of care to Plaintiff was a direct and proximate cause and a substantial factor in bringing about Plaintiffs' damages outlined above, and, as a result, Defendants are liable to Plaintiffs.

1189. Because the individually-named Defendants were employees of Defendant ARAMARK and its employees at PPS and were acting as agents, servants, and/or employees of Defendant ARAMARK and were acting within the scope and course of their employment, and under the direct control and supervision of Defendant ARAMARK and its policy and decision makers, Defendant ARAMARK is liable an on the basis of *respondeat superior* liability.

1190. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

### ELEVENTH CLAIM FOR RELIEF
### RETALIATION – ARAMARK

241

1191. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1190, as though they are fully set forth herein.

1192. After Plaintiffs were treated with deliberate indifference and not provided protective clothing and proper medical treatment by Defendant ARAMARK and its employees, they made verbal complaints, filed written grievances and put ARAMARK and its employees on Notice of Intent To Sue.

1193. By making verbal complaints, filing written grievance and putting Defendant ARA-MARK and its employees on Notice of Intent To Sue, Plaintiffs engaged in constitutionally protected activity under the First, Fifth and Fourteenth Amendments to the United States Constitution.

1194. Defendant ARAMARK and its employees malicious and recklessly retaliated against Plaintiffs and maliciously and recklessly denied them protective clothing, threatened and fired them for making verbal complaints, filing written grievance and putting Defendant ARAMARK and its employees on Notice of Intent To Sue.

1195. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## TWELFTH CLAIM FOR RELIEF
### RETALIATION – CITY OF PHILADELPHIA

1196. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1195, as though they are fully set forth herein.

242

1197. After Plaintiffs were treated with deliberate indifference and not provided protective clothing and proper medical treatment by Defendant CITY OF PHILADELPHIA and its employees, they made verbal complaints, filed written grievances and put CITY OF PHILADELPHIA and its employees on Notice of Intent To Sue.

1198. By making verbal complaints, filing written grievance and putting Defendant CITY OF PHILADELPHIA and its employees on Notice of Intent To Sue, Plaintiffs engaged in constitutionally protected activity under the First, Fifth and Fourteenth Amendments to the United States Constitution.

1199. Defendant CITY OF PHILADELPHIA and its employees malicious and recklessly retaliated against Plaintiffs and recklessly denied them protective clothing, medical care, threatened and fired them for making verbal complaints, filing written grievance and putting Defendant CITY OF PHILADELPHIA and its employees on Notice of Intent To Sue.

1200. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

### THIRTEENTH CLAIM FOR RELIEF
### RETALIATION – CORIZON

1201. Plaintiff hereby incorporates by reference, Paragraphs 1 through 1200, as though they are fully set forth herein.

1202. After Plaintiffs were treated with deliberate indifference and not provided proper medical treatment by Defendant CORIZON, its medical staff and contractors, they made verbal complaints, filed written grievances and put Defendant CORIZON on Notice of Intent To Sue.

1203. By making verbal complaints, filing written grievance and putting Defendant CORIZON on Notice of Intent To Sue, Plaintiffs engaged in constitutionally protected activity under the First, Fifth and Fourteenth Amendments to the United States Constitution.

1204. Defendant CORIZON malicious and recklessly retaliated against Plaintiffs and recklessly threatened and denied them medical care as result of them making verbal complaints, filing written grievance and putting Defendant CORIZON on Notice of Intent To Sue.

1205. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## FOURTEENTH CLAIM FOR RELIEF
## DENIAL OF DUE PROCESS – CITY OF PHILADELPHIA

1206. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1205, as though they are fully set forth herein.

1207. After Plaintiffs filed their grievances, they had a statutory and constitutional right to have their grievances fully investigated and processed by Defendants CITY OF PHILADEL-PHIA, DEPUTY WARDEN FOR ADMINISTRATION and DELANEY.

244

1208. Defendants CITY OF PHILADELPHIA, DEPUTY WARDEN FOR ADMINISTRA-
TION and DELANEY knowingly, intentionally, willfully, maliciously, wantonly, grossly
negligent, recklessly and deliberately indifferently to rights of Plaintiffs agreed to act in
concert with Defendants ARAMARK and CORIZON failed to properly investigate and
process Plaintiffs' grievances which was an act to cover-up the violations of Plaintiffs'
constitutional rights as set forth herein.

1209. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly,
grossly negligent, recklessly and deliberately indifferent actions under the color of state
law or in unlawful agreement and concert with those acting under the color of state, pur-
suant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and con-
tinues to suffer great pain and suffering, emotional distress, mental anguish and loss of
their constitutional, civil, other federal and state rights.

### FIFTEENTH CLAIM FOR RELIEF
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ALL DEFENDANTS

1210. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1210, as though they are
fully set forth herein.

1211. All Defendants' conduct was grossly reckless and beyond the bounds of conduct tolerated
in a civilized society, even in a prison environment because all Defendants caused Plain-
tiffs' physical injuries, pain and suffer and/or were on notice of Plaintiffs' physical inju-
ries, pain and suffering and were deliberately indifferent to Plaintiffs' physical injuries,
pain and suffering turned a blind eye and allowed Plaintiffs to endure pain and suffering
for an long period of time.

1212. Such conduct was outrageous and grossly reckless conduct includes, but is not limited to,
knowing, intentional, willful, malicious, wanton, grossly negligent, reckless and deliber-

ate indifference and refusal to correct the known systemic and widespread toxic and hazardous conditions in the ReTherm Ovens, Bakery Ovens, "Pit," Kitchen, Unit Management Offices and other areas through CFCF in which Plaintiffs worked; threatening and retaliating against Plaintiffs; engaging in a custom, policy and practice of willful silence and willful subjection of Plaintiff to the day-to-day malicious, reckless, negligent and deliberately indifferent treatment; denying Plaintiffs prompt and adequate medical treatment and disregarding; systematieally and continuously failing to follow official policies, rules warnings, guidelines and regulations, including important health and safety regulations, and maintained an unoffieial custom, policy and practice that created a substantial risk to the health, safety and welfare of Plaintiffs; and exploiting Plaintiffs for private profit.

1213. As a result of Defendants' outrageous, knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## SIXTEENTH CLAIM FOR RELIEF
## MEDICAL MONITORING
## ALL DEFENDANTS

1214. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1213, as though they are fully set forth herein.

1215. Plaintiffs have been significantly exposed to known and proven toxic chemicals through Defendants' knowing, intentional, willfully, malicious, wanton, grossly negligent, reckless and deliberately indifferent concerted conduct.

246

1216. As a proximate cause of the significant exposure to known and proven toxic chemicals, Plaintiffs suffer significantly increased risks of developing serious, latent diseases.

1217. These increased risks make periodic diagnostic medical examinations reasonably necessary.

1218. Monitoring and testing procedures exist which make the early detection and treatment of disease possible and beneficial.

1219. Defendants' actions and omissions render them liable to pay all costs of a comprehensive court-supervised medical monitoring program to provide diagnostic and treatment services for the benefit of Plaintiffs.

1220. As a result of Defendants' knowingly, intentionally, willfully, maliciously, wantonly, grossly negligent, recklessly and deliberately indifferent actions under the color of state law or in unlawful agreement and concert with those acting under the color of state, pursuant to an unconstitutional custom, policy and practice, Plaintiffs have suffered and continues to suffer great pain and suffering, emotional distress, mental anguish and loss of their constitutional, civil, other federal and state rights.

## VI. DEMANDS FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, JUDGMENT, DAMAGES AND PUNITIVE DAMAGES

1221. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1220, as though they are fully set forth herein.

1222. On all Claims For Relief, Plaintiffs demand judgment in their favor and a finding that they have suffered substantial and continuing injuries, declare Defendants' actions unconstitutional and enjoin Defendants from subjecting Plaintiffs to further injury to their person and their constitutional rights.

247

1223. On all Claims For Relief, Plaintiffs demand judgment in their favor pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986 and 1988; and the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, other constitutional provisions, federal statutes and state tort laws.

1224. On all Claims for Relief, Plaintiffs demand judgment in their favor and damages in an amount not less than $150,000.00 on all claims for relief, and reasonable attorney's fees, costs, expenses and interest.

1225. On all Claims For Relief, Plaintiffs demand judgment in their favor and punitive damages in an amount not less than $150,000.00 on all claims for relief, and reasonable attorney's fees, costs, expenses and interest because Defendants' actions exceeded the normal standards of decent conduct and were reckless, malicious, willful, oppressive, outrageous, unjustifiable and did not serve any penological interest.

1226. Plaintiffs demand other just relief as the Court may award.

## VII.  DEMAND FOR JURY TRIAL

1227. Plaintiffs hereby incorporate by reference, Paragraphs 1 through 1226, as though they are fully set forth herein.

1228. On all facts and claims for relief asserted, Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs demand declaratory relief, injunctive relief, judgment, damages and punitive damages on all facts and claims for relief herein asserted, and upon injunctive relief and/or judgment, reasonable attorney's fees, all costs, expenses and interest.

Respectfully submitted,

*s/ Geoffrey V. Seay*

Geoffrey V. Seay, Esquire
Attorney at Law
1315 Walnut Street, Suite 602
Philadelphia, PA 19107
Attorney For Plaintiffs
(215) 893-1480
(215) 893-1483 (Fax)
seaylaw@aol.com
May 16, 2013

249

## CERTIFICATE OF SERVICE

I, Geoffrey V. Seay, Esquire, on this 16th day of May 2013, under pains and penalties of

perjury, hereby certify that I personally served a *Courtesy Copy* of Plaintiffs' Complaint upon

the below listed persons by **e-Mail** or **HAND**.

Craig Straw, Esquire
Deputy City Solicitor
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
Counsel For CITY OF PHILADELPHIA

Stephen E. Siegrist, Esquire
O'CONNOR KIMBALL LLP
Attorneys at Law
51 Haddonfield Road, Suite 330
Cherry Hill, NJ 08002-4805
Counsel For CORIZON

Thomas J. McKenzie, Jr., Esquire
MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
Attorneys at Law
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Counsel For ARAMARK

Respectfully submitted,

*s/ Geoffrey V. Seay*

Geoffrey V. Seay, Esquire
Attorney at Law
1315 Walnut Street, Suite 602
Philadelphia, PA 19107
Attorney For Plaintiffs
(215) 893-1480
(215) 893-1483 (Fax)
seaylaw@aol.com
May 16, 2013